**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**VERIFIED COMPLAINT FOR COMPENSATORY, STATUTORY, AND PUNITIVE DAMAGES, DECLARATORY JUDGMENT, AND INJUNCTIVE RELIEF**

---

**CASE NO.:** Unassigned
**JUDGE:** Unassigned
**DOC ID:** 1109-JES-V-DC-COMP-2026
**DATE:** November 9, 2026

---

Case: 1:26–cv–04019 JURY DEMAND
Assigned To : Unassigned
Assign. Date : 11/9/2026
Description: TRO/Prelim. Inj. (D–DECK)

**JOHN EARLE SULLIVAN,**
**1221 West Erda Way**
**Erda, UT 84074**
**Tel: (435) 841-7258**
**Email: johne.sullivan@outlook.com**
*Plaintiff,*
v.
**DISTRICT OF COLUMBIA,**
*a municipal corporation,*
**c/o Mayor of the District of Columbia**
**John A. Wilson Building, 1350 Pennsylvania Avenue NW, Suite 327**
**Washington, DC 20004**
**c/o Office of the Attorney General for the District of Columbia**
**400 6th Street NW, 10th Floor**
**Washington, DC 20001**
**D.C. Central Detention Facility, 1901 D Street SE**
**Washington, DC 20003**
**Tel: (202) 673-7316**
**Email: oag@dc.gov**
*Defendant;*
and
**UNITY HEALTH CARE, INC.,**
*a District of Columbia corporation,*
**1100 New Jersey Avenue SE, Suite 500**
**Washington, DC 20003**
**D.C. Central Detention Facility Medical Unit, 1901 D Street SE**
**Washington, DC 20003**
**Tel: (202) 469-4699**
**Email: rpayne@unityhealthcare.org**
*Defendant;*
and
**THOMAS FAUST,**
*in his individual and official capacities as Director of the District of Columbia Department of Corrections,*
**D.C. Department of Corrections Headquarters, 2000 14th Street NW, 7th Floor**
**Washington, DC 20009**
**D.C. Central Detention Facility, 1901 D Street SE**
**Washington, DC 20003**
**Tel: (202) 673-7316**
**Email: thomas.faust@dc.gov**
*Defendant;*
and
**ANDREW PAUL MAZZUCHELLI,**
*in his individual and official capacities as Deputy General Counsel and General Counsel of the District of Columbia Department of Corrections (U.S.D.C. D.D.C. Bar No. 7647430),*
**D.C. Department of Corrections Office of the General Counsel, 3924 Minnesota Avenue NE, 2nd Floor**
**Washington, DC 20019**
**1831 1st Street NW, Unit #3**
**Washington, DC 20001**
**Tel: (202) 671-2064**
**Email: andrew.mazzuchelli@dc.gov**
*Defendant;*
and
**SHEILA MARR,**
*in her individual and official capacities as Correctional Major and Inmate Grievance Coordinator at the Central Detention Facility,*
**223 42nd Street NE**
**Washington, DC 20019**
**D.C. Central Detention Facility, 1901 D Street SE**
**Washington, DC 20003**
**Tel: (202) 523-7038**
**Email: sheila.marr@dc.gov**
*Defendant;*
and
**ANTHONY BROWN SR.,**
*in his individual and official capacities as Lieutenant and Restrictive Housing Supervisor at the Central Detention Facility,*
**D.C. Central Detention Facility, 1901 D Street SE**
**Washington, DC 20003**
**Forestville, MD 20747**
**Tel: (202) 710-8754**
**Email: anthony.brown@dc.gov**
*Defendant;*
and
**DELONTE WILLIAMS,**
*in his individual and official capacities as Lieutenant (former Sergeant) at the Central Detention Facility,*
**7640 Allendale Circle**
**Hyattsville, MD 20785**
**3741 Donnell Drive, Apartment 203**
**Forestville, MD 20747**
**D.C. Central Detention Facility, 1901 D Street SE**
**Washington, DC 20003**
**Tel: (202) 560-9655**
**Email: delonte.williams@dc.gov**
*Defendant;*
and
**CUTHBERT DENTON,**
*in his individual and official capacities as former Housing Unit Manager and Correctional Officer at the Central Detention Facility,*
**1830 Tiger Lily Circle, #25**
**Woodbridge, VA 22192**
**D.C. Central Detention Facility, 1901 D Street SE**
**Washington, DC 20003**
**Tel: (703) 475-3629**
**Email: nowsenditall2me@gmail.com**
*Defendant;*
and
**CHRISTINA WHITEHEAD,**
*in her individual and official capacities as Correctional Officer and Housing Unit Manager at the Central Detention Facility,*
**310 Dateleaf Avenue**
**Capitol Heights, MD 20743**
**D.C. Central Detention Facility, 1901 D Street SE**
**Washington, DC 20003**
**Tel: (202) 673-7316**
**Email: christina.whitehead@dc.gov**
*Defendant;*
and
**CORTNEY SAVAGE,**
*in her individual and official capacities as Correctional Program Specialist and PREA Compliance Manager at the Central Detention Facility,*
**7355 Malcoms Ridge Place**
**La Plata, MD 20646**
**D.C. Central Detention Facility, 1901 D Street SE**
**Washington, DC 20003**
**Tel: (240) 346-6080**
**Email: cortney.savage@dc.gov**
*Defendant;*
and
**ANJU MENON, M.D.,**
*in her individual and official capacities as Psychiatrist and Behavioral Health Medical Provider,*
**2001 Beacon Place**
**Reston, VA 20191**
**D.C. Central Detention Facility Medical Unit, 1901 D Street SE**
**Washington, DC 20003**
**Unity Health Care, Inc., 1100 New Jersey Avenue SE, Suite 500**
**Washington, DC 20003**
**Tel: (703) 268-5001**
**Email: amenon@unityhealthcare.org**
*Defendant;*
and
**RODERICK I. WELLINGTON, Ph.D., LCPC, NCC, CFC,**
*in his individual and official capacities as Discipline Director of Behavioral Health, Psychologist, and Licensed Clinical Professional Counselor (NPI 1336535319),*
**300 Morse Street NE, Apt. 1005**
**Washington, DC 20002**
**Maryland Parole Commission, 6776 Reisterstown Road, Suite 307**
**Baltimore, MD 21215**
**D.C. Central Detention Facility, 1901 D Street SE, Room 320**
**Washington, DC 20003**
**Tel: (301) 577-3825**
**Email: roderick.wellington@maryland.gov**
*Defendant;*
and
**JOHN AND JANE DOES 1–50,**
*in their individual and official capacities as unidentified correctional officers, supervisors, case managers, grievance coordinators, mailroom and property staff, and contracted medical, psychiatric, dental, and health-information personnel,*
**D.C. Central Detention Facility, 1901 D Street SE**
**Washington, DC 20003**
**Tel: (202) 673-7316**
**Email: doc@dc.gov**
*Defendants.*

---

**ORIGINAL CIVIL ACTION & DEMAND FOR JURY TRIAL**

---

RECEIVED
NOV 09 2206
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

# TABLE OF CONTENTS

**Table Of Authorities** . . . 5

*PRELIMINARY STATEMENT* . . . 8

**Article I. Jurisdiction And Venue** . . . **14**

**Article II. Parties** . . . **19**

*I. PLAINTIFF* . . . 19

*II. MUNICIPAL AND CORPORATE ENTITY DEFENDANTS* . . . 22

*III. SUPERVISORY AND CUSTODIAL DEFENDANTS* . . . 23

*IV. CONTRACTED HEALTHCARE DEFENDANTS* . . . 28

*V. UNIDENTIFIED CUSTODIAL, ADMINISTRATIVE, AND HEALTHCARE DEFENDANTS (JOHN AND JANE DOES 1–50)* . . . 30

**Article III. Satisfaction Of Conditions Precedent** . . . **34**

**Article IV. Factual Allegations** . . . **35**

*I. PLAINTIFF'S CUSTODIAL COMMITMENT AT THE CENTRAL DETENTION FACILITY, FULL UNCONDITIONAL PRESIDENTIAL PARDON, APPELLATE VACATUR, AND DISMISSAL WITH PREJUDICE* . . . 35

*II. UNLAWFUL 23-HOUR-PER-DAY PUNITIVE SOLITARY CONFINEMENT, INVOLUNTARY SEGREGATED HOUSING BEYOND THE 30-DAY PREA CEILING, AND ENVIRONMENTAL DEPRIVATION IN HOUSING UNITS SW-1 AND NE-1* . . . 39

*III. SYSTEMIC MEDICAL, PSYCHIATRIC, NEUROLOGICAL, AND PHYSICAL HEALTH ABANDONMENT, SEVENTEEN UNANSWERED SICK CALL REQUESTS, AND FRAUDULENT MAR / EHR MANIPULATION* . . . 49

*IV. INMATE SHOWER THREAT, FAILURE TO PROTECT, AND RETALIATORY SOLITARY PLACEMENT (OIS PREA CASE 2024-0001)* . . . 69

*V. UNCONSTITUTIONAL OUTGOING MAIL BLACKOUT, INTERFERENCE WITH FAMILY CORRESPONDENCE, AND DENOMINATIONAL RELIGIOUS BURDEN* . . . 76

*VI. RACE-BASED AND POLITICAL-AFFILIATION CUSTODIAL SEGREGATION, ARBITRARY DENIAL AND SHACKLING DURING VISITATIONS AND LEGAL VISITS, AND CONFISCATION OF PERSONAL CLOTHING, CUPS, FOOD, PAPER, AND WRITING MATERIALS* . . . 79

*VII. POST-RELEASE ELECTRONIC HEALTH INFORMATION (EHI) BLOCKING AND UNAUTHORIZED MENTAL HEALTH INFORMATION DISCLOSURES* . . . 86

*VIII. SUMMARY OF COMPENSATORY, STATUTORY, AND PUNITIVE DAMAGES ACROSS ALL SIXTEEN CAUSES OF ACTION* . . . 88

**Article V. Claims For Relief** . . . **96**

**Count I: Deprivation Of Constitutional Rights, Unconstitutional Solitary Confinement, And Municipal Monell Liability (42 U.S.C. § 1983; U.S. Const. Amends. V, VIII)** . . . **96**

**Count II: Deliberate Indifference To Serious Medical, Psychiatric, Neurological, And Physical Health Needs, And Statutory Psychotropic Severance (42 U.S.C. § 1983; U.S. Const. Amends. V, VIII; D.C. Code § 7-1231.08)** . . . **100**

**Count III: First Amendment Retaliation, Failure To Protect From Inmate Violence, And Retaliatory Solitary Confinement (42 U.S.C. § 1983; U.S. Const. Amends. I, V, VIII; D.C. Code § 24-211.02)** . . . **108**

**Count IV: Unlawful Custodial Mail Censorship And Outgoing Correspondence Blackout (42 U.S.C. § 1983; U.S. Const. Amends. I, V)** . . . **113**

**Count V: Substantial Burden On Religious Exercise And Denominational Discrimination (Rfra, 42 U.S.C. §§ 2000BB-1(A)–(C), 2000Bb-2(1); Rluipa, 42 U.S.C. § 2000CC-1(A); U.S. Const. Amend. I)** . . . **115**

**COUNT VI: RACE-BASED AND POLITICAL-AFFILIATION CUSTODIAL SEGREGATION, PRIVATE CONTRACTOR IMPAIRMENT, AND D.C. HUMAN RIGHTS ACT DISCRIMINATION (42 U.S.C. §§ 1981(A)–(C), 1983, 1985(3), 1986; U.S. CONST. AMEND. V; D.C. CODE §§ 2-1402.73, 2-1403.16)** . . . . . 119

**COUNT VII: UNCONSTITUTIONAL INVOLUNTARY SEGREGATED HOUSING BEYOND THE 30-DAY PREA CEILING, RETALIATORY PROTECTIVE CUSTODY, AND NEGLIGENCE PER SE (42 U.S.C. § 1983; U.S. CONST. AMENDS. I, V, VIII; D.C. CODE § 24-211.02; D.C. COMMON LAW; 34 U.S.C. §§ 30301, 30307 & 28 C.F.R. §§ 115.43, 115.68 AS PREDICATE CONSTITUTIONAL AND STATUTORY STANDARDS OF CARE)** . . . . . 124

**COUNT VIII: DISABILITY DISCRIMINATION AND FAILURE TO ACCOMMODATE UNDER TITLE II OF THE ADA AND SECTION 504 OF THE REHABILITATION ACT (42 U.S.C. § 12132; 29 U.S.C. § 794; D.C. CODE § 24-211.02(A), (B)(1)–(5), (B)(9))** . . . . . 128

**COUNT IX: BAD-FAITH GRIEVANCE THWARTING, ADMINISTRATIVE OBSTRUCTION, FIRST AND FIFTH AMENDMENT PETITION AND DUE PROCESS VIOLATIONS, AND NEGLIGENCE PER SE / EVIDENTIARY SPOLIATION (42 U.S.C. § 1983; U.S. CONST. AMENDS. I, V; D.C. CODE § 24-211.02; D.C. COMMON LAW; D.C. CODE § 22-723(A)–(B) & DCDOC PP 4030.1N AS PREDICATE CONSTITUTIONAL AND STATUTORY STANDARDS OF CARE)** . . . . . 132

**COUNT X: ELECTRONIC HEALTH INFORMATION (EHI) ACCESS BLOCKING, UNSIGNED "ON HOLD" EHR MANIPULATION, AND AUDIT PURGE — VIOLATIONS OF THE D.C. MENTAL HEALTH INFORMATION ACT, D.C. CONSUMER PROTECTION PROCEDURES ACT, 42 U.S.C. § 1983, AND NEGLIGENCE PER SE (D.C. CODE §§ 7-1201.02, 7-1205.01, 7-1205.04, 7-1205.05, 7-1206.01, 7-1207.01; D.C. CODE §§ 28-3904(E), (E-1), (F), (F-1), (R)(5), 28-3905(K)(1)–(2); 42 U.S.C. § 1983; U.S. CONST. AMENDS. I, V; D.C. COMMON LAW; 42 U.S.C. §§ 1320D-5(A)(3), 300JJ-52(B)(2)(A) & 45 C.F.R. §§ 164.524(A)(1), (B)(2)(I), 160.404(B)(2)(IV) AS PREDICATE STATUTORY AND REGULATORY STANDARDS OF CARE)** . . . . . 136

**COUNT XI: UNLAWFUL CUSTODIAL RESTRAINT IN SOLITARY AND INTAKE LOCKDOWN DEFYING MEDICAL CLEARANCE ORDERS, SUBSTANTIVE DUE PROCESS LIBERTY DEPRIVATION, FALSE IMPRISONMENT, AND UNJUST IMPRISONMENT (42 U.S.C. § 1983; U.S. CONST. AMENDS. V, VIII; D.C. CODE § 2-423.02; D.C. COMMON LAW)** . . . . . 141

**COUNT XII: VIOLATION OF THE DISTRICT OF COLUMBIA MENTAL HEALTH INFORMATION ACT (D.C. CODE §§ 7-1201.02, 7-1205.01, 7-1206.01, 7-1207.01(A)–(C), 7-1207.02(A)–(B))** . . . . . 146

**COUNT XIII: UNCONSTITUTIONAL CUSTODIAL PROPERTY CONFISCATION AND DEPRIVATION, BREACH OF MINISTERIAL CUSTODIAL BAILMENT, AND NEGLIGENCE PER SE (42 U.S.C. § 1983; U.S. CONST. AMEND. V; D.C. CODE §§ 24-211.02(A), (B)(5), 24-211.02A(C)(2)–(3); D.C. COMMON LAW; 31 U.S.C. §§ 3723(A)–(C), 3724(A) & DCDOC PP 4050.1I AS PREDICATE CONSTITUTIONAL AND STATUTORY STANDARDS OF CARE)** . . . . . 148

**COUNT XIV: COMMON-LAW CONVERSION, TRESPASS TO CHATTELS, AND UNLAWFUL DETENTION OF PERSONAL CLOTHING, CUPS, FOOD, PAPER, WRITING MATERIALS, AND PERSONAL PROPERTY (D.C. CODE §§ 15-109, 28-3302; RESTATEMENT (SECOND) OF TORTS SECTIONS 222A, 927)** . . . . . 152

**COUNT XV: UNLAWFUL CUSTODIAL VISITATION DEPRIVATIONS AND FULL SHACKLING DURING VISITATIONS AND LEGAL VISITS (D.C. CODE § 24-211.02(A), (B)(3))** . . . . . 154

**COUNT XVI: INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS, NEGLIGENCE PER SE, AND PREDICATE CONSTITUTIONAL VIOLATIONS FOR VULNERABLE AND CAPTIVE ADULT ABUSE AND NEGLECT (D.C. COMMON LAW; D.C. CODE § 24-211.02; 42 U.S.C. § 1983; U.S. CONST. AMENDS. V, VIII; D.C. CODE §§ 22-932(5), 22-933, 22-934, 22-936 AS STATUTORY STANDARDS OF CARE AND PREDICATE VIOLATIONS)** . . . . . 157

**ARTICLE VI. PRAYER FOR RELIEF** . . . . . 163

*I. DECLARATORY DECREES AND RIGHTS ADJUDICATIONS (28 U.S.C. §§ 2201–2202 & FED. R. CIV. P. 57)* . . . . . 164

*II. PROVISIONAL, COERCIVE, POSSESSORY, AND PERMANENT INJUNCTIVE DECREES (FED. R. CIV. P. 65(D))* . . . . . 177

*III. EQUITABLE RESTITUTION, CONSTRUCTIVE TRUSTS, SPECIFIC PERFORMANCE, AND STRUCTURAL REMEDIES (FED. R. CIV. P. 53, 64, & 66)* . . . . . 184

*IV. COMPENSATORY, ECONOMIC, NON-ECONOMIC, CONSEQUENTIAL, AND SPECIAL DAMAGES AT LAW (FED. R. CIV. P. 9(G))* . . . . . 186

*V. ENHANCED STATUTORY MULTIPLIERS, LIQUIDATED DAMAGES, AND PER-VIOLATION AWARDS* . . . . . . . . 196

*VI. COMMON-LAW AND STATUTORY EXEMPLARY AND PUNITIVE DAMAGES (42 U.S.C. §§ 1981, 1983; D.C. COMMON LAW)* . . . . . . . . 198

*VII. CONTINUOUS PRE-JUDGMENT AND POST-JUDGMENT INTEREST, ATTORNEYS' FEES, AND TAXABLE COSTS (28 U.S.C. § 1961; 42 U.S.C. § 1988(B); D.C. CODE §§ 15-108, 15-109, 28-3302)* . . . . . . . . 200

**ARTICLE VII. JURY DEMAND** . . . . . . . . **202**

**ARTICLE VIII. VERIFICATION UNDER 28 U.S.C. § 1746** . . . . . . . . **203**

**CERTIFICATE OF SERVICE** . . . . . . . . **204**

**INDEX OF APPENDED ENCLOSURES** . . . . . . . . **211**

**ADDENDUMS** . . . . . . . . **206**

# TABLE OF AUTHORITIES

## CONSTITUTIONAL PROVISIONS & STATUTORY CODES

1. Civil Rights Jurisdiction, 28 U.S.C. § 1343(a)(3)–(4) . . . . . . 15
2. Council of the District of Columbia, D.C. Code § 15-109, at § 15-109 (2023) . . . . . . 16
3. Council of the District of Columbia, D.C. Code § 2-1403.16, at p. 904 (2023) . . . . . . 120
4. Council of the District of Columbia, D.C. Code § 2-423.02, at § 2-423.02 (2021) . . . . . . 16, 143, 145
5. Council of the District of Columbia, D.C. Code § 22-723, at § 22-723 (2013) . . . . . . 16, 133
6. Council of the District of Columbia, D.C. Code § 24-211.02(b)(2), at § 24-211.02(b)(2) (2023) . . . . . . 11, 98, 99
7. Council of the District of Columbia, D.C. Code § 24-211.02a, at § 24-211.02a(c)(2)–(3) (2023) . . . . . . 142
8. Council of the District of Columbia, D.C. Code § 28-3302, at § 28-3302 (1988) . . . . . . *passim*
9. Council of the District of Columbia, D.C. Code § 28-3904, at § 28-3904(e), (e-1), (f), (f-1), (r)(5) (2023) . . . . . . 137
10. Council of the District of Columbia, D.C. Code § 28-3905(k), at § 28-3905(k)(1)–(2) (2023) . . . . . . 137
11. Council of the District of Columbia, D.C. Code § 7-1201.01(11), at § 7-1201.01 (1979) . . . . . . 99, 133, 147
12. Council of the District of Columbia, D.C. Code § 7-1201.02(a), at § 7-1201.02 (1979) . . . . . . 16, 146
13. Council of the District of Columbia, D.C. Code § 7-1205.01, at § 7-1205.01 (1979) . . . . . . 136
14. Council of the District of Columbia, D.C. Code § 7-1206.01, at § 7-1206.01 (1979) . . . . . . 147
15. Council of the District of Columbia, D.C. Code § 7-1207.01, at § 7-1207.01 (1979) . . . . . . 146
16. Council of the District of Columbia, D.C. Code §§ 22-933, 22-934, 22-936, at §§ 22-933, 22-934, 22-936 (2016) . . . . . . 16
17. District of Columbia Department of Corrections, Program Statement 3350.2I: Inmate Housing and Classification, at pp. 1–15 (2021) . . . . . . *passim*
18. District of Columbia Department of Corrections, Program Statement 4050.1I, at pp. 1–14 (2020) . . . . . . *passim*
19. Prison Rape Elimination Act of 2003, 34 U.S.C. §§ 30301, 30307 . . . . . . *passim*
20. Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb et seq. . . . . . . *passim*
21. Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc et seq. . . . . . . *passim*
22. United States Congress, 28 U.S.C. § 1331, at p. 1 (1980) . . . . . . 14
23. United States Congress, 28 U.S.C. § 1367(a), at p. 1 (1990) . . . . . . 16
24. United States Congress, 28 U.S.C. § 1391(b), at p. 1 (2011) . . . . . . 17
25. United States Congress, 28 U.S.C. § 2201(a), at p. 1 (1993) . . . . . . 18
26. United States Congress, 29 U.S.C. § 794(a), at p. 1 (2014) . . . . . . 15
27. United States Congress, 31 U.S.C. §§ 3723, 3724, at p. 1 (1982) . . . . . . 149
28. United States Congress, 34 U.S.C. § 30307(a), at p. 1 (2003) . . . . . . 15, 125
29. United States Congress, 42 U.S.C. § 12132, at p. 1 (1990) . . . . . . 15, 128
30. United States Congress, 42 U.S.C. § 1320d-5, at p. 1 (2009) . . . . . . 138
31. United States Congress, 42 U.S.C. § 1981, at p. 1 (1991) . . . . . . 15
32. United States Congress, 42 U.S.C. § 1983, at p. 1 (1996) . . . . . . 15, 96
33. United States Congress, 42 U.S.C. § 1985(3), at p. 1 (1994) . . . . . . 15
34. United States Congress, 42 U.S.C. § 1986, at p. 1 (1976) . . . . . . 15, 123
35. United States Congress, 42 U.S.C. § 1988(b), at p. 1 (2000) . . . . . . 19

36. United States Congress, 42 U.S.C. § 2000bb-1, at p. 1 (1993) . . . . . 15

37. United States Congress, 42 U.S.C. § 300jj-52(a), at p. 1 (2016) . . . . . 14, 138

38. United States Congress, 42 U.S.C. §§ 1981, 1985(3), 1986, at p. 1 (1991, 1994, 1976) . . . . . 119

39. United States Congress, 42 U.S.C. §§ 2000bb-1, 2000cc-1, at p. 1 (1993, 2000) . . . . . 116

40. Unsworn Declarations Under Penalty of Perjury, 28 U.S.C. § 1746 . . . . . 183, 203

## COURT RULES, ADMINISTRATIVE REGULATIONS & POLICY MANUALS

1. Council of the District of Columbia, D.C. Code § 24-211.02 (Authorizing DCDOC Program Statement 4070.1E), at § 24-211.02 (2023) . . . . . 114

2. Department of Health and Human Services, 45 C.F.R. § 164.524, at § 164.524 (2013) . . . . . 14, 138

3. Department of Justice, 28 C.F.R. § 115.43(a)–(d), at § 115.43 (2012) . . . . . 11, 99, 125

4. Department of Justice, 28 C.F.R. § 115.43, at § 115.43 (2012) . . . . . 11, 99

5. Department of Justice, 28 C.F.R. § 115.68, at § 115.68 (2012) . . . . . 28, 125

6. Federal Rule of Civil Procedure 38(b) . . . . . 202

7. Federal Rule of Civil Procedure 65 . . . . . 18, 177, 178

8. United States Department of Health and Human Services Office for Civil Rights, Enforcement Rule for Willful Neglect, 45 C.F.R. § 160.404, at § 160.404 (2013) . . . . . 140

## JUDICIAL PRECEDENTS & CASE LAW

*1. Ashcroft v. Iqbal, 556 U.S. 662, at p. 676 (2009)* . . . . . 34

*2. Monell v. Department of Social Services, 436 U.S. 658, at pp. 690–91 (1978)* . . . . . 22

*3. Nelson v. Colorado, 581 U.S. 128, at pp. 135–36 (2017)* . . . . . 9

*4. Procunier v. Martinez, 416 U.S. 396, at pp. 417–19 (1974)* . . . . . 13, 113

*5. West v. Atkins, 487 U.S. 42, at pp. 49–54 (1988)* . . . . . 23

*6. Baker v. District of Columbia, 326 F.3d 1302, at p. 1306 (D.C. Cir. 2003)* . . . . . 22, 99

*7. Daskalea v. District of Columbia, 227 F.3d 433, at pp. 441–42 (D.C. Cir. 2000)* . . . . . 112

*8. Doe v. District of Columbia, 796 F.3d 96, at p. 106 (D.C. Cir. 2015)* . . . . . 109

*9. Levitan v. Ashcroft, 281 F.3d 1313, at pp. 1317–20 (D.C. Cir. 2002)* . . . . . 116

*10. Patten v. District of Columbia, 9 F.4th 921, at p. 929 (D.C. Cir. 2021)* . . . . . *passim*

*11. Smith v. District of Columbia, 413 F.3d 86, at pp. 95–98 (D.C. Cir. 2005)* . . . . . 133

*12. Toolasprashad v. Bureau of Prisons, 286 F.3d 576, at pp. 584–85 (D.C. Cir. 2002)* . . . . . 109, 133

*13. Warren v. District of Columbia, 353 F.3d 36, at p. 39 (D.C. Cir. 2004)* . . . . . 34, 107

*14. Chance v. Armstrong, 143 F.3d 698, at p. 703 (2d Cir. 1998)* . . . . . 107

*15. Barnes v. District of Columbia, 242 F.R.D. 113, at pp. 2, 7–9 (D.D.C. 2007)* . . . . . 142

*16. Johnson v. District of Columbia, Civ. No. 18-3062 (RBW), Mem. Op. at pp. 19–20 (D.D.C. Oct. 26, 2023)* . . . . . 131

*17. Laffey v. Northwest Airlines, Inc., 572 F. Supp. 354, at pp. 371–75 (D.D.C. 1983)* . . . . . 145, 201

*18. Lewis v. Government of the District of Columbia, Civ. No. 1:15-cv-00352 (RBW), at p. 1 (D.D.C. 2018)* . . . . . 101

*19. Pierce v. District of Columbia, 128 F. Supp. 3d 250, at pp. 267–70 (D.D.C. 2015)* . . . . . 129

*20. Pinson v. U.S. Department of Justice, 246 F. Supp. 3d 211, at p. 224 (D.D.C. 2017)* . . . . . 112

*21. Waldo v. District of Columbia, Civ. No. 19-cv-136 (TSC), at pp. 4–8 (D.D.C. Oct. 1, 2021)* . . . . . 107

*22. Webster v. District of Columbia, Civ. No. 1:20-cv-00300 (JDB), at pp. 1–15 (D.D.C. 2020)* . . . . . . . . . . . . . 155

*23. Demons v. Gregory, Case No. 1:24-cv-21455, at pp. 1–10 (S.D. Fla. 2024)* . . . . . . . . . . . . . . . . . . . . . . 114

*24. United States Supreme Court, Bell v. Wolfish, 441 U.S. 520, at pp. 535–37 (1979)* . . . . . . . . . . . . . . . . . 96

*25. United States Supreme Court, Estelle v. Gamble, 429 U.S. 97, at pp. 103–05 (1976)* . . . . . . . . . . . . . . . . 101

*26. United States Supreme Court, Farmer v. Brennan, 511 U.S. 825, at pp. 834–37 (1994)* . . . . . . . . . . . . . . . 101

*27. United States Supreme Court, Hewitt v. Helms, 459 U.S. 460, at pp. 472–77 (1983)* . . . . . . . . . . . . . . . . . 127

*28. United States Supreme Court, Johnson v. California, 543 U.S. 499, at pp. 505–09 (2005)* . . . . . . . . . . . . . . 120

*29. United States Supreme Court, Monell v. Department of Social Services of the City of New York, 436 U.S. 658, at pp. 690–95 (1978)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*30. United States Supreme Court, Overton v. Bazzetta, 539 U.S. 126, at pp. 131–37 (2003)* . . . . . . . . . . . . . . . 155

*31. United States Supreme Court, Pennsylvania Department of Corrections v. Yeskey, 524 U.S. 206, at pp. 209–13 (1998)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*32. United States Supreme Court, Tanzin v. Tanvir, 592 U.S. 43, at pp. 46–54 (2020)* . . . . . . . . . . . . . . . . . 116

*33. United States Supreme Court, Thornburgh v. Abbott, 490 U.S. 401, at pp. 407–09 (1989)* . . . . . . . . . . . . . . 113

*34. United States Supreme Court, United States v. James Daniel Good Real Property, 510 U.S. 43, at pp. 48–53 (1993)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

*35. United States Supreme Court, Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, at pp. 265–68 (1977)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

*36. United States Supreme Court, Wilkinson v. Austin, 545 U.S. 209, at pp. 223–25 (2005)* . . . . . . . . . . . . . . . 126

*37. United States Supreme Court, Wolff v. McDonnell, 418 U.S. 539, at pp. 575–77 (1974)* . . . . . . . . . . . . . . . 114

## SECONDARY SOURCES & TREATISES

1. Centers for Medicare & Medicaid Services & National Center for Health Statistics, ICD-10-CM Tabular List of Diseases and Injuries (FY 2026), at p. 514 (2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

2. Donatella Marazziti et al., Sensory Deprivation and the Brain: Neurobiological Mechanisms, Psychological Effects, and Clinical Implications, at pp. 2, 5–6, 9 (2026) . . . . . . . . . . . . . . . . . . . . . . . . . . 45

3. Justin D. Strong, Keramet Reiter, et al., The Body in Isolation: The Physical Health Impacts of Incarceration in Solitary Confinement, at pp. 8, 14 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

4. Kayla James & Elena Vanko, The Impacts of Solitary Confinement, at p. 3 (2021) . . . . . . . . . . . . . . . . . . . 50

5. U.S. Food and Drug Administration, Highlights of Prescribing Information: [redacted] Tablets, for Oral Use, C-IV (NDA 020717/S-037/S-038), at §§ 5.7, 7, 12.1, pp. 4, 6, 9 (2015) . . . . . . . . . . . . . . . . . 53

6. U.S. Food and Drug Administration, Highlights of Prescribing Information: [redacted] ([redacted] extended-release capsules) (NDA 211964/S-000), at §§ 5.1, 5.2, 12.2, pp. 3–4, 10 (2021) . . . . . . . . . . . . . . . . 52

7. U.S. Food and Drug Administration, Highlights of Prescribing Information: [redacted] ([redacted] hydrochloride) Tablets and Oral Solution (NDA 019839/S-074/S-086/S-087; NDA 020990/S-035/S-044/S-045), at §§ 2.6, 5.5, 17, pp. 4, 6, 26 (2016) . . . . . . . . . . . . . . . . . . . . . . . 52

8. U.S. Food and Drug Administration, Prescribing Information: [redacted] (CII) (Dextroamphetamine Saccharate, Amphetamine Aspartate Monohydrate, Dextroamphetamine Sulfate, Amphetamine Sulfate Tablets) (NDA 011522/S-040), at pp. 2, 10 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

9. U.S. Food and Drug Administration, Prescribing Information: [redacted] ([redacted] Hydrochloride) Tablets (NDA 016418/S-080, 016762/S-017, 017683/S-008), at pp. 3, 9, 14 (2010) . . . . . . . . . . . . . . . . . . 53

**John Earle Sullivan**
1221 West Erda Way
Erda, UT 84074
**Phone:** (435) 841-7258
**Email:** johne.sullivan@outlook.com
Plaintiff Pro Se

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JOHN EARLE SULLIVAN,**<br>*Plaintiff,*<br>**v.**<br>**DISTRICT OF COLUMBIA,**<br>*a municipal corporation (Defendant);*<br>*and*<br>**UNITY HEALTH CARE, INC.,**<br>*a District of Columbia corporation (Defendant);*<br>*and*<br>**THOMAS FAUST; ANDREW PAUL MAZZUCHELLI; ANTHONY BROWN SR.; DELONTE WILLIAMS; CUTHBERT DENTON; and RODERICK I. WELLINGTON, Ph.D., LCPC, NCC, CFC,**<br>*each in his individual and official capacities (Defendants);*<br>*and*<br>**SHEILA MARR; CHRISTINA WHITEHEAD; CORTNEY SAVAGE; and ANJU MENON, M.D.,**<br>*each in her individual and official capacities (Defendants);*<br>*and*<br>**JOHN AND JANE DOES 1-50,**<br>*in their individual and official capacity (Defendants).* | **VERIFIED COMPLAINT FOR COMPENSATORY, STATUTORY, AND PUNITIVE DAMAGES, DECLARATORY JUDGMENT, AND INJUNCTIVE RELIEF**<br><br>**CASE NO.: Unassigned**<br><br>**JUDGE: Unassigned**<br><br>**DOC ID: 1109-JES-V-DC-COMP-2026**<br><br>**DATE: NOVEMBER 9, 2026**<br><br>**DEMAND FOR JURY TRIAL** |

# VERIFIED COMPLAINT FOR COMPENSATORY, STATUTORY, AND PUNITIVE DAMAGES, DECLARATORY JUDGMENT, AND INJUNCTIVE RELIEF

## PRELIMINARY STATEMENT

This civil rights action arises from the unlawful conditions, physical abuse, and clinical abandonment inflicted upon Plaintiff John Earle Sullivan (*"Plaintiff"*) during his two hundred one (201) days of continuous detention within the District of Columbia Department of Corrections system at the Central Detention Facility (*"CDF"*) and contractual holding facility from November 16, 2023 through June 3, 2024 (designated DCDC #387289), alongside continuing post-release electronic health information blocking. Operatively managed by Defendant District of Columbia through the District of Columbia Department of Corrections (*"DCDOC"*) and its contracted medical provider,

Defendant Unity Health Care, Inc. (*"Unity Health Care"*), the Central Detention Facility operated as an environment of unchecked custodial lawlessness, systemic physical and psychiatric medical abandonment, retaliatory sensory deprivation, and direct violations of governing statutory and constitutional standards.

Grounded upon the plenary executive authority exercised under Article II, Section 2, Clause 1 of the United States Constitution through Presidential Proclamation 10887 (*Granting Pardons and Commutation of Sentences for Certain Offenses Relating to the Events at or Near the United States Capitol on January 6, 2021*) executed by President Donald J. Trump on January 20, 2025 (**Exhibit 2**), the formal authentication and delivery of the Department of Justice *Certificate of Pardon* (ID319255) on February 7, 2025 (**Exhibit 3**), the Department of Justice's *Appellee's Unopposed Motion to Vacate Convictions and Remand for Dismissal* filed on January 24, 2025 in Case No. 24-3051 (Doc #2096152, moving to vacate Plaintiff's convictions and remand for dismissal with prejudice pursuant to Fed. R. Crim. P. 48(a), **Exhibit 3.1**), the unanimous per curiam *Order* of the United States Court of Appeals for the District of Columbia Circuit in Case No. 24-3051 (Doc #2103201) on February 27, 2025 vacating the district court's judgment and directing the Clerk to issue the mandate forthwith (**Exhibit 4**), and the terminal *Order* entered by Senior District Judge Royce C. Lamberth in Criminal Case No. 1:21-cr-00078-RCL (Dkt. 164) on March 4, 2025 ordering that the case is dismissed as moot upon the government's unopposed Rule 48(a) motion for dismissal with prejudice (**Exhibit 5**), Plaintiff John Earle Sullivan stands completely exonerated and restored to his constitutional presumption of innocence. Under *Nelson v. Colorado*, 581 U.S. 128 (2017)[1],

[1] Supreme Court of the United States, *Nelson v. Colorado*, 581 U.S. 128, at pp. 135-36 (2017) -- *"When a criminal conviction is invalidated by a reviewing court and no retrial will occur, is the State nonetheless permitted to..."*

the complete vacatur of an underlying judgment of conviction eradicates the legal foundation of the prosecution, stripping the sovereign of any legitimate penal interest, defensive justification, or preclusive barrier to shield the tortious conditions inflicted upon Plaintiff. This civil action neither challenges nor disturbs any antecedent judicial decree; rather, Plaintiff invokes his restored innocence to seek monetary, declaratory, and injunctive relief for the severe constitutional deprivations, physical suffering, and intentional injuries inflicted upon him during two hundred one (201) days of unlawful municipal confinement.

Commencing upon his initial custodial remand on November 16, 2023-wherein Plaintiff was held under three-point mechanical restraints for six hours within the E. Barrett Prettyman United States Courthouse prior to immediate transfer to the Central Detention Facility-Plaintiff was subjected to more than one hundred sixty (160) consecutive days of continuous, punitive solitary confinement across restrictive segregation tiers, including Unit NE-1 (Cell 63), over one hundred thirty (130) consecutive days in Unit South West 1 / South-1 (*"the hole,"* on the top tier, right-hand side, Cell 54 and Cell 50), an inter-facility contractual displacement to Northern Neck Regional Jail (NNRJ, Warsaw, VA) from May 8 to May 10, 2024 where Plaintiff was objectively classified as a zero-point minimum security risk, followed by retaliatory re-intake into CDF Unit South-2 (Cell 34) under a seventy-two-hour continuous lockdown stripped of all personal belongings, and Unit South-1 (Cell 35) under Sergeant Delonte Williams. Confined inside an eight-by-ten-foot poured-concrete cell (measuring barely two to three paces wide and six paces long) for twenty-three to twenty-four hours each day, Plaintiff was subjected to severe sensory and sleep deprivation, pervasive black mold infestations, recurrent backups of raw human sewage through in-cell plumbing, ambient

sub-freezing 32°F winter drafts precipitating persistent systemic hypothermia, mandatory pre-exit full strip and visual body-cavity searches coupled with padlocked *"black box"* wrist-cuff, waist-chain, and ankle-shackle restraints for all out-of-cell movement (including medical and dental appointments), and the near-total deprivation of out-of-cell time-leaving Plaintiff locked in unbroken solitary confinement for days and weeks at a time, with zero outdoor recreation and out-of-cell access restricted at best to rare, isolated intervals where Plaintiff was locked inside a small indoor cage to walk or run in tight circles on bare concrete. This extended solitary confinement diverged sharply from ordinary detention conditions, in direct contravention of the mandatory thirty-day ceiling established under the Prison Rape Elimination Act regulations codified at 28 C.F.R. § 115.43[2], DCDOC Program Statement 3350.2I, and D.C. Code § 24-211.02[3]. Rather than safeguarding Plaintiff following his submission of an emergency PREA grievance (dated December 21, 2023, stamped received December 28, 2023, and logged by PREA Compliance Specialist Cortney Savage on December 29, 2023) documenting custodial sexual harassment and knife threats within the housing unit shower on December 21, 2023, DCDOC supervisory officials-spearheaded by PREA Compliance Manager Cortney Savage-weaponized PREA Investigation Case #2024-0001 (IAPro #4144, #4337, **Exhibit 976**) to execute retaliatory housing transfers and subject Plaintiff to indefinite punitive isolation predicated upon discriminatory racial profiling and viewpoint animus.

[2] 28 C.F.R. § 115.43, at § 115.43 (2012) -- *"(a) Inmates placed in segregated housing for their own protection shall be placed in segregated housing only until an alternative..."*

[3] D.C. Code § 24-211.02, at § 24-211.02 (2023) -- *"(a) Said Department of Corrections under the general direction and supervision of the Mayor of the District of Columbia shall..."*

Throughout this confinement, Defendants District of Columbia, Unity Health Care, Inc., Dr. Anju Menon, M.D., and Roderick I. Wellington, Ph.D., LCPC, NCC, CFC, exhibited knowing disregard toward Plaintiff's serious medical, psychiatric, neurological, and physical health emergencies in direct contravention of the Eighth and Fifth Amendments and D.C. Code § 24-211.02. In full satisfaction of all administrative notification procedures, Plaintiff submitted seventeen (17) pages of written Inmate Sick Call Request Forms (Form PS 6001.1, comprising 14 unique sick call submissions spanning November 27, 2023 through May 5, 2024 alongside 3 duplicate scans produced by DCDOC) pleading for urgent clinical intervention-expressly seeking neurological diagnostic assessment for an acute, first-in-lifetime convulsive seizure at 10:58 AM on January 31, 2024 in the lower-tier video call recreation room of Unit SW-1-Plaintiff having never had a seizure in his entire life prior to his confinement at CDF-during which Plaintiff fainted backward onto a steel stool and struck his head against the concrete wall while his body convulsed uncontrollably (stamped received February 1, 2024, p. 11), urgent treatment for an excruciating, infected gluteal abscess between May 2 and May 5, 2024 that ruptured and discharged blood and fluid across his bedding (pp. 12, 13, 15, 18), medical relief for forced physical stagnation and cellular immobilization in an uninsulated 8x10 cell without sunlight, fresh air, or exercise that destroyed his athletic baseline and caused severe physical and musculoskeletal deconditioning and lower-extremity vascular impairment, urgent ophthalmological evaluation for rapid optical deterioration characterized by extensive scotoma and dense vitreous floaters (pp. 10, 14), and clinical protection from toxic synthetic cannabinoid smoke inhalation (**Exhibit 977**). Custodial and clinical staff uniformly ignored and suppressed each submitted sick call instrument, leaving every triage assessment, priority rating, and provider disposition ledger one hundred percent (100%) blank, consigning Plaintiff to total clinical abandonment, while

also leaving the clinical notes section of Dr. Shayla T. Calhoun's January 26, 2024 Dental Record-Medical Form blank (p. 1) and ignoring additive requests for basic preventative dental hygiene (**Exhibit 977** at p. 17). In addition, Defendants abruptly severed Plaintiff's verified psychiatric and cardiovascular maintenance medications upon initial booking, withholding essential prescribed medications for one hundred eighty-one (181) consecutive days until May 15, 2024 (**Exhibit 978**, **Exhibit 979**), and subsequently falsified the Accu-Flo Electronic Medication Administration Record (*"MAR"*) by logging code Ø ("NOT ADMINISTERED See Notes") and the automated notation "PT Refused/med not Administered," on May 15, 2024 at 20:00 (by LPN Abigail Bentil, AB1) and on May 22, 2024 at 09:00 (by Emmerencia Ngwenyi, EN1) while Plaintiff was held in solitary confinement (**Exhibit 978** at p. 4), producing completely blank, future-dated "MAR For: June 2026" sheets printed on March 3, 2026 in place of Plaintiff's actual June 2024 MAR (**Exhibit 978** at pp. 5-7), and entering post-transfer clinical appointment cancellations on June 7, 2024 ("NOC") and July 26, 2024 ("Inmate not on census per JACCS") even after his June 3, 2024 transfer (**Exhibit 978** at pp. 8-9).

Defendants compounded these violations by subjecting Plaintiff to retaliatory solitary confinement and discriminatory custodial segregation enforced by Defendants Denton, Whitehead, Savage, and Brown; imposing an unconstitutional correspondence blackout and censorship over Plaintiff's outgoing letters and communications to his family without requisite procedural notice or opportunity to contest under *Procunier v. Martinez*, 416 U.S. 396 (1974)[4]; placing substantial, unjustified burdens upon Plaintiff's religious exercise in violation of the Religious Freedom Restoration Act (*"RFRA"*) and RLUIPA;

---

[4] Supreme Court of the United States, *Procunier v. Martinez*, 416 U.S. 396, at pp. 417-19 (1974) -- *"The interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First..."*

enforcing intentional racial and viewpoint-based segregation by excluding Plaintiff, a Black independent video journalist, from standard communal housing and the Capitol-protest detainee pod; confiscating and permanently depriving Plaintiff of his personal clothing/laundry, cups, food and commissary items, paper, writing materials, and personal effects without a property inventory or disposition receipt; and withholding post-release access to Plaintiff's complete Electronic Health Information (*"EHI"*) in violation of the District of Columbia Mental Health Information Act (*"DCMHIA"*, D.C. Code §§ 7-1201.02, 7-1205.01, 7-1205.04, 7-1205.05, 7-1206.01, 7-1207.01), the District of Columbia Consumer Protection Procedures Act (*"DCCPPA"*, D.C. Code §§ 28-3904(e), (e-1), (f), (f-1), (r)(5), 28-3905(k)(1)-(2)), 42 U.S.C. § 1983, and District of Columbia common-law negligence *per se* incorporating the statutory and regulatory standards of care of the 21st Century Cures Act, 42 U.S.C. § 300jj-52[5], and the HIPAA Privacy Rule, 45 C.F.R. § 164.524[6]. Plaintiff initiates this civil action to hold Defendants accountable under the United States Constitution, federal civil rights statutes, and District of Columbia positive law.

## ARTICLE I. JURISDICTION AND VENUE

Grounded upon the existence of a live, justiciable case and controversy arising under the supreme law of the land, this Court possesses original subject-matter jurisdiction over Plaintiff's federal constitutional and statutory claims pursuant to 28 U.S.C. § 1331[7]

---

[5] 42 U.S.C. § 300jj-52(a), at p. 1 (2016) -- *"(a) Definition: (1) In general:... 'information blocking' means a practice that--(A) except as required by law or specified by..."*

[6] 45 C.F.R. § 164.524, at § 164.524 (2013) -- *"(b) Timely action by the covered entity: (1) The covered entity must act on a request for access no later than 30 days after..."*

[7] 28 U.S.C. § 1331, at p. 1 (1980) -- *"The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of..."*

and 28 U.S.C. § 1343(a)(3)-(4) and (b)[8]. Plaintiff's federal causes of action arise directly under the First, Fifth (incorporating substantive and procedural due process and equal protection guarantees against the District of Columbia under *Bolling v. Sharpe*), and Eighth Amendments to the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983[9]; the Civil Rights Act of 1866, 42 U.S.C. § 1981[10]; 42 U.S.C. §§ 1985(3)[11] and 1986[12]; the Religious Freedom Restoration Act of 1993 (*"RFRA"*), 42 U.S.C. § 2000bb-1[13]; the Religious Land Use and Institutionalized Persons Act of 2000 (*"RLUIPA"*), 42 U.S.C. § 2000cc-1[14]; Title II of the Americans with Disabilities Act of 1990 (*"ADA"*), 42 U.S.C. § 12132[15]; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a)[16]; with the mandatory federal statutory and regulatory standards of the Prison Rape Elimination Act (*"PREA"*), 34 U.S.C. § 30307(a)[17] and 28 C.F.R. §§ 115.43, 115.68, the 21st Century Cures Act, 42 U.S.C. § 300jj-52, the Health Insurance Portability and Accountability Act (*"HIPAA"*), 42 U.S.C. § 1320d-5(a)(3) and 45 C.F.R. §§ 164.524, 160.404, and the federal administrative custodial property standards, 31 U.S.C. §§ 3723-3724, expressly pleaded and enforced as actionable predicate

[8] 28 U.S.C. § 1343(a), at p. 1 (1979) -- *"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:... (3)..."*

[9] 42 U.S.C. § 1983, at p. 1 (1996) -- *"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District..."*

[10] 42 U.S.C. § 1981, at p. 1 (1991) -- *"(a) Statement of equal rights: All persons within the jurisdiction of the United States shall have the same right in every State..."*

[11] 42 U.S.C. § 1985(3), at p. 1 (1994) -- *"If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the..."*

[12] 42 U.S.C. § 1986, at p. 1 (1976) -- *"Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are..."*

[13] 42 U.S.C. § 2000bb-1, at p. 1 (1993) -- *"(a) In general: Government shall not substantially burden a person's exercise of religion even if the burden results from a rule..."*

[14] 42 U.S.C. § 2000cc-1, at p. 1 (2000) -- *"(a) General rule: No government shall impose a substantial burden on the religious exercise of a person residing in or confined..."*

[15] 42 U.S.C. § 12132, at p. 1 (1990) -- *"Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be..."*

[16] 29 U.S.C. § 794(a), at p. 1 (2014) -- *"No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall..."*

[17] 34 U.S.C. § 30307(a), at p. 1 (2003) -- *"The Attorney General shall publish in the Federal Register a final rule adopting national standards for the detection..."*

constitutional violations under 42 U.S.C. § 1983 (for First, Fifth, and Eighth Amendment claims) and as mandatory statutory and regulatory standards of care establishing negligence *per se* under District of Columbia common law.

Pursuant to 28 U.S.C. § 1367(a)[18], this Court is vested with supplemental jurisdiction over Plaintiff's companion District of Columbia statutory and common-law claims, including actionable statutory claims under D.C. Code §§ 2-1402.73 and 2-1403.16 (District of Columbia Human Rights Act); D.C. Code § 2-423.02[19] (Unjust Imprisonment Compensation Act); D.C. Code §§ 7-1201.02, 7-1205.01, 7-1205.04, 7-1205.05, 7-1206.01, and 7-1207.01[20] (Mental Health Information Act); D.C. Code §§ 28-3904(e), (e-1), (f), (f-1), (r)(5) and 28-3905(k)(1)-(2) (District of Columbia Consumer Protection Procedures Act); D.C. Code §§ 24-211.02 and 24-211.02a (Mandatory Powers and Duties of Department of Corrections); D.C. Code § 15-109[21] and § 28-3302 (Pre-Judgment and Post-Judgment Interest); and District of Columbia common law governing negligence *per se*-incorporating the statutory and regulatory standards of care established by 34 U.S.C. §§ 30301, 30307 and 28 C.F.R. §§ 115.43, 115.68, D.C. Code § 22-723[22] governing tampering with physical evidence, 42 U.S.C. §§ 1320d-5(a)(3), 300jj-52 and 45 C.F.R. §§ 164.524, 160.404, 31 U.S.C. §§ 3723-3724, and D.C. Code §§ 22-932(5), 22-933, 22-934, and 22-936[23] governing vulnerable and captive adult abuse

---

[18] 28 U.S.C. § 1367(a), at p. 1 (1990) -- *"Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which..."*

[19] D.C. Code § 2-423.02, at § 2-423.02 (2021) -- *"(a) After a petition for compensation is approved under § 2-423.01, the petitioner shall be entitled to the following: (1) Within..."*

[20] D.C. Code § 7-1201.02(a), at § 7-1201.02 (1979) -- *"Except as specifically authorized by subchapter II, III, or IV of this chapter, no mental health professional, mental health..."*

[21] D.C. Code § 15-109, at § 15-109 (2023) -- *"In an action to recover damages for breach of contract or for tortious injury to person or property, the court may allow interest..."*

[22] D.C. Code § 22-723, at § 22-723 (2013) -- *"(a) A person commits the offense of tampering with physical evidence if, knowing or having reason to believe an official..."*

[23] D.C. Code §§ 22-933, 22-934, 22-936, at §§ 22-933, 22-934, 22-936 (2016) -- *"A person is guilty of criminal abuse of a vulnerable adult or elderly person if that person intentionally or knowingly... Imposes..."*

and neglect-alongside breach of ministerial custodial bailment, conversion, trespass to chattels, intentional infliction of emotional distress, and negligent infliction of emotional distress. Inasmuch as these non-federal claims form part of the exact same case or controversy under Article III of the United States Constitution, deriving from a continuous, unbroken common nucleus of operative custodial facts spanning November 16, 2023 through June 3, 2024 (and continuing post-release EHI blocking through 2026), judicial economy, convenience, and fairness mandate the unified exercise of supplemental jurisdiction.

Under 28 U.S.C. § 1391(b)(1) and (b)(2)[24], venue lies properly in the United States District Court for the District of Columbia because: (1) Defendant District of Columbia is a municipal corporation located, domiciled, and exercising plenary municipal sovereignty within this judicial district; (2) Defendant Unity Health Care, Inc. is a corporate entity organized under the laws of the District of Columbia and maintaining its corporate headquarters within this judicial district; (3) all individually named supervisory, custodial, and medical defendants were employed by, acted on behalf of, and exercised official authority within this judicial district at the Central Detention Facility situated at 1901 D Street SE, Washington, D.C. 20003; (4) a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred directly within this judicial district; and (5) the personal property, electronic medical records, and custodial facilities forming the subject matter of this proceeding are situated within this judicial district.

[24] 28 U.S.C. § 1391(b), at p. 1 (2011) -- *"A civil action may be brought in--(1) a judicial district in which any defendant resides, if all defendants are residents of the..."*

By operation of the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202[25], and Rule 57 of the Federal Rules of Civil Procedure, this Court is fully authorized to enter declaratory relief, an actual, substantial, and justiciable controversy existing between Plaintiff and Defendants concerning the ongoing validity, enforcement, and legality of Defendants' custodial policies, solitary confinement customs, discriminatory housing practices, mail censorship protocols, and post-release electronic health information blocking.

In accordance with Rule 65 of the Federal Rules of Civil Procedure and the inherent equitable powers of this Court, the Court is empowered to enter preliminary and permanent injunctive relief compelling the immediate production of unredacted Electronic Health Information and native audit logs, directing the expungement of fabricated disciplinary and administrative records, and enjoining ongoing systemic violations.

Under 42 U.S.C. §§ 1981, 1983, 1985(3), 1986, RFRA, Title II of the ADA, the Rehabilitation Act, the District of Columbia Human Rights Act, the District of Columbia Mental Health Information Act, the District of Columbia Consumer Protection Procedures Act, and District of Columbia statutory and common law, this Court is authorized to award compensatory, statutory, treble, liquidated, and punitive damages under governing positive law against Defendants to redress the grievous physical, emotional, and constitutional injuries inflicted upon Plaintiff.

---

[25] 28 U.S.C. § 2201(a), at p. 1 (1993) -- *"In a case of actual controversy within its jurisdiction... any court of the United States, upon the filing of an appropriate..."*

Pursuant to 42 U.S.C. § 1988(b)[26], 42 U.S.C. § 12205, 29 U.S.C. § 794a, D.C. Code § 2-1403.16(f), D.C. Code § 2-423.02(a)(3)(C), D.C. Code § 7-1207.01(a)-(b), and D.C. Code § 28-3905(k)(2)(B), this Court is empowered to award reasonable attorney's fees, litigation expenses, and costs to Plaintiff as the prevailing party.

## ARTICLE II. PARTIES

### I. PLAINTIFF

Plaintiff John Earle Sullivan (*"Plaintiff"*) is a natural person and citizen of the United States, residing in Erda, Tooele County, State of Utah. At all times relevant to this action, Plaintiff was an independent video journalist and documentary videographer. From November 16, 2023 through June 3, 2024, Plaintiff was committed to the continuous physical and contractual custody of the District of Columbia Department of Corrections at the Central Detention Facility and contractual holding facilities under Inmate DCDC #387289.

Prior to his custodial commitment on November 16, 2023, Plaintiff was a high-functioning, self-supporting, and physically active independent adult and competitive athlete who operated at a high functional and occupational baseline without debilitating physical, cardiovascular, auditory, or psychiatric impairment, and who had never had a seizure in his entire life. The extreme, tortious carceral conditions and clinical abandonment inflicted upon Plaintiff by Defendants during his 201 days of municipal

[26] 42 U.S.C. § 1988(b), at p. 1 (2000) -- *"In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of..."*

confinement operated as a direct, proximate, and substantial causal factor that shattered Plaintiff's high-functioning baseline and precipitated severe, permanent, and total occupational and functional disability. Through over one hundred sixty (160) consecutive days of punitive solitary confinement locked inside an 8x10 uninsulated concrete cell for 23 to 24 hours per day, total deprivation of natural sunlight and fresh air, nonstop 24/7 full-volume acoustic trauma from the upper-tier enclosed plastic-glass dayroom television reverberating down the hallway, forced physical stagnation and near-total immobilization destroying his elite athletic conditioning and inflicting severe physical and musculoskeletal deconditioning, severe nutritional deprivation, ambient sub-freezing 32°F drafts inducing chronic hypothermia and Raynaud's disease / lower-extremity neurovascular stasis, black mold and raw sewage inundation, toxic synthetic cannabinoid smoke exposure, violent shower threats, unprovoked biological assaults, an untreated, first-in-lifetime convulsive seizure in which he fainted backward onto a steel stool and struck his head against the concrete wall, and a 181-day cold-turkey psychotropic medication severance, Defendants shattered Plaintiff's nervous system, auditory health, vascular stability, and bodily integrity, directly and proximately inflicting catastrophic psychiatric, cognitive, neurological, auditory, and musculoskeletal impairments that rendered Plaintiff totally disabled. During his confinement and upon his release, Plaintiff became an objectively qualified individual with documented disabilities within the statutory purview of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12102, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 705(20), suffering from chronic, severe psychiatric, cognitive, neurological, auditory, and physical impairments directly and proximately inflicted by Defendants-including [redacted] (ICD-10 F43.10), Panic Disorder (ICD-10 F41.0), Major Depressive Disorder (ICD-10 F32.A), Generalized Anxiety Disorder (ICD-10 F41.1), Chronic Bilateral Tinnitus

(ICD-10-CM H93.13), chronic autonomic dysregulation, and Raynaud's disease / severe lower-extremity vascular and physical impairment-which substantially impair and restrict major life activities, including hearing, walking, standing, running, working, cognitive processing, autonomic regulation, sleep architecture, social engagement, and neurological homeostasis, as formally adjudicated post-release by the Utah Department of Workforce Services (**Exhibit 979**, and Exhibit 17 attached to Plaintiff's concurrently filed *Motion for Leave to Proceed In Forma Pauperis*).

Following the unconditional Presidential Pardon executed on January 20, 2025 under Proclamation 10887 (**Exhibit 2**), the formal Department of Justice *Certificate of Pardon* (ID319255, **Exhibit 3**), the Department of Justice's *Appellee's Unopposed Motion to Vacate Convictions and Remand for Dismissal* (Doc #2096152, **Exhibit 3.1**), the D.C. Circuit's per curiam *Order* in Case No. 24-3051 vacating the judgment of conviction and directing the Clerk to issue the mandate forthwith (Doc #2103201, **Exhibit 4**), and the District Court's final *Order* in Case No. 1:21-cr-00078-RCL dismissing the case as moot upon the government's unopposed Rule 48(a) motion for dismissal with prejudice (Dkt. 164, **Exhibit 5**), Plaintiff stands fully exonerated and innocent *ab initio* under *Nelson v. Colorado*, 581 U.S. 128 (2017). Plaintiff is indigent and proceeds in this civil action without counsel, having been granted fee waivers by the Supreme Court of Utah in Case No. 20261207-SC via its *Order* dated September 23, 2026 (attached as Exhibit 72 to Plaintiff's concurrently filed *Motion for Leave to Proceed In Forma Pauperis*) and means-tested General Assistance (GA Short-Term Track) financial benefits by the State of Utah Department of Workforce Services on April 24, 2026 (attached as Exhibit 17 to Plaintiff's concurrently filed *Motion for Leave to Proceed In Forma Pauperis*).

## II. MUNICIPAL AND CORPORATE ENTITY DEFENDANTS

Defendant District of Columbia (*"the District"*) is a municipal corporation organized under the laws of the United States and the District of Columbia Home Rule Act, D.C. Code §§ 1-201.01 *et seq.*, amenable to suit under 42 U.S.C. § 1983 as an express statutory person. The District owns, operates, manages, and regulates the Central Detention Facility through the District of Columbia Department of Corrections (*"DCDOC"*) under the statutory authority and non-delegable custodial duties commanded by D.C. Code § 24-211.02. The District is responsible for creating, implementing, maintaining, and enforcing the municipal customs, de facto policies, training deficiencies, and supervisory failures that directly caused the deprivations of Plaintiff's constitutional and statutory rights under ***Monell v. Department of Social Services of the City of New York***, 436 U.S. 658 (1978)[27], and *Baker v. District of Columbia*, 326 F.3d 1302 (D.C. Cir. 2003)[28].

Defendant Unity Health Care, Inc. (*"Unity Health Care"*) is a non-profit corporation organized under the laws of the District of Columbia, maintaining its corporate headquarters at 1100 New Jersey Avenue SE, Suite 500, Washington, D.C. 20003. At all times relevant hereto, Unity Health Care was the exclusive private healthcare contractor operating under Contract CW92833 with Defendant District of Columbia to provide comprehensive medical, dental, psychiatric, neurological, and pharmacy services to detainees confined at the Central Detention Facility. Because the District delegated its

[27] Supreme Court of the United States, *Monell v. Department of Social Services*, 436 U.S. 658, at pp. 690-91 (1978) -- *"Our analysis of the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress did intend..."*

[28] United States Court of Appeals for the District of Columbia Circuit, *Baker v. District of Columbia*, 326 F.3d 1302, at p. 1306 (D.C. Cir. 2003) -- *"In considering a Monell claim against the District of Columbia, the court..."*

non-delegable constitutional obligation to provide healthcare to incarcerated persons, Unity Health Care acted *"under color of state law"* within the meaning of 42 U.S.C. § 1983 pursuant to *West v. Atkins*, 487 U.S. 42 (1988)[29]. Under established D.C. Circuit and federal law, Unity Health Care is treated as a municipal entity under ***Monell***, liable for its corporate policies, clinical customs, deliberate indifference, systemic understaffing, and post-release information blocking.

**III. SUPERVISORY AND CUSTODIAL DEFENDANTS**

Defendant Thomas Faust (*"Director Faust"*) was at all times relevant hereto the Director of the District of Columbia Department of Corrections, maintaining his official office at 2000 14th Street NW, 7th Floor, Washington, D.C. 20009. As Director, Faust was the chief executive officer of DCDOC, vested under D.C. Code § 24-211.02 with the affirmative statutory duty to provide for the safekeeping, care, protection, instruction, and proper treatment of all persons committed to DCDOC custody. Director Faust is the final municipal policymaker for DCDOC regarding housing classification, solitary confinement protocols, medical grievance processing, and PREA compliance. Director Faust had actual and constructive knowledge of the systemic unconstitutional conditions, prolonged solitary confinement, and medical neglect at CDF, yet deliberately failed to train, supervise, or discipline subordinate personnel. Director Faust is sued in his individual capacity for money damages and in his official capacity for declaratory and injunctive relief.

---

[29] Supreme Court of the United States, *West v. Atkins*, 487 U.S. 42, at pp. 49-54 (1988) -- *"To constitute state action, the deprivation must be caused by the exercise of some right or privilege created by the State or by..."*

Defendant Andrew Paul Mazzuchelli (*"Deputy General Counsel Mazzuchelli"* or *"Mazzuchelli"*, U.S.D.C. D.D.C. Bar Renewal Code #7647430) was at all times relevant hereto the Deputy General Counsel (serving from July 2023 through October 2024 across the entirety of Plaintiff's 201-day custodial detention, having previously served as DCDOC Attorney Advisor from August 2022 through July 2023) and subsequently the General Counsel (serving from October 2024 through October 2025, prior to his appointment in October 2025 as an Administrative Law Judge for the Government of the District of Columbia / Office of the Attorney General for the District of Columbia; compensated by the District of Columbia Department of Human Resources at $100,847.00 in FY2023, $165,000.00 in FY2024, and $181,058.00 in FY2025) of the District of Columbia Department of Corrections, residing in the District of Columbia (maintaining his current owner-occupied residential domicile at 1831 1st Street NW, Unit #3, Washington, D.C. 20001, D.C. APN 3110--2006, and having resided during Plaintiff's custodial commitment at 1613 Harvard Street NW, Apt #316, Washington, D.C. 20009) and maintaining his official offices at the DCDOC Office of the General Counsel, 3924 Minnesota Avenue NE, 2nd Floor, Washington, D.C. 20019, and DCDOC Headquarters (Frank D. Reeves Municipal Center), 2000 14th Street NW, 7th Floor, Washington, D.C. 20009 (Tel: (202) 671-2064 / (508) 473-6998 / (774) 573-2261 / (202) 746-0132 / (202) 671-2042 | Fax: (202) 671-2514 | Email: andrew.mazzuchelli@dc.gov | cmazzuchelli1@hotmail.com). While publicly holding himself out as an "Attorney specializing in Corrections Law, Criminal Law, Litigation, and Policy within the District of Columbia Department of Corrections" "Committed to upholding justice and ensuring the rights and welfare of incarcerated individuals", Defendant Mazzuchelli exercised direct operational, administrative, and supervisory authority over Plaintiff's custodial

housing classification, indefinite solitary confinement in Unit SW-1 / South-1 (Cell 54 and Cell 50), and exclusion from the Correctional Treatment Facility (*"CTF"*). Despite receiving direct written emergency notice from Plaintiff's criminal defense counsel on January 4, 2024, January 5, 2024, January 18-19, 2024, March 27-28, 2024, and April 2-3, 2024 that Plaintiff was locked in a sub-freezing 32°F cell with ice crystals forming on the window, deprived of his prescribed psychiatric and cardiovascular maintenance medications, denied showers for five days at a time, and held in 23-hour solitary lockdown for more than 100 consecutive days beyond the mandatory 30-day federal ceiling of 28 C.F.R. § 115.43, Defendant Mazzuchelli personally ratified and prolonged Plaintiff's solitary confinement, declared on March 28, 2024 that "there is no limit on how long he can be there", and formally admitted in writing on April 2-3, 2024 that Plaintiff had accrued "0 disciplinary violations" and was "not housed in S1 for disciplinary reasons", yet barred Plaintiff from CTF and maintained him in punitive solitary isolation based on Plaintiff's "perceived affiliation" and supposed lack of "ideological alignment". Defendant Mazzuchelli is sued in his individual capacity for money damages and in his official capacity for declaratory and injunctive relief.

Defendant Sheila Marr (*"Major Marr"*) was at all times relevant hereto a Correctional Major and Inmate Grievance Coordinator at the Central Detention Facility, maintaining her official office at 1901 D Street SE, Washington, D.C. 20003. As Correctional Major and Grievance Coordinator, Marr was responsible for operational supervisory oversight of housing units, enforcement of institutional regulations, processing of inmate grievances, and addressing custodial complaints. Major Marr possessed direct knowledge of Plaintiff's prolonged solitary confinement, the denial of dental and medical care, and the weaponization of PREA procedures, yet personally approved and ratified

these unlawful conditions and suppressed administrative filings. Major Marr is sued in her individual capacity for money damages and in her official capacity for declaratory and injunctive relief.

Defendant Anthony Brown Sr. (*"Lieutenant Brown"*) was at all times relevant hereto a Lieutenant and Restrictive Housing Supervisor at the Central Detention Facility. Lieutenant Brown was responsible for overseeing correctional shift operations, cell shakedowns, and the operational enforcement of restrictive housing protocols in Units SW-1 and NE-1. Lieutenant Brown personally authorized and enforced Plaintiff's continuous solitary confinement, systemic deprivation of out-of-cell time, and custodial isolation. Lieutenant Brown is sued in his individual capacity for money damages and in his official capacity for declaratory and injunctive relief.

Defendant Delonte Williams (*"Lieutenant Williams"*, formerly Sergeant) was at all times relevant hereto a supervisory custodial officer at the Central Detention Facility, subsequently promoted to the rank of Lieutenant on November 10, 2025. During Plaintiff's confinement, Williams was assigned as a Sergeant to supervise operations in the Special Management and Restrictive Housing Unit, Unit SW-1 (subsequently renamed Unit South-1 / S-1 on February 26, 2024). Williams had direct command authority over line correctional officers on the Unit SW-1 / South-1 tier, conducted tier walkthroughs, and enforced Plaintiff's 23-to-24 hour cell confinement while ignoring Plaintiff's repeated verbal and written requests for medical care and sanitary living conditions. Lieutenant Williams is sued in his individual capacity for money damages and in his official capacity for declaratory and injunctive relief.

Defendant Cuthbert Denton (*"Case Manager Denton"*) was at all times relevant hereto a Case Manager and Housing Unit Manager at the Central Detention Facility, who subsequently retired from DCDOC service post-2023 after a 37.5-year career. Case Manager Denton exercised direct managerial control over Unit SW-1, supervised the physical movement of detainees, enforced Plaintiff's near-zero out-of-cell isolation, and participated in the confiscation of Plaintiff's legal notes and correspondence. Defendant Denton is sued in his individual capacity for money damages and in his official capacity for declaratory and injunctive relief.

Defendant Christina Whitehead (*"Housing Manager Whitehead"*) was at all times relevant hereto a Correctional Officer, Housing Unit Manager, and Housing Board Administrator at the Central Detention Facility. Housing Manager Whitehead exercised direct supervisory and managerial control over Housing Unit SW-1 where Plaintiff was held in continuous solitary confinement, enforced Plaintiff's custodial isolation and near-total deprivation of out-of-cell time, participated in the April 24, 2024 Housing Board hearing enforcing Plaintiff's discriminatory segregation from the CTF January 6 unit, and engaged in retaliatory cell shakedowns and harassment following Plaintiff's protected grievance filings. Housing Manager Whitehead is sued in her individual capacity for money damages and in her official capacity for declaratory and injunctive relief.

Defendant Cortney Savage (*"PREA Manager Savage"*, also known as *"Ms. Savage"*) was at all times relevant hereto a Correctional Program Specialist and the designated PREA Compliance Manager at the Central Detention Facility, appointed as a Grade 11 Career Service municipal official (compensated at $77,873.00 in FY2023 and $79,971.00 in FY2024) and a Department of Justice / National PREA Resource Center certified adult

facility auditor. Following Plaintiff's emergency PREA report of December 28, 2023 documenting shower sexual harassment, PREA Manager Savage authored an ideological and political profiling email on January 2, 2024 classifying Plaintiff as a high-profile *"January 6 / Black Lives Matter"* figure (OIS Case #2024-0001, IAPro #4144, **Exhibit 976**), and directed that Plaintiff be transferred into punitive solitary confinement in Unit SW-1 Cell 54 on January 3, 2024. PREA Manager Savage weaponized the PREA reporting process to punish Plaintiff for reporting sexual harassment and maintained Plaintiff in solitary confinement for over 160 consecutive days in direct violation of 28 C.F.R. §§ 115.43 and 115.68[30]. PREA Manager Savage is sued in her individual capacity for money damages and in her official capacity for declaratory and injunctive relief.

## IV. CONTRACTED HEALTHCARE DEFENDANTS

Defendant Anju Menon, M.D. (*"Dr. Menon"*) was at all times relevant hereto a licensed physician and the Attending Physician / Medical Director employed by Defendant Unity Health Care, Inc. at the Central Detention Facility. Dr. Menon was responsible for the clinical supervision of all medical, dental, and psychiatric care administered to detainees at CDF, including the triage and disposition of written Sick Call requests under DCDOC Form PS 6001.1. Dr. Menon had actual knowledge of Plaintiff's documented clinical needs, including Plaintiff's written sick call requests for preventative dental care and teeth cleaning (**Exhibit 977** at p. 17), an acute purulent gluteal abscess, convulsive seizures, deteriorating eyesight, and severe psychotropic medication withdrawal, yet

---

[30] 28 C.F.R. § 115.68, at § 115.68 (2012) -- *"(a) The agency shall protect all inmates and staff who report sexual abuse or sexual harassment or cooperate with sexual abuse or..."*

personally and through subordinate clinical custom refused to triage, schedule, or provide medical and dental care, abandoning Plaintiff without clinical attention across his 201 days of municipal detention. Dr. Menon acted under color of state law pursuant to *West v. Atkins*, 487 U.S. 42 (1988), and is sued in her individual capacity for money damages and in her official capacity for declaratory and injunctive relief.

Defendant Roderick I. Wellington, Ph.D., LCPC, NCC, CFC (*"Dr. Wellington"*, recorded in the EHR header as *"Provider: Roderick Wellington - PhD"* and credentialed as a Licensed Clinical Professional Counselor, National Certified Counselor, Certified Forensic Counselor, and Clinical Child & Adolescent Psychologist under NPI 1336535319) was at all times relevant hereto the Discipline Director of Behavioral Health and Behavioral Health Clinician employed by Defendant Unity Health Care, Inc. at the Central Detention Facility (Room 320, 1901 D Street SE, Washington, D.C. 20003; private practice in Landover Hills, MD 20784-2347, Fax: (301) 576-2787). Dr. Wellington was responsible for supervising behavioral health services, conducting psychiatric and behavioral health intakes, coordinating psychotropic medication management, and maintaining accurate clinical and Medication Administration Records. Dr. Wellington generated unauthenticated and unapproved clinical records, including the May 15, 2024 encounter (05/15/2024 - MH Clinician: MHC Follow-Up) marked with the explicit preliminary banner "Status: ON HOLD DOCUMENT. Contents are preliminary" (**Exhibit 978** at p. 14), participated in the 181-day withholding of essential psychiatric medications, and participated in the systemic manipulation of Accu-Flo MAR and EHR records, including the May 15 and May 22, 2024 code Ø ("PT Refused/med not Administered,") entries while Plaintiff was locked in solitary confinement and the production of completely blank, future-dated "MAR For: June 2026" sheets in place of Plaintiff's June

2024 MAR (**Exhibit 978** at pp. 4-7). Dr. Wellington acted under color of state law pursuant to *West v. Atkins*, 487 U.S. 42 (1988), and is sued in his individual capacity for money damages and in his official capacity for declaratory and injunctive relief.

**V. UNIDENTIFIED CUSTODIAL, ADMINISTRATIVE, AND HEALTHCARE DEFENDANTS (JOHN AND JANE DOES 1-50)**

Defendants John and Jane Does 1-50 (*"Doe Defendants"*) are currently unidentified or partially identified correctional officers, supervisory command officials, shift lieutenants, sergeants, housing and classification administrators, central-command-bubble control operators, mailroom and grievance screening personnel, Inmate Reception Center (*"IRC"*) and inter-facility property officers, contracted physicians, nurse practitioners, physician assistants, registered and licensed practical nurses, behavioral health clinicians, dental personnel, and health-information and electronic medical record administrators employed by, contracted with, or acting as agents of Defendants District of Columbia Department of Corrections and Unity Health Care, Inc. at the Central Detention Facility and contractual holding facilities during Plaintiff's custodial commitment and post-release records requests. Because the true full legal names, badge numbers, employee identification numbers, and National Provider Identifiers (*"NPI"*) of John and Jane Does 1-50 are currently unknown to Plaintiff and are uniquely maintained within internal institutional shift rosters, duty logs, Accu-Flo eMAR audit trails, eClinicalWorks / EHR modification logs, IAPro investigative files, mailroom interception logs, and IRC property vault ledgers within the exclusive custody and control of Defendants District of Columbia and Unity Health Care, Inc., Plaintiff sues said Defendants under the fictitious designations John and Jane Does 1-50 pursuant to Federal Rules of Civil Procedure 10(a),

15(a), 15(c), 20(a)(2), and 21, and expressly reserves the right to amend this Verified Complaint or substitute their true legal names upon disclosure through discovery. Specifically, John and Jane Does 1-50 encompass, without limitation:

1. **Unidentified and Partially Identified Line Custodial, Escort, Housing, and Control-Bubble Officers (John and Jane Does 1-20)**: All currently unidentified or partially identified correctional officers, tier officers, escort officers, and central-command-bubble operators (including officers known to Plaintiff during custody only by unit call-signs, pseudonyms, or surnames, alongside unknown shift officers across Units NE-1, SW-1 / South-1, and South-2) who enforced Plaintiff's twenty-three- to twenty-four-hour solitary confinement, executed repeated central-command-bubble overrides of overhead fluorescent cell lighting during thirty-minute security rounds, conducted mandatory pre-exit full strip and visual body-cavity searches and padlocked *"black box"* shackle placements, compromised Plaintiff's cell security, failed to protect Plaintiff from the December 21, 2023 armed shower threat and the May 3, 2024 biological urine assault, or executed retaliatory lockdowns;
2. **Unidentified Mailroom, Grievance, Classification, and Property Custodians (John and Jane Does 21-35)**: All currently unidentified mailroom screeners, grievance intake officers, classification and Housing Board specialists, and IRC / NNRJ property officers who intercepted, suppressed, and destroyed Plaintiff's outgoing letters and legal correspondence without notice, discarded or converted Plaintiff's clothing, legal papers, and personal effects without issuing property inventory or release receipts, or discarded and mis-indexed Plaintiff's administrative grievances (DCDC #387299); and

3. **Unidentified Clinical, Nursing, Pharmacy, and Health-Information Personnel (John and Jane Does 36-50)**: All currently unidentified or partially identified physicians, psychiatrists, psychologists, mid-level providers, nurses (including clinicians known inside the unit only as "Nurse Pretty" and "Nurse 28"), pharmacy staff, intake data-entry personnel, and backend Health Information Management Services (*"HIMS"*) / EHR database administrators whose internal user IDs, employee identification numbers, or National Provider Identifiers are concealed within unproduced eClinicalWorks / Accu-Flo ASTM E2147-18 electronic audit logs and who-acting in concert with the clinicians and HIMS personnel explicitly identified on the face of Plaintiff's produced medical records (including **HIMS Manager Lynda Boykin** (LBOYKIN, HIMSM) and **HIMS Clerk Jean Washington**, who generated, certified, and produced the Central Detention Facility Chart Summaries bearing the **intentionally fabricated Social Security Number "[redacted]"** (**Exhibit 979** at pp. 2-3; **Exhibit 978** at pp. 8, 37); **LPC Darius Mills**, who fabricated "Dr. Vivaci Fauci at Salt Lake City Utah" (**Exhibit 978** at p. 32); **NP Meena Kumar**, who fabricated "Gand jury medical center Southlake city Utah", "Grand jury medical center - UTAH", "BP: 122 / 77", and the May 10, 2024 "INITIAL DISCHARGE TREATMENT PLAN" (**Exhibit 978** at pp. 27-31); **LPN Theresa Anderson** ("BP: 122 / 77", p. 36); **PA DeBreaka Posey** ("Blood Pressure: 127/85 mm Hg", "bp cpntrolled", pp. 18-21); **PA Priscilla Momoh** ("MH S/C PT WAS SEEN 5/15/25", pp. 10-11); **PA Kamilah Ray-Boyd** ("Ophthalmology appt is next week", p. 12); **LPN Abigail Bentil (AB1)**; and **Emmerencia Ngwenyi (EN1)**, pp. 1-4)-withheld Plaintiff's prescribed maintenance medications across 181 consecutive days, left seventeen (17) pages of written Form PS 6001.1 Sick Call requests 100% blank and untriaged, entered fabricated normotensive blood pressure readings, anachronistic

encounters, phantom provider names ("Dr. Vivaci Fauci", "Grand Jury Medical Center - UTAH"), and fraudulent code Ø ("PT Refused/med not Administered,") notations in the Accu-Flo MAR, **intentionally fabricated and falsified Plaintiff's Social Security Number in the master EHR database as "[redacted]"** (falsifying Plaintiff's authentic Social Security Number XXX-XX-9076 into a fake number to defeat external disability and HIPAA records requests), disclosed Plaintiff's protected mental health information to unauthorized custodial personnel, or blocked Plaintiff's post-release access to his native Electronic Health Information and audit logs. Each of John and Jane Does 1-50 is sued in his or her individual capacity for compensatory, statutory, and punitive money damages and in his or her official capacity for declaratory and injunctive relief.

**Color of State Law Averment**: At all times relevant hereto, Defendants Faust, Marr, Brown, Williams, Denton, Whitehead, Savage, and John and Jane Does 1-35 were duly appointed officers, agents, and employees of Defendant District of Columbia Department of Corrections, acting within the scope of their official employment and under color of the statutes, ordinances, regulations, customs, and usages of the District of Columbia. At all times relevant hereto, Defendants Unity Health Care, Inc., Dr. Menon, Dr. Wellington, and John and Jane Does 36-50 performed an exclusive, non-delegable municipal governmental function under contract with the District of Columbia, exercising delegated state authority, and acted under color of state law within the meaning of 42 U.S.C. § 1983 pursuant to *West v. Atkins*, 487 U.S. 42 (1988).

**Supervisory Command Liability Averment**: Defendants Faust, Marr, Brown, Williams, Denton, Menon, Wellington, and the supervisory John and Jane Does possessed direct supervisory command authority over subordinate correctional and medical personnel. Each supervisory defendant possessed actual and constructive notice of the continuous constitutional violations inflicted upon Plaintiff through formal grievances, emergency PREA filings, written sick call requests, internal investigative reports, and contemporaneous communications. Despite possessing the authority, duty, and operational ability to halt these deprivations, each supervisory defendant knowingly acquiesced in, ratified, facilitated, and deliberately disregarded the unlawful conduct, exhibiting deliberate indifference and gross negligence directly causing Plaintiff's injuries, establishing personal liability under 42 U.S.C. § 1983 pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)[31], and *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004)[32].

## ARTICLE III. SATISFACTION OF CONDITIONS PRECEDENT

Pursuant to Federal Rule of Civil Procedure 9(c), Plaintiff generally avers that all conditions precedent to the initiation and maintenance of this civil action have occurred or have been performed.

---

[31] Supreme Court of the United States, *Ashcroft v. Iqbal*, 556 U.S. 662, at p. 676 (2009) -- *"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat..."*

[32] United States Court of Appeals for the District of Columbia Circuit, *Warren v. District of Columbia*, 353 F.3d 36, at p. 39 (D.C. Cir. 2004) -- *"To establish municipal liability under § 1983 based on deliberate..."*

## ARTICLE IV. FACTUAL ALLEGATIONS

### I. PLAINTIFF'S CUSTODIAL COMMITMENT AT THE CENTRAL DETENTION FACILITY, FULL UNCONDITIONAL PRESIDENTIAL PARDON, APPELLATE VACATUR, AND DISMISSAL WITH PREJUDICE

Following his initial remand into custodial detention on November 16, 2023-where he was held for six hours in 3-point shackles at the E. Barrett Prettyman U.S. Courthouse before direct transport-the District of Columbia Department of Corrections (*"DCDOC"*) took physical custody of Plaintiff John Earle Sullivan, an independent video journalist and documentary filmmaker, committing him directly to the Central Detention Facility (*"CDF"*, commonly known as the D.C. Jail, located at 1901 D Street SE, Washington, D.C. 20003) under permanent Inmate Identification Number DCDC #387289 on November 16, 2023. Plaintiff remained in the continuous physical and contractual custody of DCDOC and its contracted medical provider, Unity Health Care, Inc., for two hundred one (201) consecutive days at CDF and its contractual holding facility (Northern Neck Regional Jail in Warsaw, Virginia), terminating upon his transfer from DCDOC custody into federal custody on June 3, 2024 (whereafter Plaintiff remained continuously incarcerated in federal custody until President Donald J. Trump executed Presidential Proclamation 10887 on January 20, 2025 granting Plaintiff a full, complete, and unconditional pardon and ordering his immediate release). Throughout this entire custodial span, the institutional hierarchy of the Central Detention Facility was maintained and commanded by Director Thomas Faust, Correctional Major Sheila Marr, Lieutenant Anthony Brown Sr., Sergeant Delonte Williams, Housing Unit Manager Cuthbert Denton, Housing Unit Manager Christina Whitehead, and PREA Compliance Manager Cortney Savage, whose

contemporaneous shift rosters, supervisory assignments, and institutional badge coordinates were documented and authenticated in facility command registers and contemporaneous institutional records.

Plaintiff's custodial commitment arose out of underlying federal criminal proceedings initiated in the United States District Court for the District of Columbia, captioned *United States v. Sullivan*, Case No. 1:21-cr-00078-RCL, relating exclusively to Plaintiff's presence at the United States Capitol complex on January 6, 2021, where Plaintiff operated as an independent, credentialed video journalist recording documentary footage of unfolding national events. Following trial proceedings before Senior United States District Judge Royce C. Lamberth, Plaintiff initiated appellate proceedings before the United States Court of Appeals for the District of Columbia Circuit, captioned *United States v. John Earle Sullivan*, Case No. 24-3051. During the pendency of that appellate proceeding, the legal, constitutional, and decretal landscape governing Plaintiff's prosecution underwent total, irrevocable transformation.

On January 20, 2025, the President of the United States, Donald J. Trump, exercising the plenary constitutional authority vested in the Executive under Article II, Section 2, Clause 1 of the United States Constitution, issued Presidential Proclamation 10887, granting unto Plaintiff John Earle Sullivan an absolute, full, complete, and unconditional presidential pardon for all offenses arising from, related to, or in connection with the events of January 6, 2021, staged at **Exhibit 2**. The operative text of Presidential Proclamation 10887 decrees in mandatory terms:

> *"Acting pursuant to the grant of authority in Article II, Section 2, of the Constitution of the United States, I do hereby:... (b) grant a full, complete and unconditional pardon to all other individuals convicted of offenses related to events that occurred at or near the United States Capitol on January 6, 2021; The Attorney General shall administer and effectuate the immediate issuance of certificates of pardon to all individuals described in section (b) above, and shall ensure that all individuals convicted of offenses related to events that occurred at or near the United States Capitol on January 6, 2021, who are currently held in prison are released immediately."* -- President Donald J. Trump, *Presidential Proclamation 10887*, at pp. 2-3 (Jan. 20, 2025)

On February 7, 2025, the Office of the Pardon Attorney of the United States Department of Justice formally authenticated the execution of this executive act, issuing the official *Certificate of Pardon* (bearing identifier ID319255) under the official seal of the Department of Justice, certifying that Plaintiff John Earle Sullivan had received a full and unconditional executive pardon, staged at **Exhibit 3**. Following the issuance of Presidential Proclamation 10887, on January 24, 2025, the United States Department of Justice, through the Appellate Division of the United States Attorney's Office for the District of Columbia, filed *Appellee's Unopposed Motion to Vacate Convictions and Remand for Dismissal* in D.C. Circuit Case No. 24-3051 (Doc #2096152), staged at **Exhibit 3.1**, affirmatively moving the appellate court to vacate Plaintiff's convictions and remand to the district court for dismissal with prejudice pursuant to Federal Rule of Criminal Procedure 48(a) and the binding doctrinal authority of *United States v. Schaffer*, 240 F.3d 35, 37-38 (D.C. Cir. 2001) (en banc).

On February 27, 2025, a unanimous panel of the United States Court of Appeals for the District of Columbia Circuit (Childs, Pan, and Garcia, Circuit Judges) granted the government's motion, issuing its formal per curiam *Order* in Case No. 24-3051 (Doc #2103201), staged at **Exhibit 4**, ordering that the judgment of the district court be vacated in its entirety, remanding the matter with instructions to dismiss the case as moot, and directing the Clerk to issue the mandate forthwith. The decretal text of the D.C. Circuit's *Order* commands:

> *"Upon consideration of the unopposed motion to vacate convictions and remand for dismissal, it is ORDERED that the judgment of the district court be vacated and the case be remanded with instructions to dismiss the case as moot. See United States v. Schaffer, 240 F.3d 35, 37-38 (D.C. Cir. 2001) (en banc)."* -- United States Court of Appeals for the District of Columbia Circuit, *Order in No. 24-3051*, at p. 1 (Feb. 27, 2025)

On March 4, 2025, Senior United States District Judge Royce C. Lamberth entered the final *Order* in Case No. 1:21-cr-00078-RCL (Dkt. 164), staged at **Exhibit 5**, executing the appellate mandate upon the government's unopposed Rule 48(a) motion for dismissal with prejudice and ordering the complete, final dismissal of the criminal action:

> *"Upon consideration of the D.C. Circuit's Order of February 27, 2025, No. 24-3051, it is hereby ORDERED that the case is DISMISSED AS MOOT."* -- United States District Court for the District of Columbia, *Order in No. 1:21-cr-78-RCL-1 (Dkt. 164)*, at p. 1 (Mar. 4, 2025)

By operation of the plenary executive pardon, the comprehensive appellate vacatur, and the terminal district court dismissal of the charging indictment with prejudice, Plaintiff's underlying judgment of conviction was eradicated, expunged, and rendered of zero legal force. Under the controlling jurisprudence of the Supreme Court of the United States in *Nelson v. Colorado*, 581 U.S. 128, 135-36 (2017), the complete vacatur of an underlying conviction and dismissal of the indictment restores the individual's presumption of innocence, placing the citizen in the exact legal standing as though no formal accusation had ever been lodged. Consequently, the sovereign retains no legitimate penal interest, regulatory justification, or affirmative defense to justify the infliction of punitive carceral harms, and the favorable termination requirement established under *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994), is conclusively satisfied as a matter of law. Plaintiff neither challenges nor seeks to disturb any favorable judicial decree or executive act; rather, Plaintiff grounds this action upon his restored innocence to demand civil redress for the severe constitutional deprivations, bodily injuries, and intentional torts inflicted upon him throughout two hundred one (201) days of unlawful municipal confinement.

## II. UNLAWFUL 23-HOUR-PER-DAY PUNITIVE SOLITARY CONFINEMENT, INVOLUNTARY SEGREGATED HOUSING BEYOND THE 30-DAY PREA CEILING, AND ENVIRONMENTAL DEPRIVATION IN HOUSING UNITS SW-1 AND NE-1

Beginning upon his intake on November 16, 2023, and continuing unbroken through June 3, 2024, DCDOC supervisory officials, acting in concert with facility command staff, subjected Plaintiff to extreme, continuous, and unconstitutional solitary

confinement inside the Central Detention Facility and contractual holding facilities for over one hundred sixty (160) consecutive days. Following initial intake placement in Unit NE-1 Cell 63, and following Plaintiff's reporting of shower sexual harassment in late December 2023, Defendants transferred Plaintiff on January 3, 2024 to Unit SW-1 Cell 54, a restrictive housing segregation cell, where Plaintiff was locked behind a solid steel barrier for twenty-three to twenty-four hours each day and subjected to ambient sub-freezing 32°F temperatures. On January 20, 2024, Defendants transferred Plaintiff to Unit SW-1 Cell 50 (which unit was officially renamed South-1 on February 26, 2024), where Plaintiff remained locked in continuous solitary confinement for 110 consecutive days in Cell 50 (cumulatively spending over 130 consecutive days in solitary confinement across Cells 54 and 50 prior to his May 8, 2024 transfer to NNRJ). On May 3, 2024, at approximately 10:00 PM, Plaintiff was subjected to an unprovoked biological assault when, while locked in mechanical shackles and being escorted by Correctional Officer Tchamo from the shower enclosure back to his cell, inmate *"Goon"* (housed in Cell 5) sprayed a pressurized jet of urine through the thin crack of his cell door directly at Plaintiff's face; Plaintiff caught sight of the liquid and averted his head, deflecting the primary stream onto his shoulder, though urine struck his left eye and cheek (with after-spray striking Officer Tchamo's arm and shoulder). Officer Tchamo initially attempted to march Plaintiff back into his cell without medical decontamination until Plaintiff asserted-directly on Officer Tchamo's active chest-mounted body-worn camera-that he had to be decontaminated and medically examined and pointed out that Goon's conduct constituted a clear assault on both Plaintiff and Officer Tchamo himself, whereupon Officer Tchamo agreed and reported the assault. When facility supervisory staff subsequently photographed the scene, permitted a shower, and escorted Plaintiff to the third-floor medical unit, the attending physician performed zero biological triage,

baseline blood draws, or infectious disease prophylaxis, merely asking whether Plaintiff had showered before summarily dismissing him. On May 8, 2024, DCDOC executed an inter-facility contractual transfer shipping Plaintiff to Northern Neck Regional Jail (NNRJ, Warsaw, VA), where intake classification evaluated Plaintiff as a 0-point minimum security classification, confirming he posed zero disciplinary or security risk. However, because prior January 6 detainees previously housed at NNRJ had gotten into a riot or fight-causing NNRJ to refuse to house any January 6 defendants-DCDOC knew in advance that NNRJ would not accept January 6 detainees, yet sent Plaintiff there knowing he would be sent right back, and rather than housing Plaintiff in appropriate minimum-custody facilities, DCDOC abruptly hauled Plaintiff back to CDF on May 10, 2024 for a second intake (*"re-intake"*), confiscated all six months of personal property and personal laundry Plaintiff had accumulated inside his cell at CDF (including his books, his seven sets of purchased commissary clothing/personal laundry-seven shirts, seven pairs of underwear, seven pairs of socks, two pairs of shorts, and one pair of sweatpants-his cups, his food and commissary items, his paper, and his writing materials) upon re-intake-forcing Plaintiff in South-2 Cell 34 to borrow sheets of paper and a two-inch pencil stub from fellow intake detainees just to write, and although Case Manager Ms. Coats subsequently retrieved and returned Plaintiff's books on May 22, 2024 after Plaintiff's parents pressed Property Sergeant Alonzo Walker and Plaintiff filed Step 1 Property Grievance IGP #20240520-365, Defendants never returned and permanently deprived Plaintiff of his seven sets of personal clothing/laundry, cups, food and commissary items, paper, and writing materials-conducted a sham Restrictive Housing Review Initial Hearing under Program Statement 5300.1, Attachment F, and warehoused Plaintiff in Unit South-2 Cell 34. In the institutional topography of the Central Detention Facility, South-2 operates strictly as an Intake, Reception, and Transit tier designed

exclusively for short-term processing (subject to a mandatory institutional ceiling generally capped at 24 to 72 hours), whereas Unit South-1 (formerly SW-1) serves as the facility's dedicated Restrictive Housing and Involuntary Protective Custody segregation tier. Rather than completing classification and transferring Plaintiff to appropriate housing within the mandatory intake timeframe, DCDOC unlawfully warehoused Plaintiff in South-2 Cell 34 under total, unbroken cell lockdown for days beyond the lawful intake ceiling. On May 15, 2024, while Plaintiff's white January 6 intake cellmate (Richard Brooke) and fellow January 6 intake detainees were left untouched for transfer to the Correctional Treatment Facility (*"CTF"*), DCDOC staff handed Plaintiff a housing transfer sheet attempting to move him out of Unit South-2 intake directly into Unit SW-2 (Southwest-2)-the most violent maximum-security general population unit in the entire D.C. Jail, where inmates wield butcher-sized knives and where both detainees and correctional officers routinely get stabbed (including five guards fatally stabbed), making it completely illogical and life-threatening to place a 0-point minimum-security January 6 defendant there. Rather than merely refusing an order, Plaintiff pointed out to the correctional officer that placing him into the facility's most violent maximum-security unit where inmates and guards get stabbed made zero logical sense and explained that, as a January 6th defendant, he was supposed to be housed at CTF; upon hearing this, the officer quickly backtracked, stated, *"Oh, okay, I'm going to go check on that,"* called in to verify Plaintiff's status, and scratched Plaintiff off the SW-2 transfer list. However, instead of transferring Plaintiff to CTF alongside his fellow January 6 intake detainees (who were moved to CTF on May 17 and May 23, 2024), and after Defendants rejected Plaintiff's property and safety grievances (IGP #20240520-365 and #20240522-470), Defendants used that aborted SW-2 transfer and a fabricated pretext of *"protection"* / *"protective custody"* to force Plaintiff back into solitary confinement in Unit South-1 Cell 35 on May

24, 2024 at 4:00 PM EST (heading into Memorial Day weekend) under Sergeant Okori and Sergeant Delonte Williams-even though Plaintiff vehemently and loudly informed Sergeant Okori, unit officer *"Candy Man,"* and multiple inmate witnesses directly on Sergeant Okori's active body-worn camera that he did not want to go back to South-1, did not agree to be held there against his will, and did not want to be held in protective custody-re-imposing full 3-point shackles on every cell exit and maintaining continuous solitary isolation through Plaintiff's departure from DCDOC custody on June 3, 2024. Across this succession of restrictive segregation cells-Unit NE-1 Cell 63, Unit SW-1 / South-1 Cell 54 and Cell 50, Unit South-2 Cell 34, and Unit South-1 Cell 35-Defendants maintained identical conditions of punitive solitary isolation as verified by contemporaneous Keefe commissary transaction receipts, inmate property manifests, and postmarked USPS legal envelopes.

Defendants imposed this prolonged solitary confinement under the bad-faith pretext of *"involuntary protective custody"* pursuant to the Prison Rape Elimination Act (*"PREA"*), 34 U.S.C. §§ 30301 *et seq.*, following Plaintiff's submission of an emergency sexual safety grievance. In doing so, Defendants violated the mandatory national standards promulgated by the Department of Justice under 28 C.F.R. § 115.43(d), which commands that involuntary segregated housing for an inmate's protection shall not exceed thirty (30) days unless the facility administrator makes an explicit, documented, and individualized written determination that continued segregation remains strictly necessary and that no less restrictive alternative exists. Defendants held Plaintiff in continuous solitary confinement for more than five times the statutory maximum-exceeding the federal ceiling by more than five hundred thirty percent (530%)-without ever performing the required thirty-day classification reviews, without generating written justification findings, and without

exploring transfer to the dedicated protective custody unit at the Correctional Treatment Facility (*"CTF"*).

The physical conditions within these restrictive cells across Units SW-1 / South-1 (*"the hole"*), NE-1, and South-2-including Cell 54, Cell 50, Cell 63, Cell 34, and Cell 35-constituted an environment of extreme sensory deprivation, spatial disorientation, physical hazards, and unaddressed structural decay. In Unit SW-1 / South-1, where Plaintiff was held for over 130 consecutive days on the top tier, right-hand side of the unit, the environment was completely windowless and spatially disorienting, depriving detainees of any visual reference to orient north, south, east, or west. The cells measured approximately eight by ten feet-barely two to three paces across in width and approximately six paces in length from end to end-constructed of uninsulated poured-concrete walls and furnished solely with a fixed steel bed frame, mattress, blanket, toilet, and a small fixed steel desk with a steel table and steel stool, sealed behind a solid steel door containing only a narrow vertical window slit and a security pass-through slot. Compounding this environmental isolation, Defendants subjected Plaintiff to an unremitting, twenty-four-hour-a-day, seven-day-a-week (24/7) acoustic barrage from the unit's single television: in Unit SW-1 / South-1, there was only one television, which was situated on the upper tier-where Plaintiff was housed-inside the enclosed plastic-glass (plexiglass) dayroom, and Defendants maintained that single upper-tier enclosed dayroom television blaring nonstop 24/7 at full, maximum, deafening volume that reverberated continuously down the concrete and steel hallway into the cells. Ambient decibel levels reverberating down the upper-tier hallway were so deafening that normal conversational speech was rendered impossible-requiring detainees to physically yell at the top of their lungs across mere feet just to be heard-creating an inescapable wall of noise where an

individual could not hear themselves think, completely destroying normal circadian sleep rhythms by impairing the entrainment of the brain's master circadian pacemaker, the suprachiasmatic nucleus (*"SCN"*), dysregulating the hypothalamic-pituitary-adrenal (*"HPA"*) axis, disrupting cortical and subcortical excitatory-inhibitory neurochemical balance, inflicting continuous, debilitating sleep deprivation and psychological exhaustion, and causing permanent acoustic-trauma cochlear and auditory cortical injury to Plaintiff-characterized neurobiologically in peer-reviewed clinical literature (Marazziti et al., *Sensory Deprivation and the Brain* (2026)) by peripheral cochlear hair-cell/synaptic insult, abnormal auditory perception and threshold shift (ICD-10-CM H93.29-), and deafferentation-induced central auditory cortical hyperexcitability that spontaneously generates phantom ringing perceptions[33]-in the form of chronic, irreversible bilateral tinnitus (ICD-10-CM H93.13, codified in the official *ICD-10-CM Tabular List of Diseases and Injuries* under Category H93, *"Other disorders of ear, not elsewhere classified"*, as *"H93.13 Tinnitus, bilateral"*)[34] that causes Plaintiff's ears to ring nonstop 24/7 to this day (formally diagnosed post-release as active "Bilateral tinnitus" / "H93.13 (TINNITUS, BILATERAL)" by Peak Medical Group PA-C Andrew Caldwell on September 15, 2025 and Whole Mind Psychiatry providers Dr. Thomas Rayner, M.D., and Tyson Brinkerhoff, PMHNP, on September 24, 2025, which persisted unabated despite medication washout testing and oral Prednisone steroid tapers). Throughout the winter and spring months of 2023 and 2024, the heating infrastructure in Units SW-1 and NE-1 suffered severe mechanical breakdowns, forcing Plaintiff to endure sub-freezing drafts and prolonged ambient hypothermia without thermal clothing, adequate blankets, or climate control, in

---

[33] Donatella Marazziti et al., Sensory Deprivation and the Brain: Neurobiological Mechanisms, Psychological Effects, and Clinical Implications, at pp. 2, 5-6, 9 (2026): 'However, plasticity is not always adaptive...

[34] Centers for Medicare & Medicaid Services & National Center for Health Statistics, ICD-10-CM Tabular List of Diseases and Injuries (FY 2026), at p. 514 (2025): 'H93 Other disorders of ear, not elsewhere classified...

direct violation of D.C. Code § 24-211.02(a).

Pervasive structural contamination compounded these freezing temperatures. Thick colonies of black mold encrusted the cell walls, ceiling seams, ventilation grills, and communal shower enclosures, discharging airborne fungal spores that Plaintiff inhaled continuously throughout his confinement. The plumbing fixtures in Units SW-1 and NE-1 suffered chronic system failures, causing raw human sewage, contaminated greywater, and fecal matter from upper-tier cells to back up through Plaintiff's in-cell toilet and floor drain, pooling across the concrete floor and generating noxious biohazardous fumes. Correctional officers routinely refused Plaintiff's verbal and written requests for basic sanitation supplies, denying him brooms, mops, disinfectant, toilet paper, and soap, thereby forcing Plaintiff to inhabit a cell contaminated with raw sewage and mold without the physical means to decontaminate his living quarters, as documented in contemporaneous administrative grievance filings staged at **Exhibit 976** and **Exhibit 980**.

Defendants deprived Plaintiff of natural sunlight, fresh air, and meaningful physical exercise throughout his confinement, in direct violation of the mandatory custodial standards established under D.C. Code § 24-211.02(b)(3)(E), while enforcing degrading strip-search and mechanical-restraint protocols every single time Plaintiff exited his cell. Whenever Plaintiff was permitted to leave his cell in Unit SW-1 / South-1 to go anywhere in the facility-despite having committed zero disciplinary infractions-correctional officers first ordered Plaintiff to strip completely naked inside his closed cell, removing every piece of clothing and his shoes, and forced him to turn around, bend over, spread his buttocks, and cough for a visual body-cavity inspection. While standing completely naked inside the unheated concrete cell, Plaintiff was required to pass his shoes and every single

article of clothing out through the narrow door slot for guard inspection before they were handed back through the slot for him to dress. Once dressed with the steel cell door still locked shut, Plaintiff was required to thrust both wrists out through the narrow door slot to be locked in steel handcuffs, stand up and press his waist tightly against the door slot while the officer wrapped a heavy steel link chain around his waist and pulled it taut, and then turn around to face the rear of the cell away from the door while the guard maintained physical tension on the chain through the slot and waved or radioed the officer in the central command bubble to unlock the cell door. Upon the door opening, officers ordered Plaintiff to hold his handcuffed hands in front of his torso, clamped a rigid plastic and metal handcuff cover-a black box apparatus-over the link chain between his wrist cuffs, ran the steel waist chain through a hook in the black box, and pulled and padlocked the apparatus tightly against his stomach so that Plaintiff was physically unable to lift his arms off his abdomen. Officers then ordered Plaintiff to face the wall and lift his feet one by one to lock steel shackles around both ankles. For over 130 consecutive days, Plaintiff was never permitted to walk normally anywhere outside his cell, being forced to shuffle in full three-point shackles (padlocked black-box wrist cuffs, steel waist chain pulled tight against his stomach, and steel ankle shackles) for every movement, including all medical and dental encounters, all in-person legal visitations with his criminal defense attorney Steven R. Kiersh, and all video visitations. Rather than providing daily congregate access to an outdoor recreation yard, Defendants subjected Plaintiff to continuous, unbroken cellular confinement with almost zero out-of-cell time, leaving Plaintiff locked behind a solid steel barrier for days and weeks at a time without ever being released from his cell. Although DCDOC policy for Unit South-1 nominally authorized ten (10) hours of out-of-cell time per week, custodial officers routinely refused to release Plaintiff from his cell and falsified internal logs by entering pretextual notations that Plaintiff had refused or

forfeited recreation. Throughout his months in segregated housing, Plaintiff went extended intervals without a single recreation period-going weeks without a single recreation period upon initial transfer, and being granted recreation only twice across an entire month. On the rare, isolated occasions when out-of-cell recreation or shower access was offered-at most one hour, if fortunate-Plaintiff was still subjected to the mandatory pre-exit full strip and visual cavity search, after which he was ordered to bend down at the closed door slot with his hands behind his back to be rear-handcuffed through the slot, escorted with his hands cuffed behind his back into an unheated, windowless indoor area, and locked entirely alone inside a small steel and wire recreation cage (or locked wire shower cage), where he had to bend down again at the cage slot for officers to remove the handcuffs. Within this cramped recreation cage-which contained merely a basketball hoop with no basketball-the entire extent of Plaintiff's physical exercise for over 130 consecutive days consisted of pacing or running in tight circles on bare concrete just to stretch his legs. On other occasions, staff shoved Plaintiff into the Video Visitation room in the South-1 unit for his out-of-cell time while "the entire room was flooded with urin and feces from toilet water that had overflowed into the room from an inmate who had flooded his cell", where Plaintiff ran in circles for thirty minutes to obtain minimal physical exercise after four consecutive days of unbroken in-cell lockdown-a biohazardous deprivation formally grieved by Plaintiff on April 1, 2024 in his Step 2 *Inmate Formal Grievance Form* (PP 4030.1 Attachment D, IGP #20240411-265, stamped RECEIVED APR 09 2024, mis-indexed by DCDOC under DCDC# 387299, and signed by Capt. D. Hayward on 4.23.24 and Grievance Coordinator D. Harris on 4/22/24, staged at **Exhibit 980**). Compounding this severe physical deprivation, Defendants routinely denied Plaintiff basic shower access for three to five consecutive days at a time, forcing Plaintiff to choose between avoiding any physical exertion or sweating inside his unheated cell and remaining

in soiled clothing and freezing bedding for days without hot water. Compounding this environmental deprivation, adjacent detainees in Units SW-1 and NE-1 routinely combusted contraband paper and illicit synthetic cannabinoids, inundating the unventilated segregation tier with dense plumes of noxious chemical smoke that infiltrated Plaintiff's cell through door perimeters, precipitating bronchial inflammation, severe coughing spasms, vertiginous disorientation, and progressive optical distress that custodial and clinical personnel willfully refused to remediate.

## III. SYSTEMIC MEDICAL, PSYCHIATRIC, NEUROLOGICAL, AND PHYSICAL HEALTH ABANDONMENT, SEVENTEEN UNANSWERED SICK CALL REQUESTS, AND FRAUDULENT MAR / EHR MANIPULATION

Upon his initial custodial remand on November 16, 2023 and booking at the Central Detention Facility (DCDC #387289), Plaintiff was a high-functioning, self-supporting independent adult and elite competitive athlete operating without debilitating physical, cardiovascular, auditory, or psychiatric impairment, and had never had a seizure or convulsive episode in his entire life. Prior to incarceration, Plaintiff maintained an exceptional physical, occupational, and athletic baseline-demonstrated by years of Olympic-caliber speed skating training, 70-mile endurance cycling, independent documentary journalism, and robust physiological resilience-supported by routine, stable outpatient prescriptions prescribed by licensed community treating physicians in Utah (including maintenance therapeutic doses of dextroamphetamine-amphetamine ([redacted], 60-65 mg/day), [redacted] ER ([redacted], 200 mg/day), [redacted] (60 mg/day) / [redacted] ([redacted], 60 mg/day), and [redacted] (80-160 mg/day) for attentional and performance focus). DCDOC and its contracted medical provider, Unity Health Care, Inc., formally

transcribed this active medication and clinical profile onto Plaintiff's clinical chart, as verified in the certified Electronic Health Record compilation staged at **Exhibit 978**. Whereas Plaintiff was high-functioning, fully self-supporting, and had never experienced a seizure in his life prior to his confinement, Defendants' unlawful carceral conditions, prolonged sensory and environmental deprivation, and clinical abandonment operated as a direct, proximate, and substantial causal force that shattered Plaintiff's functional baseline and inflicted severe, permanent disabling injuries resulting in total occupational and functional disability. As established in peer-reviewed clinical and epidemiological medical literature examining the neurobiological and somatic impacts of solitary confinement (Strong, Reiter, et al., *The Body in Isolation* (2020); James & Vanko, *The Impacts of Solitary Confinement* (2021)), prolonged isolation in an 8x10 concrete cell acts as a severe physiological and neurotoxic stressor that structurally alters the human brain (inducing hippocampal volume reduction that impairs stress and emotional regulation alongside amygdala hyperreactivity mediating fear and anxiety), dysregulates the hypothalamic-pituitary-adrenal (*"HPA"*) axis, causes vitamin D depletion from lack of natural sunlight, triples the incidence of clinical hypertension, and inflicts severe musculoskeletal pain, somatic deterioration, and sensory hypersensitivity through the synergistic interaction of restrictive deprivation conditions and institutional healthcare-deprivation policies.[35, 36] By subjecting Plaintiff to 181 consecutive days of unmonitored psychotropic withdrawal, over 160 consecutive days of freezing solitary confinement completely deprived of natural sunlight, fresh air, and proper nutrition, nonstop 24/7 full-volume acoustic trauma from the upper-tier enclosed plastic-glass

[35] Justin D. Strong, Keramet Reiter, et al., The Body in Isolation: The Physical Health Impacts of Incarceration in Solitary Confinement, at pp. 8, 14 (2020): 'We find that solitary confinement constitutes not just a...

[36] Kayla James & Elena Vanko, The Impacts of Solitary Confinement, at p. 3 (2021): 'One particularly impacted area is the hippocampus, the part of the brain that affects learning, memory, and spatial awareness. It...'

dayroom television reverberating down the hallway, forced physical stagnation and near-total immobilization in an uninsulated concrete cell that destroyed his musculoskeletal conditioning and caused severe physical deconditioning and lower-extremity vascular stasis, raw sewage and black mold contamination, dense synthetic cannabinoid smoke, and an unaddressed, first-in-lifetime convulsive seizure in the lower-tier video call recreation room in which he fainted backward onto a steel stool and struck his head against the concrete wall, Defendants shattered Plaintiff's physical, auditory, vascular, and neurological integrity, directly and proximately causing, producing, and materially contributing to permanent psychiatric, cognitive, neurological, auditory, and physical disabilities-including [redacted] (ICD-10 F43.10), Panic Disorder (ICD-10 F41.0), Major Depressive Disorder (ICD-10 F32.A / F32.9), Generalized Anxiety Disorder (ICD-10 F41.1), [redacted] (ICD-10 F90.9), Chronic Bilateral Tinnitus (ICD-10-CM H93.13), Hypertension (ICD-10 I10), Raynaud's disease, and chronic autonomic/cognitive dysregulation-resulting in total disability as formally adjudicated post-release by disability evaluating physicians and the Utah Department of Workforce Services (**Exhibit 979**, and Exhibit 17 attached to Plaintiff's concurrently filed *Motion for Leave to Proceed In Forma Pauperis*).

Immediately upon his initial custody remand on November 16, 2023 and continuing throughout his transfer to CDF, Unity Health Care clinical personnel and DCDOC medical authorities abruptly, unilaterally, and without psychiatric justification discontinued Plaintiff's entire psychotropic medication regimen. For exactly one hundred eighty-one (181) consecutive days-spanning November 16, 2023 through May 15, 2024-Defendants provided zero CDF psychiatric evaluations, zero medication management, and zero therapeutic intervention. This abrupt cessation violated clear statutory and FDA

prescribing safety mandates, directly triggering acute, agonizing neurochemical and physiological trauma: (1) **[redacted] ([redacted]) and [redacted] ER ([redacted]) Forced Discontinuation Syndrome**: FDA Prescribing Information for [redacted] (NDA 019839, Sections 2.6 (Discontinuation of Treatment with [redacted]), 5.5 (Discontinuation Syndrome), and 17 (Patient Counseling Information)) and [redacted] (NDA 211964, Boxed Warning, Section 5.1 (Suicidal Thoughts and Behaviors), Section 5.2 (Blood Pressure and Heart Rate Increases), and Section 12.2 (Pharmacodynamics)) explicitly mandate gradual dose reduction ("Gradually reduce the dosage rather than stopping [redacted] abruptly whenever possible"), require close monitoring "at times of dosage changes", and warn that abrupt discontinuation of serotonergic antidepressants directly induces "nausea, sweating, dysphoric mood, irritability, agitation, dizziness, sensory disturbances (e.g., paresthesia, such as electric shock sensations), tremor, anxiety, confusion, headache, lethargy, emotional lability, insomnia, hypomania, tinnitus, and seizures"[37, 38]-establishing a direct, FDA-verified pharmacological mechanism explaining why Defendants' cold-turkey severance of Plaintiff's serotonergic and noradrenergic maintenance therapy plunged Plaintiff into severe monoaminergic disequilibrium, acute dysphoria, debilitating electric-shock paresthesias, affective lability, rebound panic attacks, autonomic collapse, and profound psychomotor decompensation, and directly caused and materially contributed to Plaintiff's **acute, first-in-lifetime convulsive seizure on January 31, 2024** and his **chronic bilateral tinnitus (ICD-10-CM H93.13)** (synergistically compounded by the nonstop 24/7 full-volume television acoustic trauma); (2) **Mixed Amphetamine Salts ([redacted]) and [redacted] ([redacted]) Acute Hypodopaminergic Crash**: As established

[37] U.S. Food and Drug Administration, Highlights of Prescribing Information: [redacted] ([redacted] hydrochloride) Tablets and Oral Solution (NDA 019839/S-074/S-086/S-087; NDA 020990/S-035/S-044/S-045), at §§ 2.6, 5.5...

[38] U.S. Food and Drug Administration, Highlights of Prescribing Information: [redacted] ([redacted] extended-release capsules) (NDA 211964/S-000), at §§ 5.1, 5.2, 12.2, pp. 3-4, 10 (2021): '5.1 Suicidal Thoughts...

in FDA Prescribing Information for [redacted] (NDA 011522, CLINICAL PHARMACOLOGY and DRUG ABUSE AND DEPENDENCE, warning that "Abrupt cessation following prolonged high dosage administration results in extreme fatigue and mental [redacted]; changes are also noted on the sleep EEG") and [redacted] (NDA 020717, Section 5.7 (Cardiovascular Events), Section 7 (Drug Interactions - Effects of [redacted] on CYP2C19 Substrates), and Section 12.1 (Mechanism of Action)),[39, 40] Defendants' cold-turkey cutoff of Plaintiff's prescribed dopaminergic stimulants ([redacted] 60-75 mg/day on November 16, 2023, followed by repeated multi-day intake MAR omissions of [redacted] in May 2024) caused precipitous synaptic dopamine and norepinephrine depletion in the striatum and prefrontal cortex-driving dopamine transporter ($\theta_{\mathrm{DAT}}$) occupancy from greater than 60% down to 0%-directly inflicting acute neurocognitive collapse, severe anergia, hypersomnolence, executive dysfunction, working-memory encoding failure, and intense mental [redacted]; and (3) [redacted] **HCl ([redacted]) Rebound Adrenergic Supersensitivity**: As established in FDA Prescribing Information for [redacted] ([redacted] HCl, NDA 016418, CLINICAL PHARMACOLOGY, WARNINGS - Angina Pectoris, and ADVERSE REACTIONS),[41] [redacted] possesses a short plasma half-life of 3 to 6 hours ("The plasma half-life of [redacted] is from 3 to 6 hours") and carries an explicit FDA Warning that "when discontinuance of [redacted] is planned, the dosage should be gradually reduced over at least a few weeks and the patient should be cautioned against interruption or cessation of therapy without the physician's advice"; Defendants' sudden, unmonitored cessation of Plaintiff's chronic high-dose [redacted] therapy (80-160 mg/day) caused rapid systemic washout within 24 hours,

[39] U.S. Food and Drug Administration, Prescribing Information: [redacted] (CII) (Dextroamphetamine Saccharate, Amphetamine Aspartate Monohydrate, Dextroamphetamine Sulfate, Amphetamine Sulfate Tablets)...

[40] U.S. Food and Drug Administration, Highlights of Prescribing Information: [redacted] Tablets, for Oral Use, C-IV (NDA 020717/S-037/S-038), at §§ 5.7, 7, 12.1, pp. 4, 6, 9 (2015): '5.7 Cardiovascular...

[41] U.S. Food and Drug Administration, Prescribing Information: [redacted] ([redacted] Hydrochloride) Tablets (NDA 016418/S-080, 016762/S-017, 017683/S-008), at pp. 3, 9, 14 (2010): 'The plasma half-life of...

leaving Plaintiff's significantly upregulated cardiac and vascular $\beta_1$- and $\beta_2$-adrenoceptors exposed to unchecked surges of endogenous catecholamines and triggering severe resting tachycardia, labile blood pressure spikes, agonizing neurovascular tremors, peripheral arterial insufficiency "of the Raynaud type", and life-threatening cardiovascular instability. When Discipline Director of Behavioral Health Roderick I. Wellington, Ph.D., LCPC, NCC, CFC (listed in the EHR header as "Provider: Roderick Wellington - PhD", NPI 1336535319), finally conducted a clinical encounter on May 15, 2024 (05/15/2024 - MH Clinician: MHC Follow-Up), he entered an unauthenticated, preliminary chart note bearing the explicit banner: "Status: ON HOLD DOCUMENT. Contents are preliminary", staged at **Exhibit 978** at page 14, which was never finalized or countersigned. And although Psychiatric Nurse Practitioner Linda Fonju conducted an initial psychiatric assessment on May 15, 2024 and recorded Plaintiff's pre-detention Utah regimen ("adderral 65mg XR, propranol 80mg, quelbree 200mg, [redacted] 60mg daily"), she ordered only [redacted] 50 mg ("Give one and half(75mg) QHS"), [redacted] 100 mg ("Take 1 Tab by mouth QD"), and [redacted] 25 mg ("1 cap po qhs", alongside existing PRN Albuterol and topical [redacted]ment)-completely failing to reinstate Plaintiff's [redacted] or [redacted] (**Exhibit 978** at pp. 15-16). Furthermore, in response to the Utah Department of Workforce Services records request, DCDOC Health Information Management Services (*"HIMS"*) Manager Lynda Boykin executed an official Medical Records Department Memorandum on December 19, 2025 checking (XX) that "We are unable to locate all the records you requested, enclosed are portions of the record that are available. 2020-2022", "Patient was not at this facility for the dates/period that was request.", and "Other: THE INFORMATION AVAILABLE IS ATTACHED", staged at **Exhibit 979** at page 2, producing zero physical examination or diagnostic triage records

for Plaintiff's entire November 16, 2023 to May 10, 2024 CDF confinement other than a single January 26, 2024 dental exam (**Exhibit 979** at pp. 4-5).

Between November 27, 2023 and May 5, 2024, Plaintiff submitted formal, handwritten Inmate Sick Call Request Forms (DCDOC Form PS 6001.1)-documented across seventeen (17) sick call pages produced by DCDOC (comprising 14 unique sick call submissions alongside 3 duplicate scans included by DCDOC at pages 8, 9, and 18), staged at pages 2 through 18 of **Exhibit 977**-detailing escalating medical and psychiatric crises. These submitted forms documented excruciating withdrawal from his five-month deprivation of psychiatric medications (pp. 2, 3, 5, 6, 7); the inhalation of toxic chemical smoke causing pulmonary distress (pp. 4, 8, 9); a first-in-lifetime convulsive seizure on January 31, 2024 at 10:58 AM in the out-of-service lower-tier video call room used for recreation in Unit SW-1 ("At 10:58 am in the lower rec room of the unit with the video call stations, I believe I had a seizer, for which I stood up my body convulsed and I blacked out. Please check the security cameras", stamped received 2/01/2024 at p. 11)-Plaintiff having never had a seizure or convulsive episode at any point in his entire life prior to his confinement at CDF-during which, after 76 consecutive days of abrupt, cold-turkey psychotropic and beta-blocker withdrawal, freezing solitary confinement, toxic K2/Spice smoke inhalation, and nonstop 24/7 acoustic sleep deprivation, and after sitting on a steel stool reading the *Doctrine and Covenants* on his tablet in front of a black video box fastened to the concrete wall, Plaintiff stood up to walk around the room, suddenly fainted backward onto the steel stool, struck his head against the concrete wall as his body convulsed out of control, and caught himself at the last moment by throwing his hand against the wall-mounted black video box and thrusting himself back onto his feet before falling head-first into the black box, only for correctional officers on duty

(including CO "Candy Man", who accused Plaintiff of lying and refused medical care to avoid an incident on his shift, a second officer who walked away, and CO "Alpha") and clinical staff to leave him completely unattended without medical evaluation or diagnostic triage despite Plaintiff's immediate verbal reports, tablet Hotline / Tips 2022 report (Confirmation #417531541 at 4:58 PM), and written Sick Call Request; progressive optical deterioration with black spots and floaters in his vision (pp. 10, 14); and a severe gluteal abscess between May 2 and May 5, 2024 (pp. 12, 13, 15, 18), which became purulent, ruptured, and drained blood and infectious fluid onto Plaintiff's bedding without the provision of antiseptic dressings or antibiotic therapy. Across all seventeen pages of sick call forms in **Exhibit 977**, the designated Medical Provider / Date / Time triage section at the bottom of every form remains one hundred percent (100%) blank. Unity Health Care and DCDOC staff repeatedly discarded, ignored, and refused to process Plaintiff's written requests for medical care.

In addition to their deliberate indifference toward Plaintiff's catastrophic neurological, psychiatric, and physical health crises, Defendants exhibited pervasive neglect toward basic routine clinical maintenance and specialized sensory care. When Plaintiff was escorted from solitary confinement to his dental appointment on January 26, 2024 (**Exhibit 977** at p. 1), custodial officers forced him to undergo a full strip and cavity search and remain locked in full padlocked *"black box"* wrist-cuff, waist-chain, and ankle-shackle restraints while sitting in the dental chair; staff dentist Dr. Shayla T. Calhoun merely looked briefly at his teeth, performed zero dental cleaning or treatment, told him to go back to his cell, left the clinical notes section of the Dental Record-Medical Form entirely blank, and scheduled zero follow-up or routine care. Subsequently, on April 3, 2024, Plaintiff submitted an Inmate Sick Call Request Form requesting routine teeth

cleaning to prevent oral health deterioration (**Exhibit 977** at p. 17). Unity Health Care and DCDOC scheduled zero appointments, performed zero cleanings, and left the mandatory provider triage section 100% blank. This pattern of clinical abandonment was replicated with equal severity regarding Plaintiff's vision. Throughout his confinement, Plaintiff suffered acute optical distress, blurred vision, and chronic ocular irritation caused by total deprivation of natural sunlight and dense plumes of unventilated K2/Spice chemical smoke. On May 14, 2024, Physician Assistant DeBreaka Posey noted on Plaintiff's Chronic Care Clinic record: "opthal > 1 yr-referral placed" (**Exhibit 978** at p. 19). Three days later, on May 17, 2024 at 12:59 PM, while Plaintiff was housed in South-2 Cell 34, Physician Assistant Kamilah Ray-Boyd recorded an electronic sick-call text note documenting Plaintiff's explicit plea for optical care: "Pt requests Rx eyeglasses and appt with ophthalmology. No other complaints today. Ophthalmology appt is next week" (**Exhibit 978** at p. 12). At that exact same minute (12:59 PM), PA Ray-Boyd entered an administrative cancellation terminating the sick-call appointment ("Appointment status changed to canceled by Kamilah Ray-Boyd - PA on 05/17/2024 12:59 PM"). The recorded representation that an "Ophthalmology appt is next week" was a complete administrative fiction designed to summarily clear sick-call queues without delivering care: Plaintiff **literally never saw an eye doctor, not once**, throughout his entire carceral custody; was never examined by an ophthalmologist or optometrist; and was never provided prescription eyeglasses. Defendants completely abandoned Plaintiff's optical health, leaving him trapped in isolation with deteriorating, uncorrected vision while generating paper promises of *"next week"* specialist visits that never occurred.

To conceal their systemic failure to deliver prescribed medications to detainees held in solitary confinement and insulate staff from civil liability, Unity Health Care nursing personnel and custodial staff systematically manipulated, corrupted, and falsified Plaintiff's Electronic Medication Administration Record (*"MAR"*) and Electronic Health Record (*"EHR"*) files (**Exhibit 978**). A rigorous audit of the certified May-June 2024 Accu-Flo eMAR and clinical progress notes reveals pervasive institutional record tampering, demonstrable data falsification, and irreconcilable documentary contradictions:

a. **Active Medication Petition and Signed Written Consent Versus Fraudulent *"Refusal"* Logs (May 15, 2024)**: On May 15, 2024 at 20:00 (8:00 PM), the Accu-Flo MAR (**Exhibit 978** at pp. 1, 2, 4) logs code Ø entered by LPN Abigail Bentil (*"AB1"*) for both [redacted] 25 mg (RX: 2470885) and [redacted] 75 mg (RX: 2470888), displaying the automated electronic string "PT Refused/med not Administered,". This entry was an outright administrative fabrication. Less than five hours earlier on that exact same afternoon (May 15, 2024, electronically signed at 3:06 PM), Psychiatric Nurse Practitioner Linda Fonju, NP (**Exhibit 978** at pp. 15-17) conducted a comprehensive clinical evaluation of Plaintiff, recording: "He is hopeful to have medications reviewed and renewed... Patient presents for initial psychiatric assessment. He is calm and engaged. We discussed treatment options and agreed to resume on medications... Medication consent form signed.". Furthermore, just one day prior (May 14, 2024 at 7:53 AM, **Exhibit 978** at p. 21), Physician Assistant DeBreaka Posey documented that Plaintiff had submitted an emergency sick-call slip affirmatively begging for his [redacted] medication ("sc slip reviewed. pt requesting to take 200mg of [redacted]"). Crucially, Plaintiff had specifically requested [redacted] ([redacted]) at bedtime (QHS) as a chemical sleep aid and sedative precisely to survive and sleep through the unremitting, deafening blare of the unit's

single television located on the upper tier inside the enclosed plastic-glass dayroom, which was kept at full, maximum volume nonstop 24/7 and reverberated continuously down the hallway into the cells so loudly that detainees had to scream at the top of their lungs to be heard. It is clinically, behaviorally, and chronologically absurd to claim that an inmate who actively begged healthcare providers for bedtime sleep medication to counteract deafening acoustic torture, and who signed formal written consent forms to resume his psychotropic regimen, suddenly *"refused"* those very medications five hours later. By logging the fraudulent Ø (*"PT Refused"*) code, LPN Bentil masked institutional delivery failure, leaving Plaintiff locked in solitary confinement subjected to acute sleep deprivation under maximum television volume without his prescribed sleep aid.

b. **Defiance of Three Explicit Medical Directives Mandating Open Population, Falsified Clinical Cover Story Claiming Plaintiff Was Housed in South-2 Intake *"Because of His Safety,"* and Outright Failure to Deliver Medications Falsely Logged as Accu-Flo Code Ø *"Refusals"* (May 10-22, 2024)**: There was zero excuse for Defendants not delivering Plaintiff's medications on the evening of May 15, 2024 or the morning of May 22, 2024: Defendants knew Plaintiff's exact cell location at all times, because Plaintiff's exact housing assignment ("Facility: Central Detention Facility", "Unit: S-2", "Cell: 34", and subsequently "Unit: S-1", "Cell: 35") was actively tracked in JACCS and printed directly across the header of Defendants' own Accu-Flo MAR (**Exhibit 978** at pp. 1-4). Defendants simply did not deliver Plaintiff's prescribed medications to his cell, and then entered code Ø ("PT Refused/med not Administered,") to falsely blame Plaintiff for refusing medications they never brought him. Under Accu-Flo eMAR operational programming (**Exhibit 978** at p. 4, Instruction A: "SUGGEST REFUSED/WITHHELD MEDICATION"), whenever a

medication nurse (such as LPN Abigail Bentil, "AB1", on May 15, 2024 or "EN1" on May 22, 2024) fails to deliver and administer a scheduled dose, selecting code Ø to close out the shift ledger automatically outputs the combined boilerplate string "PT Refused/med not Administered," without a patient-signed refusal waiver or witness verification, thereby fraudulently converting Defendants' own failure to deliver medication ("med not Administered") into a fabricated patient refusal ("PT Refused"). Simultaneously, during this exact same May 10-16, 2024 window, DCDOC and Unity Health Care actively falsified the clinical record to justify unlawfully locking Plaintiff inside an intake tier (**Unit South-2**) past the legal duration limit in direct defiance of three separate clinical orders mandating **Open Population**. Specifically, on May 10, 2024 at 7:20 PM, Supervisory Mental Health Clinician Darius Mills formally evaluated Plaintiff and entered the mandatory clinical plan: "Housing Assignment: Open Population" (**Exhibit 978** at p. 35), and at 11:47 PM, Nurse Practitioner Meena Kumar documented Plaintiff's official medical disposition: "Disposition: Open Population" (**Exhibit 978** at p. 30). Subsequently, on May 15, 2024, Psychiatric Nurse Practitioner Linda Fonju reaffirmed this exact clinical directive: "Disposition: Open Population" (**Exhibit 978** at p. 16). Every single medical doctor, nurse practitioner, and mental health clinician who examined Plaintiff evaluated him as fully cleared for general population and expressly commanded his placement in Open Population. Yet DCDOC custodial authorities completely defied and overrode these repeated medical directives, locking Plaintiff in continuous solitary confinement inside South-2 Cell 34. To construct a fraudulent pretext for this defiance, Dr. Roderick Wellington entered an unauthenticated, preliminary note on May 15, 2024 ("Status: ON HOLD DOCUMENT. Contents are preliminary", **Exhibit 978** at pp. 13-14) asserting under "HPI or Presenting Complaint": "Mr. Sullivan had left the jail for the Feds a week ago

and only stayed for 1 night and they brought him back to DC Jail. He was not informed why. He is now housed on South-2, when he left he was on South-1, because of his safety. He's is a J6'er. CT is not a danter to self or others at this time. CT informs this writer that he really does not want to return to South-1. This writer will follow up with CT on a needed basis." With the parenthetical clause (", when he left he was on South-1,") set off by commas, Dr. Wellington explicitly claimed that Plaintiff "is now housed on South-2... because of his safety. He's is a J6'er." This entry is a blatant institutional lie and spatial inversion: under DCDOC's own facility topography, **Unit South-2 is strictly an Intake, Reception, and Transit tier** where arriving detainees are temporarily held for short-term intake processing (capped at 24 to 72 hours), whereas **Unit South-1 (formerly SW-1) is the facility's Restrictive Housing and Involuntary Protective Custody segregation tier** where Plaintiff had previously been locked for over 130 days (including 110 consecutive days in Cell 50 and 17 days in Cell 54). An inmate cannot be housed in **South-2**-which is an intake unit-for his safety. Rather, Dr. Wellington fabricated this false clinical narrative claiming Plaintiff was housed in South-2 *"because of his safety"* as a cover story to excuse DCDOC illegally holding Plaintiff in an intake cell (South-2 Cell 34) under continuous total lockdown for days beyond the lawful 24-to-72-hour intake ceiling in defiance of three clinical orders for Open Population, even while admitting in the exact same note that Plaintiff "is not a danter [danger] to self or others at this time" and "really does not want to return to South-1."

c. **Complete Omission of Documented Weekend MAR Administrations and 72-Hour Intake MAR Void (May 10-12, 2024)**: On May 10, 2024 at 7:52 PM (**Exhibit 978** at p. 23), LPN Theresa Anderson explicitly certified: "This writer has given / observed pt. take his 1st dose of PO [redacted] 50MG and [redacted] 75MG per Rx, tolerated well.

Weekend MAR completed.", and at 11:47 PM (**Exhibit 978** at p. 30), NP Meena Kumar documented: "will contineu previous psych meds - ordered for 7 days supply". Yet on the certified May 2024 Accu-Flo MAR (**Exhibit 978** at pp. 1-2), May 10, May 11, and May 12 contain zero recorded administrations-every administration box is marked X ("NOT DUE") or ***-and the bridge orders (RX: 2470885, RX: 545933, RX: 2470888) were not entered into Accu-Flo until May 13, 2024. This discrepancy proves that Unity Health Care maintained disconnected, unverified parallel records, suppressed documented weekend administrations, and left Plaintiff completely deprived of his morning [redacted] ([redacted]) for at least seventy-two (72) continuous hours following intake.

d. **Custodial Escort Defaults Falsely Logged as Patient *"No Shows"* and Pretextual Cancellation of *"Med Issues"* Sick Calls (May 13-14, 2024 and June 7, 2024)**: On May 13, 2024 at 4:14 PM (**Exhibit 978** at p. 22), DNP Taiwo Adeyemo canceled Plaintiff's psychiatric appointment, truthfully admitting: "Pt was not escorted to the clinic for appt. He has been resc.". However, the following day (May 14, 2024 at 3:23 PM, **Exhibit 978** at p. 17), when correctional guards again failed to escort Plaintiff to the third-floor mental health clinic (MH_OP 3FL), NP Linda Fonju falsely documented the encounter as "Appointment No Show", writing "Unit called, inmate did not arrive"-falsely blaming Plaintiff for custodial non-movement. Similarly, on June 7, 2024 (**Exhibit 978** at pp. 8-9), Plaintiff had a scheduled mental health appointment bearing the explicit clinical reason "sick call: med issues"-proving Plaintiff was actively fighting to resolve ongoing medication withholding-which NP Fonju summarily canceled under the code "NOC" ("No Contact / Not On Call").

e. **Manufacture of Non-Existent Community Medical Providers (*"Grand Jury Medical Center - UTAH"*), Anachronistic Dates (*"SEEN 5/15/25"*), Phantom Prescriptions, Falsified Blood Pressure Readings, Diagnostic Problem List Contradictions (*"HYPERTENSION (ICD-401.9)"*), and Intentional Fabrication of a Fake Social Security Number (*"*[redacted]*"*) by HIMS Manager Lynda Boykin and HIMS Clerk Jean Washington to Sabotage Disability and HIPAA Records Requests**: On May 27, 2024 at 9:27 AM (**Exhibit 978** at pp. 10-11), PA Priscilla Momoh summarily canceled Plaintiff's medical sick-call encounter by entering a fraudulent and impossible anachronism: "MH S/C PT WAS SEEN 5/15/25, F/U APPT IS SCHEDULED 7/26/24"-citing an imaginary clinical appointment scheduled for the year 2025 to justify denying care in 2024. Demonstrating pervasive internal clinical contradictions and outright record falsification generated to conceal institutional non-treatment, the providers' own clinical documentation and diagnostic problem lists across eight separate encounters-including Dr. Kathy Alston's federal USM-553 transit summary (p. 10), Dr. Roderick Wellington (p. 14), NP Linda Fonju (p. 16), PA DeBreaka Posey (pp. 18-19), NP Meena Kumar (pp. 23, 27), Supervisory Clinician Darius Mills (p. 33), and the permanent Chart Summary (p. 37)-literally diagnose and classify Plaintiff under the active clinical diagnosis: "HYPERTENSION (ICD-401.9) (ICD10-I10)". Furthermore, DCDOC's own internal clinical dental records independently corroborate this chronic cardiovascular diagnosis: on January 26, 2024, staff dentist Dr. Shayla Calhoun, DDS, conducted a dental procedure exam (**Exhibit 979** at p. 4), explicitly charting: "Medical hx reviewed, PMH: HTN" (Past Medical History: Hypertension), and on the contemporaneous Health Services Dental Record-Medical Form dated January 26, 2024 (**Exhibit 979** at p. 5), signed by both

Plaintiff and Dr. Calhoun, the medical history section explicitly documents "High Blood Pressure: Yes" (circled). Under the providers' own written clinical analysis (*"Assessment/Plan: HYPERTENSION."*), PA Posey logged "Hypertension Control: Controlled" and recorded: "pt reports taking propanolol for bp & anxiety, not currently on meds with bp cpntrolled", while intake clinicians concurrently recorded "1. Hx of HYPERTENSION currently off [redacted] BP readings reviewed". Yet the providers populated the electronic health record with fabricated vital signs asserting that Plaintiff was completely normotensive without anti-hypertensive pharmacotherapy (logging a resting blood pressure of 122/77 mmHg on May 10, 2024 at intake, p. 27, and 127/85 mmHg on May 14, 2024 in chronic clinic, p. 19). These logged blood pressure readings and encounters represent outright electronic fabrications: at no point during his intake processing on May 10, 2024 or during the chronic care clinic on May 14, 2024 did any medical provider, nurse, or technician take Plaintiff's blood pressure, place a sphygmomanometer cuff on his arm, or measure his vital signs, nor did any such vitals examination take place. Placed in an unceasingly hostile carceral environment characterized by deafening acoustic blare, continuous solitary confinement, biological fluid assaults, and an active, pus-draining buttock wound that induced acute pain, headaches, and physical stress, Plaintiff experienced severe physical symptoms consistent with elevated blood pressure. Defendants' clinical staff either fabricated these physical encounters and normotensive readings out of whole cloth to manufacture a false electronic record of active vital monitoring, or, if any reading had been taken, willfully suppressed and falsified hypertensive readings to manufacture a pretextual notation of *"bp cpntrolled"* and justify total medical inaction. Despite recording that Plaintiff had completely normal, controlled blood pressure and had "NOT been taking [redacted] at all" (p. 18), clinicians mechanically copy-pasted

* *DC/[redacted] ([redacted]) Take 1 tablet PO QAM across five successive progress notes (pp. 18, 27, 33, 35) as an active *"Current Medication,"* while stamping his permanent chart with a formal chronic cardiovascular diagnosis (ICD-401.9 / ICD10-I10) directly contradicted by their own physical examinations. Demonstrating further mechanical fabrication, Unity clinicians (including PA Posey at p. 21 and intake staff at pp. 28, 35) repeatedly populated Plaintiff's chart with automated, canned EHR *"smart text"* macros asserting: "Health hazards of tobacco, illicit drug use, and excessive alcohol intake discussed and patient advised to quit if using, or not to initiate if not already using". This counseling entry was a complete institutional fiction: Plaintiff is an elite athlete, a lifetime non-smoker, has never used illicit drugs, and has completely abstained from alcohol for over five continuous years (with prior lifetime consumption limited to rare occasional drinks years earlier). No provider ever conducted substance counseling with Plaintiff; rather, clinicians mechanically clicked pre-configured EHR compliance macros to simulate substantive clinical engagement without ever speaking to the patient. Compounding this systemic record falsification, Unity intake screening clinicians repeatedly entered completely fictitious, non-existent medical facilities onto Plaintiff's official intake chart: on May 10, 2024, NP Meena Kumar documented that Plaintiff was receiving community mental health care at "Gand jury medical center Southlake city Utah" (**Exhibit 978** at p. 28) and "Grand jury medical center - UTAH" (**Exhibit 978** at p. 31), alongside LPC Darius Mills charting Plaintiff's treating physician as "Dr. Vivaci Fauci at Salt Lake City Utah" (**Exhibit 978** at p. 32) and garbling active prescriptions as "[redacted], Proparanol 80 mg daily Quilbee 200 mg daily". No medical facility named *"Grand Jury Medical Center"* exists in the State of Utah; Plaintiff received his community healthcare from licensed treating medical clinics in Utah.

Intake clinicians-fixated on Plaintiff's underlying federal criminal indictment-transcribed criminal court terminology (*"Grand Jury"*) and a fabricated physician name (*"Dr. Vivaci Fauci"*) into Plaintiff's permanent medical chart, ensuring that any purported institutional verification of Plaintiff's community psychiatric records would fail and manufacturing a self-inflicted institutional void to justify 181 days of total psychotropic abandonment. Most egregiously, this intentional record falsification was executed directly against Plaintiff's master identity profile: on the permanent Central Detention Facility Chart Summary generated on December 19, 2025 with the explicit footer "Report run by Lynda Boykin - HIMS Manager" (**Exhibit 979** at p. 3) and again on the Central Detention Facility Chart Summary generated on March 3, 2026 with the explicit footer "Report run by Jean Washington - HIMS Clerk" (**Exhibit 978** at p. 37), Defendants **intentionally fabricated and falsified Plaintiff's Social Security Number**-entering the fake, fabricated Social Security Number **"**[redacted]**"** on Plaintiff's permanent medical chart in place of Plaintiff's authentic, verified Social Security Number (XXX-XX-9076, redacted in this public pleading pursuant to Federal Rule of Civil Procedure 5.2(a)(1) privacy redaction requirements, whereas "[redacted]" is a fabricated number printed on the face of Defendants' records)-while HIMS Manager Lynda Boykin simultaneously falsified Plaintiff's custody status as "Status: Active" at "Home LOC: Central Detention Facility" on December 19, 2025, more than eighteen months after his June 3, 2024 departure. This was not a mistake or clerical oversight; it was a deliberate, calculated fraud engineered to sabotage external disability and records inquiries and conceal evidence of Defendants' 2023-2024 medical neglect.

Specifically, when the State of Utah Department of Workforce Services transmitted a formal medical records request on December 7, 2025 seeking Plaintiff's detention

medical history (**Exhibit 979** at p. 1), **HIMS Manager Lynda Boykin** (FROM: LBOYKIN,HIMSM, signed L. Boykin HIMS M on December 19, 2025 at **Exhibit 979** at p. 2, and electronically signed by Lynda Boykin - HIMS Manager on 12/23/2025 at 12:00 PM at **Exhibit 978** at p. 8) executed an official UNITY HEALTH CARE / D.C. DEPARTMENT OF CORRECTIONS Medical Records Department Memorandum checking (XX) the false certifications: "We are unable to locate all the records you requested, enclosed are portions of the record that are available. 2020-2022", "Patient was not at this facility for the dates/period that was request.", and "Other: THE INFORMATION AVAILABLE IS ATTACHED"-withholding Plaintiff's entire May-June 2024 clinical chart and 17 pages of unanswered sick call slips from the Utah disability agency while attaching only the falsified December 19, 2025 Chart Summary bearing the fabricated "[redacted]" (p. 3) and two pages of January 26, 2024 dental forms (pp. 4-5). By intentionally fabricating "[redacted]" in the master EHR database and falsifying Plaintiff's facility presence, HIMS Manager Lynda Boykin, HIMS Clerk Jean Washington, and Defendants deliberately defeated SSN-indexed records queries, manufactured a fraudulent pretext to tell Utah disability authorities that Plaintiff "was not at this facility for the dates/period that was request.", obstructed Plaintiff's disability adjudication, and executed willful information blocking under the DCMHIA, DCCPPA, HIPAA, and the 21st Century Cures Act.

f. **Omission of Active [redacted] on Federal USM-553 Transit Summary, Blank Future-Dated *"MAR For: June 2026"* Substitution, and Post-Transfer Appointment Cancellations**: On May 31, 2024 at 9:32 PM (**Exhibit 978** at p. 10), Unity Physician Dr. Kathy Alston executed the mandatory federal USM-553 *Medical*

*Summary of Prisoner in Transit*. Under Section II ("Medication Required For Care En Route"), Dr. Alston listed only [redacted] 100 mg and [redacted]ment, completely omitting Plaintiff's active, verified [redacted] 75 mg QHS order (RX: 2471754), thereby deliberately exposing Plaintiff to another episode of forced, cold-turkey SSRI withdrawal during multi-day federal transport. Furthermore, after logging code Ø ("NOT ADMINISTERED See Notes") and the automated notation "PT Refused/med not Administered," on May 15, 2024 at 20:00 (by LPN Abigail Bentil, AB1) and on May 22, 2024 at 09:00 (by Emmerencia Ngwenyi, EN1) on the May 2024 MAR (**Exhibit 978** at p. 4), Defendants withheld Plaintiff's actual June 2024 MAR in their March 3, 2026 HIPAA production and instead generated three completely blank, future-dated "MAR For: June 2026" pages (Page 1 of 3 to Page 3 of 3, printed 3/3/2026 1:34:31 PM, **Exhibit 978** at pp. 5-7), while entering post-transfer appointment cancellations on June 7, 2024 ("Reason: NOC", for "sick call: med issues") and July 26, 2024 ("Inmate not on census per JACCS", **Exhibit 978** at pp. 8-9)-conclusively establishing that Defendants' Accu-Flo MAR and EHR logs were manipulated to conceal medication non-delivery and erase Plaintiff's clinical continuity.

g. **Fictitious *"Initial Discharge Treatment Plan"* Executed at Intake (May 10, 2024 at 7:38 PM) and Subsequent JACCS Census Falsification (*"Inmate not on census per JACCS"*)**: An irreconcilable institutional fraud appears on page 20 of Plaintiff's certified EHR (**Exhibit 978** at p. 27), wherein Nurse Practitioner Meena Kumar generated, printed, and electronically signed an official document entitled: "05/10/2024 - Internal Correspondence: Handout Printed - INITIAL DISCHARGE TREATMENT PLAN" at 7:38 PM-mere minutes after Plaintiff's arrival at CDF following inter-facility transit from Northern Neck, and concurrently charted "Initial

Discharge Treatment Plan handout given" (p. 30). This document was an absolute administrative fraud and impossibility: Plaintiff was never discharged from municipal or carceral custody on May 10, 2024, but remained continuously detained in carceral custody until January 20, 2025. Stamping an arriving detainee with an 'Initial Discharge Treatment Plan' during intake processing served a fraudulent administrative function: creating a premature electronic paper trail indicating discharge or outpatient transition to manipulate municipal length-of-stay metrics, justify the summary cessation of clinical responsibility, and obscure prolonged intake holding. This systemic data falsification directly culminated on July 26, 2024 (**Exhibit 978** at p. 8), when Psychiatric Nurse Practitioner Linda Fonju canceled Plaintiff's scheduled psychiatric follow-up appointment (MH_OP 3FL) under the explicit cancellation comment: "Inmate not on census per JACCS"-demonstrating that DCDOC and Unity personnel manipulated the Jail and Custody Tracking System ('JACCS') and EHR census tracking databases to falsely erase Plaintiff from active facility rolls, thereby evading judicial scrutiny and medical continuity obligations.

## IV. INMATE SHOWER THREAT, FAILURE TO PROTECT, AND RETALIATORY SOLITARY PLACEMENT (OIS PREA CASE #2024-0001)

On December 21, 2023, at approximately 1:00 PM, while Plaintiff was standing in the lower right-tier shower area of Housing Unit NE-1 preparing to enter one of the two open showers (staged at pages 8, 11, and 12 of **Exhibit 976**), three to four male detainees approached Plaintiff, called him "Chris Brown", and exclaimed that they wanted to "get a piece of that ass". Knowing that one or two of the approaching detainees possessed

homemade knives/shanks (including an inmate subsequently caught on December 28 or December 29, 2023 with a knife exceeding three inches in length), Plaintiff quickly removed his shirt, threw it into his shower bag hanging on one of the four round metal hooks fastened to the concrete slab wall just outside the showers, and slipped behind one of the light bluish-green shower curtains into the far-left solid steel shower stall to conceal himself. Several male detainees then gathered immediately outside the shower curtain, reached through the shower curtains toward Plaintiff's waist area, and made unwelcome aggressive sexual advances and explicit verbal threats ("oh he's going to get fucked in the ass" and "he wants it"), trapping Plaintiff inside the shower stall and placing him in imminent fear for his physical safety. Plaintiff escaped the shower, notified tier staff, and drafted an emergency formal grievance under the Prison Rape Elimination Act (*"PREA"*), 34 U.S.C. §§ 30301 *et seq.*, on the *Inmate Informal Resolution Complaint Form* (PP 4030.1 Attachment C, marked "Emergency Grievance", dated 12-21-23 in Unit NE1-63, stamped RECEIVED DEC 28 2023 at page 12 of **Exhibit 976**, and logged in IAPro #4144 as received by PREA Compliance Specialist Cortney Savage on 12/29/2023 at page 1), demanding physical protection, medical evaluation, and an immediate administrative investigation into the armed sexual assault threat.

Rather than shielding Plaintiff from sexual violence or disciplining the aggressors, DCDOC supervisory officials weaponized the PREA reporting process into an instrument of retaliatory punishment. DCDOC Office of Investigative Services (*"OIS"*) initiated PREA Investigation Case #2024-0001 (tracked internally under IAPro Record ID #4144 and #4337), overseen and approved by OIS Approving Supervisor Kevin Hammond, as detailed in the official investigative dossier staged at **Exhibit 976**. On January 2, 2024, Defendant PREA Compliance Manager Cortney Savage (*"Ms. Savage"*)-a Grade 11

Career Service municipal official (compensated at $77,873.00 in FY2023 and $79,971.00 in FY2024) and a Department of Justice / National PREA Resource Center certified adult facility auditor-participated in the Inmate Reception Center medical-room interview of Plaintiff and logged an internal electronic review directive (Review of Housing 01/02/2024, **Exhibit 976** at p. 9) to facility supervisors and Legal Counsel, explicitly profiling Plaintiff based on his high-profile public status as an independent video journalist associated with the January 6, 2021 Capitol protests and prior civil rights coverage ("Inmate is being charged with crimes from the Capitol on January 6th however he is a Black Lives Matter Supporter and also allegedly recorded the death of another January 6th person and sold the video footage"), and directing that Plaintiff be placed on "rec alone and house alone status for this inmate while on S1". Instead of authorizing Plaintiff's transfer to the communal protective custody annex at the Correctional Treatment Facility (*"CTF"*) pursuant to mandatory PREA standards (28 C.F.R. § 115.43), Ms. Savage and facility command staff ordered Plaintiff's punitive transfer on January 3, 2024 into the restrictive housing unit of Unit SW-1 (SO-1 RHU/54, **Exhibit 976** at p. 7).

Following this retaliatory placement, Housing Unit Manager Cuthbert Denton, Correctional Officer Christina Whitehead, PREA Compliance Manager Cortney Savage, and line correctional officers initiated an active campaign of harassment designed to force Plaintiff to abandon his PREA complaint. Staff subjected Plaintiff's solitary cell to repeated, destructive shakedowns, scattering his legal papers, stepping on his bedding, and confiscating personal property. Officers issued direct verbal threats, warning Plaintiff that inmates who file sexual abuse complaints against staff or favored detainees do not leave CDF intact. Simultaneously, OIS conducted a sham investigation in Case #2024-0001 (**Exhibit 976** at pp. 2, 11): in the formal *PREA Investigative Report*

*(Unfounded/Unsubstantiated)* submitted by the redacted Reporting Investigator on January 11, 2024 (1/11/24) and approved by OIS Approving Supervisor Kevin Hammond (SUPERVISOR APPROVING - KEVIN HAMMOND) on January 16, 2024 (01/16/2024), OIS explicitly checked the header box VIDEO: X NO confirming no video evidence was preserved in the investigative file, while contradictorily asserting in the narrative body that OIS had "reviewed Body Worn Camera (BWC) footage as well as the Surveillance Video (CSC) and was unable to secure any evidence to corroborate Inmate Sullivan's allegations", relying on four unsworn inmate interviews conducted on January 2, 2024 in which detainees admitted that "Inmates hang out around the shower and do joke around with one another", and formally closing Case #2024-0001 as "Unsubstantiated". When Plaintiff filed a Step 2 Formal Grievance on February 16, 2024 on the only form made available to him-a Spanish-language *Formulario de Queja Formal del Presidiario* (PP 4030.1 Adjunto D, stamped RECEIVED FEB 29 2024, **Exhibit 976** at p. 16)-OIS issued a Memorandum on March 1, 2024 admitting that Plaintiff was "immediately re-housed in SO-1 Housing Unit and remained on protective custody status" (**Exhibit 976** at p. 18), and when Plaintiff submitted his Step 3 *Level 1 Appeal-Administrative Remedy* on April 4, 2024 through the proper administrative grievance channels (PP 4030.1 Attachment F, stamped RECEIVED APR 12 2024, **Exhibit 976** at p. 17) formally reporting that DCDOC had retaliated against him "by throwing me in the Hole (South-1) for over 98 days straight", Defendants logged the filing under IAPro Record ID #4337 and rubber-stamped it "Within Policy" (**Exhibit 976** at pp. 13-15), leaving Plaintiff locked in retaliatory solitary confinement for over one hundred sixty days in direct violation of 28 C.F.R. § 115.68 and D.C. Code § 22-723.

Defendants' failure to protect and retaliatory pattern continued throughout Plaintiff's custodial confinement. On May 3, 2024, at approximately 10:00 PM, Plaintiff was subjected to an unprovoked biological assault directly precipitated by DCDOC staff's compromise of his safety. Weeks prior, on April 16, 2024, Correctional Officer O-Rock had guided transferred January 6 detainee Bos Dominic from Cell 7 directly to Plaintiff's cell window, waking Plaintiff from sleep and deliberately exposing his housing location to hostile detainees; Bos Dominic immediately incited the tier by falsely proclaiming Plaintiff was a rat and undercover informant, sparking widespread death threats that custodial supervisors failed to remediate. Consequently, as Plaintiff was walking in mechanical shackles under escort by Correctional Officer Tchamo from the shower enclosure back to Cell 50, detainee Goon (housed in Cell 5) sprayed a pressurized jet of urine through the thin crack between his steel cell door and the concrete wall directly at Plaintiff's face. Plaintiff caught sight of the liquid stream out of the corner of his eye and averted his face, absorbing the primary blast on his shoulder, though urine entered his left eye and struck his left cheek (with after-spray droplets hitting Officer Tchamo's upper arm and shoulder). Officer Tchamo initially attempted to march Plaintiff back into his cell as if nothing had occurred, until Plaintiff asserted-directly on Officer Tchamo's active chest-mounted body-worn camera-that he must be decontaminated, allowed to shower and change into clean clothing, and medically examined because Goon's act was a clear assault on both Plaintiff and Officer Tchamo. Once Officer Tchamo recognized and agreed that both he and Plaintiff had been assaulted by Goon's urine, he decided to report the assault to higher officials, whereupon facility supervisors arrived, photographed Plaintiff's injuries, allowed a shower, and escorted Plaintiff to the third-floor medical unit, where an attending physician asked solely whether Plaintiff had showered and immediately dismissed him without performing baseline blood draws, prophylactic treatment, or

biological hazard triage. Although DCDOC transferred Goon to a shielded isolation cell, custodial staff permitted inmate detail worker Track to spread false gossip across South-1 that Plaintiff had snitched on Goon, prompting detainee Spencer in Cell 52 to openly agitate the tier to issue a kite to have Plaintiff stabbed with a knife upon his arrival at federal prison-even though Plaintiff had never reported Goon, as Goon had assaulted a correctional officer and snitched on himself. The facility's complete failure to maintain internal operational security was further confirmed the following morning, May 4, 2024 at 9:17 AM, when Bos Dominic, having overheard officers discussing the biological assault, leaked the incident outside the jail to Mel Hawley, who transmitted a text message to Plaintiff's VIAPATH tablet inquiring into his condition. On May 8, 2024, DCDOC executed an inter-facility contractual transfer shipping Plaintiff to Northern Neck Regional Jail (NNRJ, Warsaw, VA). At NNRJ, objective institutional intake classification evaluated Plaintiff and assigned him a 0-Point Minimum Security Classification, conclusively confirming that Plaintiff posed zero security, escape, or disciplinary threat. However, because prior January 6 detainees previously housed at NNRJ had gotten into a riot or fight-causing Northern Neck Regional Jail to establish a categorical ban refusing to house any January 6 defendants-DCDOC knew in advance that NNRJ did not accept January 6 detainees, yet intentionally sent Plaintiff there knowing he would be rejected and sent right back, and abruptly returned Plaintiff to CDF on May 10, 2024. In orchestrating this May 8, 2024 inter-facility transfer to NNRJ and returning Plaintiff to CDF on May 10, 2024 for a second intake, DCDOC custodial personnel confiscated all six months of personal cell property and personal laundry Plaintiff had accumulated during his confinement at CDF, specifically including his books (and dictionary), his seven sets of personal clothing/laundry (seven shirts, seven pairs of underwear, seven pairs of socks, two pairs of shorts, and one pair of sweatpants), his cups, his food and commissary items, his paper,

and his writing materials. Upon Plaintiff's return to CDF on May 10, 2024, DCDOC left Plaintiff in re-intake in Unit South-2 Cell 34 completely stripped of his books, clothing, cups, food, paper, and writing materials (forcing Plaintiff to borrow sheets of paper and a two-inch dull pencil stub from fellow intake detainees just to write), subjected Plaintiff on May 10, 2024 to a sham Restrictive Housing Review Initial Hearing under Program Statement 5300.1, Attachment F, warehoused him in Unit South-2 Cell 34 under continuous cell lockdown, and subsequently forced him back into Unit South-1 Cell 35 under Sergeant Delonte Williams with 3-point shackles re-imposed on every cell exit. Although Case Manager Ms. Coats subsequently retrieved and returned Plaintiff's books (along with incoming correspondence and legal papers held by Property Sergeant Alonzo Walker) on May 22, 2024 after Plaintiff requested assistance from Ms. Coats on May 14, 2024 (05-14-2024), had his parents contact Lieutenant Anthony Brown Sr. and Sergeant Walker, and submitted formal Step 1 Property Grievance IGP #20240520-365 on May 17, 2024 (PP 4030.1, Attachment C) demanding the return of all property taken upon his one-day transfer to NNRJ, DCDOC completely ignored the grievance form itself (leaving the DOC RESPONSE section 100% blank past the 5/27/24 response deadline), refused to issue any property release sheet or inventory receipt, and failed and refused to return-and discarded, threw away, or permanently deprived Plaintiff of-his confiscated personal clothing/laundry (seven shirts, seven pairs of underwear, seven pairs of socks, two pairs of shorts, and one pair of sweatpants), his cups, his food and commissary items, his paper, and his writing materials through and after his transfer from DCDOC custody on June 3, 2024.

**V. UNCONSTITUTIONAL OUTGOING MAIL BLACKOUT, INTERFERENCE WITH FAMILY CORRESPONDENCE, AND DENOMINATIONAL RELIGIOUS BURDEN**

Throughout his two hundred one days of municipal incarceration, DCDOC correctional officers, mailroom staff, and supervisory personnel maintained an unconstitutional censorship apparatus that systematically interfered with, intercepted, and severed Plaintiff's outgoing mail communications with his family. Plaintiff prepared personal letters and outgoing correspondence addressed to his family members detailing the inhumane conditions, medical abandonment, and illicit drug overdoses inside CDF, and deposited those outgoing letters in the designated outgoing mail receptacles of Units SW-1 and NE-1. Custodial guards and mailroom supervisors systematically intercepted, confiscated, suppressed, withheld, and destroyed outgoing letters and correspondence deposited by Plaintiff for mailing to his family, specifically ensuring that Plaintiff's outgoing communications with his family and his reports of systemic custodial corruption, medical abandonment, and unlawful confinement inside the Central Detention Facility were blocked from leaving the facility.

Defendants maintained this unconstitutional mail censorship and suppression regime over Plaintiff's outgoing family correspondence, while simultaneously obstructing Plaintiff's internal facility grievance filings by depriving him of basic copying and grievance materials required to confidentially submit facility grievances without staff retaliation-as expressly documented by Plaintiff in IGP #20240411-265 ("I do not have the ability to attach a copy or create a copy of the Informal Resolution Form due to not being provided with the proper materials to confidentially file this IGP without being subject to further retaliation from DOC officials", staged at **Exhibit 980**) and contemporaneous

administrative records. In executing this censorship and confiscation embargo against Plaintiff's outgoing mail and family correspondence, Defendants acted in direct violation of DCDOC Policy Statement PP 4070.1E and the constitutional mandates established by the Supreme Court in *Procunier v. Martinez*, 416 U.S. 396, 417-19 (1974). Defendants never provided Plaintiff with written notice that his outgoing mail had been seized, never specified the penological justification for withholding his letters and mail, never afforded Plaintiff an administrative opportunity to contest the confiscation, and never submitted the censorship determinations to an impartial reviewing official.

Simultaneously, Defendants imposed a substantial burden on Plaintiff's fundamental right to religious exercise and engaged in overt denominational discrimination, violating the Religious Freedom Restoration Act (*"RFRA"*), 42 U.S.C. §§ 2000bb-1 *et seq.*, the Religious Land Use and Institutionalized Persons Act (*"RLUIPA"*), 42 U.S.C. §§ 2000cc-1 *et seq.*, and the First and Fifth Amendments. Prior to and during his incarceration, Plaintiff was and is a practicing member of **The Church of Jesus Christ of Latter-day Saints (*"LDS"*)**. While Plaintiff possessed and studied his personal scriptures inside his cell (including the *Book of Mormon* and *Doctrine and Covenants*, and even gifted an extra copy of the *Book of Mormon* furnished through Church Prison Ministries and his family to Correctional Officer "Coyote" in February 2024), a sacred, indispensable ordinance and tenet of Plaintiff's denomination of faith is attending weekly Sunday worship services and **partaking of the Sacrament blessed and administered by an authorized member of The Church of Jesus Christ of Latter-day Saints holding the priesthood**. While holding Plaintiff in solitary confinement in Unit SW-1 / South-1 (Cell 54, Cell 50, and Cell 35) and Unit NE-1 (Cell 63), Defendants categorically prohibited any member or priesthood holder from Plaintiff's denomination of

faith from entering the housing unit or facility to visit Plaintiff, administer the Sacrament, or conduct Sunday denominational worship services.

Specifically, in February 2024, **Brother Pete Christensen**-a member of Plaintiff's denomination, The Church of Jesus Christ of Latter-day Saints-attempted to coordinate with the DCDOC Chaplain's Office to gain clearance to enter the Central Detention Facility to visit and minister to Plaintiff, as no LDS missionary or priesthood visitation program had been established in Plaintiff's unit. On **March 30, 2024 (03-30-2024)**, Plaintiff submitted an inmate request slip / request for assistance directly to Unit SW-1 / South-1 Chaplain **Eric Sims** requesting access to weekly Sunday religious services of his denomination and the administration of the Sacrament by an authorized LDS priesthood holder. When Defendants failed to grant or accommodate his request, Plaintiff filed a formal **Step 1 Informal Resolution Complaint Form on April 1, 2024 (04-01-2024, PP 4030.1, Attachment C, checking "o Religious Services" in Unit South-1:50)**, stating verbatim: "I am a member of the Church of Jesus Christ for Later Day Saints and since I have been housed at the DOC CDF I have been completely denied my right to practice a religion of my choice. I am asking the DOC to provide me the ability to attend religious services for my faith every Sunday and to partake of the Sacrament blessed by members of the Church of Jesus Christ who hold the powers and authorities of the priesthood to administer such ordinances as ordained by God." Defendants completely ignored Plaintiff's Step 1 complaint and left the "***FOR DOC COMPLETION***" response section one hundred percent (100%) blank. On **April 4, 2024 (04-04-2024)**, Plaintiff escalated the matter by filing a formal **Step 2 Inmate Formal Grievance Form (PP 4030.1, Attachment D, checking "o Religious Services" in Unit South-1:50)**, explicitly documenting Defendants' denominational discrimination inside Unit South-1: "The reason

that this is not resolved is due to the DOC remaining to deny me my right to practice and attend a religion of my choice, and regardless of being housed in the South-1 unit I still have a right to both practice and attend a religion of my choice. Other inmates who are members of the Muslim denomination are granted this right within the South-1 unit to both practice and attend a religion of thier choosing and as such I should be granted equal opportunities as a member of The Church of Jesus Christ of Latter-Day Saints to both practice and attend a religion of my choice." Defendants again left the official "***FOR DOC COMPLETION***" adjudication section one hundred percent (100%) blank and refused to permit any member or priesthood holder from Plaintiff's denomination of faith to visit Plaintiff, administer the Sacrament, or provide Sunday denominational services throughout his two hundred one days of confinement. Defendants' categorical refusal to allow a priesthood holder from Plaintiff's denomination to administer the Sacrament and conduct Sunday worship services-while simultaneously granting detainees of the Muslim denomination inside the exact same solitary unit (South-1) the right to practice and attend religious services of their choosing-was unsupported by any compelling governmental interest and failed to employ the least restrictive means, subjecting supervisory and operational defendants Faust, Marr, Brown, Williams, Denton, Whitehead, Savage, and Unit Chaplain Eric Sims to personal-capacity monetary liability under *Tanzin v. Tanvir*, 592 U.S. 43, 46 (2020).

## VI. RACE-BASED AND POLITICAL-AFFILIATION CUSTODIAL SEGREGATION, ARBITRARY DENIAL AND SHACKLING DURING VISITATIONS AND LEGAL VISITS, AND CONFISCATION OF PERSONAL CLOTHING, CUPS, FOOD, PAPER, AND WRITING MATERIALS

DCDOC executive leadership and facility supervisors enforced a discriminatory,

two-tiered system of custodial housing within the Central Detention Facility that subjected Plaintiff to severe disparate treatment based on his race and perceived political affiliations. Plaintiff is a Black independent video journalist who documented the January 6, 2021 Capitol protests as part of his broader independent civil rights and protest journalism. Following their detention, white individuals charged with offenses arising out of the January 6 Capitol demonstration were segregated into specialized, communal housing pods at the Correctional Treatment Facility (*"CTF"*), designated colloquially as the *"Patriot Wing."* Within this specialized cohort, detainees enjoyed expansive out-of-cell privileges, daily congregate recreation, access to personal electronic tablets, video visitation, educational seminars, specialized nutritional supplements, and direct congressional and media advocacy access.

In stark contrast, DCDOC supervisory officials singled out Plaintiff, as a Black video journalist, for absolute custodial isolation. Defendants refused Plaintiff's repeated administrative requests for transfer to CTF or general population, exiling him instead to the most hazardous, structurally decaying punitive segregation cells within CDF (SW-1 and NE-1). By subjecting Plaintiff to twenty-three- to twenty-four-hour solitary lockdown, near-total deprivation of out-of-cell time, raw sewage contamination, and sub-freezing temperatures while granting white Capitol detainees communal privileges, Defendants enforced an intentional racial and political classification that fails constitutional strict scrutiny under the Fifth Amendment's Equal Protection component, *Johnson v. California*, 543 U.S. 499, 505 (2005), and violates 42 U.S.C. § 1981, as documented in contemporaneous records staged at **Exhibit 976** and **Exhibit 980**.

Defendants' proffered administrative justification for categorically refusing Plaintiff transfer to the CTF January 6 pod-namely, the bad-faith pretext that housing a Black journalist among white, conservative Capitol defendants would inevitably trigger racial friction or physical violence from white detainees-was a complete, calculated institutional falsehood. This pretext was refuted by the physical reality of Plaintiff's intake housing in Southwest 1:

1. **Direct In-Cell Co-Housing with White January 6 Detainee Frank Giustino**: Upon his initial intake commitment on November 16, 2023, DCDOC custodial staff placed Plaintiff directly into an eight-by-ten-foot intake cell in Southwest 1, assigning him as cellmate to white January 6 defendant Frank Rocco Giustino (DCDC #387252, BOP Register #81395-509), who had arrived at CDF on November 13, 2023 following arrest in Florida. For approximately one week inside that confined cell, Plaintiff and Giustino lived together in complete, unbroken peace. There were zero verbal altercations, zero racial slurs, zero political conflicts, and zero threats of violence. To the contrary, while Plaintiff was physically incapacitated on the upper bunk due to severe neurochemical withdrawal caused by DCDOC abruptly cutting off his prescribed psychotropic medications cold turkey, Plaintiff voluntarily gave his daily meal trays to Giustino and provided care, comfort, and mutual assistance while Giustino suffered debilitating gastrointestinal illness on the lower bunk.
2. **Peaceful Congregate Commingling During Segregated Intake Recreation Tiers**: Furthermore, under DCDOC intake procedures in Southwest 1-both during Plaintiff's initial booking in November 2023 and during his secondary intake in May 2024 following his return from Northern Neck Regional Jail-DCDOC enforced a segregated cohort release schedule under which January 6 detainees were unlocked for daily out-of-cell recreation, telephone access, and showers in isolated groups strictly

partitioned away from general population detainees. During these daily one- to two-hour intake recreation intervals, Plaintiff commingled freely, continuously, and directly with multiple white January 6 detainees in the communal tier spaces, dayrooms, and telephone banks. Throughout both intake periods, Plaintiff commingled with these white Capitol detainees without a single physical fight, verbal dispute, or security incident.

3. **Total Demolition of the Pretextual Safety Defense and Executive Legal Ratification by Defendant DCDOC Deputy General Counsel Andrew Paul Mazzuchelli**: The undisputed empirical fact that Plaintiff co-housed harmoniously in the same eight-by-ten cell with Frank Giustino and commingled peacefully on the recreation tiers with other January 6 detainees conclusively eliminated any conceivable penological justification based on inmate safety or racial incompatibility. DCDOC's refusal to transfer Plaintiff to CTF was not an act of protective safekeeping; it was an intentional, retaliatory measure of discriminatory racial and viewpoint segregation formally ratified at the highest legal and policymaking levels of the agency. Specifically, Defendant DCDOC Deputy General Counsel Andrew Paul Mazzuchelli (U.S. District Court for the District of Columbia Bar No. 7647430, who served as DCDOC Attorney Advisor from August 2022 to July 2023, Deputy General Counsel from July 2023 to October 2024 throughout the entirety of Plaintiff's detention, and General Counsel from October 2024 to October 2025 prior to his appointment as a District of Columbia Administrative Law Judge in October 2025, and who publicly held himself out as an "Attorney specializing in Corrections Law, Criminal Law, Litigation, and Policy within the District of Columbia Department of Corrections" "Committed to upholding justice and ensuring the rights and welfare of incarcerated individuals") personally intervened on January 5, 2024 and again in written

correspondence on April 2-3, 2024 to ratify Plaintiff's exclusion from the CTF unit and indefinite confinement in Unit South-1 solitary isolation. In his written correspondence to Plaintiff's criminal defense counsel, Defendant Deputy General Counsel Andrew Paul Mazzuchelli explicitly admitted that Plaintiff had accrued "0 disciplinary violations" and was "not housed in S1 for disciplinary reasons", yet expressly justified barring Plaintiff from CTF and locking him in 23-hour solitary confinement based on Plaintiff's "perceived affiliation" and supposed lack of "ideological alignment", asserting that the CTF unit was reserved for detainees sharing "similar ideological views". DCDOC supervisory and legal officials thus deliberately banished Plaintiff-the sole Black documentarian-to the sensory deprivation, raw sewage contamination, and violence of CDF solitary confinement, while seamlessly transferring the very white co-detainees with whom Plaintiff had peacefully co-existed directly into the communal socialization, personal electronic tablets, video visitations, and public media broadcast privileges of the CTF *"Patriot Wing."*

Defendants compounded this isolation by arbitrarily denying and cancelling scheduled video visitations and forcing Plaintiff to remain in full shackles during visitations and legal visits. Under D.C. Code § 24-211.02(b)(3), the Department of Corrections is under an affirmative legislative mandate to initiate and maintain regular afternoon and evening visiting hours at the Central Detention Facility for a minimum of five (5) days a week, including Saturdays and Sundays. While Plaintiff's criminal defense attorney Steven R. Kiersh visited him in person at the facility and Plaintiff had video visitations with his family when permitted, there were occasions throughout Plaintiff's municipal incarceration when Defendants refused to allow Plaintiff to attend video visitations and cancelled his scheduled video visitations. Correctional officers made false

excuses to refuse to bring Plaintiff out for scheduled video visitations-claiming that the video visitation system was not working when it clearly was working, or claiming that his family did not call or did not have a visitation set up when Plaintiff's family did have a visitation set up and called Plaintiff on his phone or tablet (and on occasions such as Sunday, January 28, 2024, officers did not take Plaintiff out of his cell in Unit SW-1 Cell 50 for his scheduled family video visit and cancelled it without giving a reason, whereupon Plaintiff called his parents on his tablet to let them know that guards did not take him out of his cell for the video visit). Furthermore, whenever Plaintiff went to visitations, including to see his lawyer Steven R. Kiersh, Plaintiff was kept in **full shackles** (three-point mechanical restraints consisting of wrist handcuffs inside the padlocked black-box cover, a steel waist chain, and steel ankle shackles), while correctional officers searched through all of his lawyer Steven R. Kiersh's papers, folders, and bags going into and out of the jail. These arbitrary denials of scheduled video visitations and full-shackle restraints during legal and video visitations were executed without disciplinary conviction, without institutional security justification, and without regulatory process, violating D.C. Code § 24-211.02 and D.C. common law, *Webster v. District of Columbia*, Civ. No. 20-300 (JDB) (D.D.C.).

Furthermore, DCDOC correctional officers, intake personnel, and property supervisors, including Property Sergeant Alonzo Walker, confiscated, converted, and permanently deprived Plaintiff of his accumulated personal clothing/laundry, cups, food and commissary items, paper, and writing materials. Upon Plaintiff's initial custodial remand from the courthouse on November 16, 2023, DCDOC intake staff only took the street clothing Plaintiff was wearing upon arrival. Over the ensuing six months of his confinement at CDF (November 2023 through May 2024), Plaintiff accumulated personal

property inside his cell-specifically including his books (such as his dictionary and reading/religious books), seven sets of purchased commissary clothing/personal laundry (seven shirts, seven pairs of underwear, seven pairs of socks, two pairs of shorts, and one pair of sweatpants), his cups, his food and commissary items, his paper, and his writing materials-which custodial officers repeatedly targeted during retaliatory cell shakedowns in Units SW-1 and NE-1. When DCDOC abruptly transferred Plaintiff to Northern Neck Regional Jail (*"NNRJ"*) in Warsaw, Virginia on May 8, 2024 and hauled him right back to CDF on May 10, 2024 for his second intake in Unit South-2 Cell 34, custodial and property personnel confiscated all six months of Plaintiff's accumulated cell property and personal laundry-including his books, his seven sets of personal clothing/laundry, his cups, his food and commissary items, his paper, and his writing materials-leaving Plaintiff in South-2 Cell 34 forced to borrow sheets of paper and a two-inch pencil stub from fellow intake detainees just to write. Although Case Manager Ms. Coats subsequently retrieved and returned Plaintiff's books (along with incoming letters and legal documents held by Sergeant Walker) on May 22, 2024 after Plaintiff requested assistance from Ms. Coats on May 14, 2024 (05-14-2024), had his parents contact Lieutenant Anthony Brown Sr. and Sergeant Walker, and submitted his formal Step 1 Property Grievance (IGP #20240520-365, dated 5-17-24 on PP 4030.1, Attachment C) explicitly requesting that DCDOC return all property taken upon his one-day transfer to NNRJ, Defendants stonewalled the grievance form itself (leaving the DOC RESPONSE section 100% blank beyond the 5/27/24 response due date) and failed and refused to return-and discarded, threw away, or permanently deprived Plaintiff of-his seven sets of personal clothing/laundry (seven shirts, seven pairs of underwear, seven pairs of socks, two pairs of shorts, and one pair of sweatpants), his cups, his food and commissary items, his paper, and his writing materials prior to or following his June 3, 2024 transfer from DCDOC

custody, without ever issuing a property inventory sheet, property disposition receipt, or release manifest, in direct violation of the mandatory property safeguarding and return commands of D.C. Code §§ 24-211.02(a), (b)(5), 24-211.02a(c)(2), and DCDOC Program Statement 4050.1I, inflicting property loss and injury compensable under 31 U.S.C. §§ 3723, 3724, and D.C. Code §§ 15-109 and 28-3302.

## VII. POST-RELEASE ELECTRONIC HEALTH INFORMATION (EHI) BLOCKING AND UNAUTHORIZED MENTAL HEALTH INFORMATION DISCLOSURES

Both during his incarceration-including on April 2, 2024 when the DCDOC Inmate Records Office issued a formal written refusal memorandum redirecting Plaintiff to FOIA and Mr. Obebe-and continuously following his transfer from DCDOC custody on June 3, 2024 and his full Presidential Pardon and physical release from federal custody on January 20, 2025, Plaintiff initiated formal written demands to DCDOC and its exclusive medical contractor, Unity Health Care, Inc., demanding complete, unredacted copies of his certified Electronic Health Records, Medication Administration Records, dental imaging and diagnostic files, and comprehensive electronic audit trails. Plaintiff submitted these records requests pursuant to the federal statutory right of access guaranteed under the Health Insurance Portability and Accountability Act (*"HIPAA"*), 45 C.F.R. § 164.524, and the anti-information blocking provisions of the 21st Century Cures Act, 42 U.S.C. § 300jj-52.

Defendants Unity Health Care, Inc., DCDOC Privacy Officer Oluwasegun *"Segun"* Obebe, and Records Specialist Elton Jones engaged in intentional, bad-faith information blocking and records suppression. Under 45 C.F.R. § 164.524(b)(1), covered entities and

their business associates must act upon an individual's request for protected health information no later than thirty (30) days following receipt. Defendants willfully ignored Plaintiff's requests for months on end, completely exceeding the statutory thirty-day deadline without providing written notices of extension. When Defendants finally produced partial, fragmentary disclosures on March 3, 2026 and April 25, 2026, Defendants intentionally withheld and suppressed vital categories of electronic health data, including the complete native audit logs, electronic clinician signature timestamps, internal triage tracking manifests, and complete dental intake records and provider notes. This intentional suppression was calculated to prevent Plaintiff from obtaining forensic documentation of Unity's 181-day psychotropic medication withholding, Dr. Wellington's unauthenticated May 15, 2024 mental health note marked "Status: ON HOLD DOCUMENT. Contents are preliminary", the fraudulent May 15 and May 22, 2024 code Ø ("PT Refused/med not Administered,") MAR entries, the substitution of completely blank future-dated "MAR For: June 2026" pages in place of Plaintiff's June 2024 MAR, and the post-transfer appointment cancellations on June 7, 2024 ("NOC") and July 26, 2024 ("Inmate not on census per JACCS"), constituting willful neglect and actionable electronic health information blocking under 42 U.S.C. §§ 1320d-5(a)(3) and 300jj-52(b)(2)(A).

Simultaneously, Defendants Unity Health Care, Inc., Attending Physician Dr. Anju Menon, Discipline Director of Behavioral Health Dr. Roderick I. Wellington, Ph.D., LCPC, NCC, CFC, and DCDOC custodial staff committed repeated, egregious violations of the District of Columbia Mental Health Information Act (*"DCMHIA"*), D.C. Code §§ 7-1201.02 *et seq.* Under D.C. Code § 7-1201.02(a), no mental health professional, mental health facility, data collector, or employee thereof shall disclose or permit the

disclosure of mental health information to any unauthorized person absent explicit, informed statutory consent. Throughout Plaintiff's incarceration and post-release processing, Defendants repeatedly disclosed, discussed, and transmitted Plaintiff's highly confidential psychiatric diagnoses (ICD-10 F41.1, F90.9, F41.0, F32.A), psychotropic prescription histories, and behavioral health observations to non-medical correctional guards, housing classification officers, administrative clerks, and third-party municipal actors who possessed zero therapeutic relationship with Plaintiff and zero legitimate medical need to know.

These unauthorized disclosures of sensitive psychiatric records subjected Plaintiff to severe public humiliation, custodial stigmatization, and heightened vulnerability to guard abuse, in direct violation of D.C. Code § 7-1201.02. Pursuant to D.C. Code § 7-1207.01(b), any person who willfully or intentionally violates the DCMHIA is strictly liable to the injured client in an amount not less than one thousand dollars ($1,000.00) in statutory liquidated damages for each unlawful disclosure, in addition to actual damages, costs, reasonable attorney's fees, and trial by jury under subsection (c), establishing independent statutory liability against Unity Health Care, Dr. Menon, Dr. Wellington, and their municipal coconspirators.

## VIII. SUMMARY OF COMPENSATORY, STATUTORY, AND PUNITIVE DAMAGES ACROSS ALL SIXTEEN CAUSES OF ACTION

The monetary damages sought across the sixteen causes of action set forth in this Verified Complaint are grounded in governing federal and District of Columbia positive law. The cumulative civil liability and damages resulting from Defendants'

unconstitutional customs, statutory safekeeping breaches, and intentional torts-as well as any ongoing, continuing, or additional unlawful acts and omissions uncovered through discovery-are sought in an amount to be proven at trial exceeding, and in no event less than, **$41,939,958.86**. This minimum threshold comprises compensatory, economic, and statutory liquidated damages of at least **$22,793,594.63** (with the full measure to be determined at trial) together with exemplary and punitive damages of no less than **$19,146,364.23** (and such greater sum as the jury may award) assessed against the corporate and individual defendants for willful, wanton, and malicious deprivations of fundamental constitutional and statutory rights.

These minimum damages thresholds are distributed across the sixteen causes of action pled herein as follows:

The civil rights deprivations under 42 U.S.C. § 1983, municipal ***Monell*** policies, and hazardous custodial conditions under D.C. Code § 24-211.02 (Count I) establish damages exceeding, and in no event less than, **$12,481,030.79** (encompassing at least $11,310,500.00 for the unlawful deprivation of liberty across 6,408.0 custodial hours and systemic *Monell* structural policy liabilities alongside no less than $1,170,530.79 for raw sewage inundation, environmental hypothermia, and unconstitutional conditions of confinement). Deliberate indifference to serious medical, psychiatric, neurological, and physical health needs under the Eighth and Fifth Amendments (*Estelle v. Gamble*) and statutory psychotropic severance under D.C. Code § 7-1231.08 (Count II) warrant recovery in a sum of no less than **$3,872,798.27**, and such greater amount as may be proven at trial (encompassing at least $873,750.00 in statutory psychotropic severance damages alongside systemic medical and physical health abandonment, severe physical

and musculoskeletal deconditioning from forced physical stagnation and denial of sunlight/fresh air, unanswered sick call requests, untreated convulsive seizures, and unmonitored medication withdrawal). First Amendment retaliation, failure to protect from known inmate violence, and retaliatory solitary confinement under 42 U.S.C. § 1983 and D.C. Code § 24-211.02 (Count III) support damages upward from a minimum floor of **$1,113,500.00** (comprising at least $506,000.00 in failure-to-protect damages alongside no less than $607,500.00 for retaliatory solitary confinement, PREA sexual safety breaches, and harassment). Outgoing mail suppression, correspondence blackouts, and journalistic censorship under *Procunier v. Martinez* and the First and Fifth Amendments (Count IV) establish liability in an amount exceeding, and not less than, **$1,632,945.97**. Substantial burden on religious exercise under RFRA (42 U.S.C. § 2000bb-1) and RLUIPA (42 U.S.C. § 2000cc-1) (Count V) entitles Plaintiff to individual-capacity damages under *Tanzin v. Tanvir* of at least **$259,500.00**, with the full measure to be determined at trial.

Racial and political custodial segregation under 42 U.S.C. §§ 1981, 1983 and the D.C. Human Rights Act, D.C. Code § 2-1402.73 (Count VI) supports recovery in a sum exceeding, and in no event less than, **$709,831.50** (encompassing at least $662,331.50 for constitutional and statutory segregation deprivations and no less than $47,500.00 under the DCHRA). Unconstitutional involuntary segregated housing exceeding the 30-day PREA mandatory ceiling, retaliatory protective custody, and common-law negligence *per se* under 42 U.S.C. § 1983, the First, Fifth, and Eighth Amendments, D.C. Code § 24-211.02, and the predicate statutory and regulatory standards of care of 34 U.S.C. §§ 30301, 30307 and 28 C.F.R. §§ 115.43, 115.68 (Count VII) warrant damages of no less than **$1,461,370.40**, and such greater sum as may be proven at trial. Disability discrimination and failure to accommodate under Title II of the ADA and Section 504 of the

Rehabilitation Act (Count VIII) establishes liability upward from a minimum floor of **$1,379,750.00**. Bad-faith grievance destruction, unnumbered form suppression, First and Fifth Amendment Petition and Due Process obstruction, and common-law negligence *per se* / evidentiary spoliation under 42 U.S.C. § 1983, D.C. Code § 24-211.02, and the predicate statutory and regulatory standards of care of D.C. Code § 22-723 and DCDOC Program Statement 4030.1N (Count IX) support damages in an amount exceeding, and not less than, **$2,431,250.00**. Post-release Electronic Health Information blocking, "Status: ON HOLD DOCUMENT" manipulation, and mandatory audit trail suppression under the District of Columbia Mental Health Information Act (D.C. Code §§ 7-1201.02, 7-1205.01, 7-1205.04, 7-1205.05, 7-1206.01, 7-1207.01), the District of Columbia Consumer Protection Procedures Act (D.C. Code §§ 28-3904(e), (e-1), (f), (f-1), (r)(5), 28-3905(k)(1)-(2)), 42 U.S.C. § 1983 (First and Fifth Amendments), and District of Columbia common-law negligence *per se* incorporating the statutory and regulatory standards of care of 42 U.S.C. §§ 1320d-5(a)(3), 300jj-52 and 45 C.F.R. §§ 164.524, 160.404 (Count X) establish statutory, compensatory, and treble damages of at least **$426,972.00**. Unlawful custodial restraint in solitary and intake lockdown defying medical open-population clearance orders, substantive due process liberty deprivation, false imprisonment, and unjust imprisonment *ab initio* under 42 U.S.C. § 1983, D.C. Code § 2-423.02, and D.C. common law (Count XI) warrant recovery in a sum of no less than **$291,712.33**, and such further amounts as proven at trial. Unlawful disclosures and record violations under the D.C. Mental Health Information Act, D.C. Code §§ 7-1201.02 and 7-1207.01 (Count XII), carry statutory liquidated damages of at least **$3,000.00** (not less than $1,000.00 for each willful disclosure proven), in addition to full actual damages. Unconstitutional custodial property confiscation, breach of ministerial custodial bailment, and common-law negligence *per se* under 42 U.S.C. § 1983, the Fifth Amendment, D.C.

Code §§ 24-211.02(a), (b)(5), 24-211.02a(c)(2)-(3), and the predicate statutory and regulatory standards of care of 31 U.S.C. §§ 3723-3724 and DCDOC Program Statement 4050.1I (Count XIII) establish liability of no less than **$5,400.00**, and such greater amount as proven at trial. D.C. common-law conversion, wrongful retention of personal property, and six percent prejudgment interest under D.C. Code §§ 15-109 and 28-3302 (Count XIV) support recovery exceeding, and in no event less than, **$60,259.72**. Custodial visitation deprivations and full-shackle restraints during legal and video visitations under D.C. Code § 24-211.02(b)(3) (Count XV) warrant damages upward from a minimum threshold of **$112,901.39**. Intentional and negligent infliction of emotional distress, common-law negligence *per se*, and predicate constitutional violations under 42 U.S.C. § 1983, D.C. Code § 24-211.02, and the statutory standards of care governing vulnerable and captive adult abuse and neglect under D.C. Code §§ 22-932(5), 22-933, 22-934, and 22-936 (Count XVI) establish liability in an amount to be determined by the jury exceeding, and in no event less than, **$16,203,736.49**.

Pursuant to federal pleading standards, ***Monell v. Department of Social Services***, 436 U.S. 658 (1978), *West v. Atkins*, 487 U.S. 42 (1988), and the non-delegable statutory safekeeping mandate of D.C. Code § 24-211.02, the municipal and corporate entities bear direct and vicarious liability for both their own institutional policies and customs and the wrongful acts and omissions of their supervisory officials, contracted clinicians, administrative personnel, and custodial staff (including both the individuals identified below and any additional known or currently unknown personnel whose identities and participation are uncovered through discovery):

With respect to **Municipal and Corporate Entity Liability**, the District of Columbia and Unity Health Care, Inc., bear direct institutional liability in a combined sum exceeding, and in no event less than, **$27,515,971.52**. The District of Columbia, as the municipal corporation exercising non-delegable statutory safekeeping duties under D.C. Code § 24-211.02, bears direct municipal liability of at least **$26,557,668.16** and is jointly and severally liable for all subordinate supervisory, clinical, administrative, and custodial staff liabilities in an aggregate sum to be determined at trial exceeding, and not less than, **$41,939,958.86**. Defendant Unity Health Care, Inc., as the municipal healthcare contractor acting under color of state law, bears direct corporate liability of no less than **$958,303.36**, and bears joint and several corporate liability with its subordinate clinicians and records personnel in an aggregate amount upward from a minimum floor of **$1,445,912.20**.

With respect to **Contracted Clinical, Legal, and Records Administration Personnel**, specialized healthcare contractors, clinicians, legal counsel, and records administrators establish damages in an amount exceeding, and in no event less than, **$1,808,480.25**, including, without limitation: Records and Privacy Officer Oluwasegun *"Segun"* Obebe (not less than **$1,057,445.88** for bad-faith electronic health information suppression and willful refusal to process HIPAA access demands); Psychiatrist Defendant Dr. Anju Menon (not less than **$264,773.74**); Defendant DCDOC Deputy General Counsel / General Counsel Andrew Paul Mazzuchelli, U.S.D.C. D.D.C. Bar No. 7647430 (not less than **$186,781.71**); Clinical Physician Dr. O'Donovan (not less than **$144,547.49**); Discipline Director of Behavioral Health Defendant Dr. Roderick I. Wellington, Ph.D., LCPC, NCC, CFC (not less than **$78,287.61** for unauthenticated clinical charting and records manipulation); and FOIA Records Officer Elton Jones (not

less than **$76,643.82**), together with any additional clinical or records personnel identified in discovery.

With respect to **Supervisory Command and Leadership Officials**, facility command and supervisory officials establish supervisory damages in an amount exceeding, and in no event less than, **$1,573,072.62** for affirmative direction, knowledge, acquiescence, and failure to intervene, including, without limitation: Major Sheila Marr (not less than **$552,630.16** for grievance suppression and tampering); Lieutenant Anthony Brown Sr. (not less than **$430,164.21** in Housing Unit SW-1); DCDOC Director Thomas Faust (not less than **$156,438.76** for institutional policy ratifications); Sergeant Delonte Williams (not less than **$151,602.24** in Unit SW-1 / South-1); Sergeant Ugochukwu Okorie (not less than **$132,452.00**); Supervisory Mental Health Clinician Darius Mills (not less than **$71,709.95**); Lieutenant King (not less than **$44,383.36**); Sergeant Darlene Bryant (not less than **$22,650.75**); Warden Lennard Johnson (not less than **$5,917.86**); Captain D. Hayward (not less than **$3,287.70**); and Unit NE-1 Sergeant Theophilus Ojo (not less than **$1,835.63**), together with any additional command or supervisory personnel identified in discovery.

With respect to **Line Custodial Staff and Operational Personnel**, subordinate correctional officers, case managers, and operational staff establish damages in an amount exceeding, and in no event less than, **$746,598.61** for intentional and tortious misconduct, including, without limitation: Case Manager Tiara Coates (not less than **$138,191.82**); Correctional Officer *"Candy Man"* (not less than **$132,273.89**); Correctional Officer Chancelin Tchakossi (not less than **$112,897.30**); Housing Unit Manager Cuthbert Denton

(not less than **$108,219.38**); Correctional Officer Ishaccar Kamara (not less than **$86,657.23**); Facility Chaplain Eric Sims and DCDOC Religious Services personnel (not less than **$60,000.00** for denominational religious exercise and Sacrament deprivations); PREA Specialist Cortney Savage (not less than **$36,250.00** for retaliatory solitary transfers); Movement Coordinator Mohamed Bangura (not less than **$18,190.08**); Case Manager Hawkins (not less than **$16,875.00**); Correctional Officer Tosin Kayode (not less than **$10,547.95**); Property Sergeant Alonzo Walker (not less than **$7,591.80** for property confiscation and destruction); Correctional Officer Georges Orock (not less than **$4,602.66**); Correctional Officer Dangustard Palle (not less than **$2,958.93**); Correctional Officer Churda (not less than **$2,630.16**); Case Manager Zanders (not less than **$2,383.58**); Correctional Officer Maurice Jones (not less than **$1,753.44**); Housing Unit Manager Christina Whitehead (not less than **$1,479.47**); Case Manager Amaechi (not less than **$876.72**); and Case Manager Freezell (not less than **$739.73**), together with any other participating officers, case managers, and staff whose identities and actions are ascertained through discovery.

Together, these institutional, supervisory, clinical, and operational liabilities establish cumulative damages in an amount to be proven in full at trial exceeding, and in no event less than, **$41,939,958.86**, holding Defendants District of Columbia, Unity Health Care, Inc., and their custodial and clinical agents fully accountable for the grievous constitutional, statutory, and common-law injuries inflicted upon Plaintiff.

## ARTICLE V. CLAIMS FOR RELIEF

### COUNT I: DEPRIVATION OF CONSTITUTIONAL RIGHTS, UNCONSTITUTIONAL SOLITARY CONFINEMENT, AND MUNICIPAL MONELL LIABILITY (42 U.S.C. § 1983; U.S. CONST. AMENDS. V, VIII)

*(Against Defendants District of Columbia, Thomas Faust, Andrew Paul Mazzuchelli, Sheila Marr, Anthony Brown, Delonte Williams, Cuthbert Denton, and John and Jane Does 1-35)*

Plaintiff repeats, realleges, and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Verified Complaint as though set forth in full under this Count.

Pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983,[42] every person who, under color of any statute, ordinance, regulation, custom, or usage of the District of Columbia, subjects or causes to be subjected any citizen to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States, is liable to the injured party in an action at law, suit in equity, or other proper proceeding for redress. Grounded upon the foundational precepts of ***Bell v. Wolfish***,[43] the Fifth and Eighth Amendments to the United States Constitution proscribe the infliction of cruel and unusual punishments and secure substantive and procedural due process protections against arbitrary, punitive, and objectively unreasonable conditions of confinement that are not rationally related to a legitimate nonpunitive governmental purpose or appear

---

[42] 42 U.S.C. § 1983, at p. 1 (1996).
[43] United States Supreme Court, *Bell v. Wolfish*, 441 U.S. 520, at pp. 535-37 (1979).

excessive in relation to that purpose. Pursuant to the seminal doctrine articulated in ***Monell v. Department of Social Services***,[44] a municipal corporation is subject to direct Section 1983 liability whenever an affirmative municipal enactment, persistent and widespread custom, or systemic failure to train and supervise reflects deliberate indifference to federally protected constitutional liberties and operates as the moving force behind the constitutional deprivation. Furthermore, pursuant to ***Ashcroft v. Iqbal***, 556 U.S. 662, 676-77 (2009),[45] supervisory officials who affirmatively command, knowingly acquiesce in, or exhibit subjective deliberate indifference toward ongoing subordinate constitutional infractions incur personal liability under Section 1983.

Defendants District of Columbia, Director Thomas Faust, Deputy General Counsel Andrew Paul Mazzuchelli, Correctional Major Sheila Marr, Lieutenant Anthony Brown Sr., Sergeant Delonte Williams, Case Manager Cuthbert Denton, and John and Jane Does 1-35, acting under color of District of Columbia law, subjected Plaintiff to severe, atypical, and prolonged solitary confinement and unconstitutional environmental deprivations at the Central Detention Facility. Specifically, following Plaintiff's reporting of custodial sexual harassment, Defendants maintained Plaintiff in continuous, punitive solitary confinement across Unit NE-1 (Cell 63), Unit SW-1 / South-1 (*"the hole,"* on the top tier, right-hand side, Cell 54 and Cell 50 for over 130 consecutive days), subjected him to a sham contractual transfer to Northern Neck Regional Jail (NNRJ, Warsaw, VA) from May 8 to May 10, 2024 where he was scored as a 0-point minimum security classification, followed by immediate return to CDF Unit South-2 (Cell 34) under a 72-hour continuous cell lockdown, and Unit South-1 (Cell 35) under Sergeant Delonte Williams with full

[44] United States Supreme Court, *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, at pp. 690-95 (1978).
[45] United States Supreme Court, *Ashcroft v. Iqbal*, 556 U.S. 662, at pp. 676-77 (2009).

padlocked black-box, waist-chain, and ankle-shackle restraints re-imposed on every cell exit, maintaining Plaintiff in continuous isolation for over 160 consecutive days through his transfer from DCDOC custody on June 3, 2024. Plaintiff was confined to an eight-by-ten-foot poured-concrete cell (measuring barely two to three paces wide and six paces long) for twenty-three to twenty-four hours per day, subjected to unbroken sensory deprivation, mandatory pre-exit full strip and visual cavity searches and through-slot clothing/footwear inspections prior to any cell exit, padlocked *"black box"* wrist-cuff, waist-chain, and ankle-shackle restraints for all out-of-cell movement, an unremitting 24/7 acoustic barrage from the unit's single television located on the upper tier inside the enclosed plastic-glass dayroom blaring nonstop twenty-four hours a day, seven days a week at full, maximum, deafening volume and reverberating continuously down the hallway (completely eliminating sleep, preventing conversational speech, forcing detainees to yell at the top of their lungs across mere feet to be heard, and inflicting permanent auditory ear damage and chronic 24/7 bilateral tinnitus, ICD-10-CM H93.13,causing Plaintiff's ears to ring nonstop 24/7), unmitigated exposure to raw sewage backing up through plumbing fixtures, pervasive toxic black mold, extreme winter temperatures without adequate thermal clothing or bedding, and intense clouds of burning synthetic cannabinoid smoke infiltrating the cell from adjacent tiers without mechanical exhaust. Defendants deprived Plaintiff of out-of-cell time, outdoor exercise, and natural sunlight, leaving Plaintiff locked in continuous solitary isolation for days and weeks at a time and restricting out-of-cell movement to rare, isolated intervals locked inside a small indoor wire cage running in tight circles, in direct violation of mandatory custodial care standards set forth in D.C. Code § 24-211.02(a) and (b)(3).[46] These extreme conditions exceeded all penological justification, diverged sharply from standard general population

[46] D.C. Code § 24-211.02, at § 24-211.02 (2023).

housing, and violated the mandatory thirty-day solitary confinement ceiling established under 28 C.F.R. § 115.43 and DCDOC Policy Program 3350.2I.[47]

Defendants acted with actual knowledge, subjective recklessness, and deliberate indifference to Plaintiff's physical health, mental stability, and constitutional rights. Defendants Faust, Mazzuchelli, Marr, Brown, Williams, Denton, and John and Jane Does 1-35 received repeated contemporaneous written notices, emergency grievances, and staff intelligence reports regarding Plaintiff's unconstitutional solitary confinement, environmental filth, and deteriorating psychiatric condition, yet affirmatively approved, enforced, and prolonged Plaintiff's isolation. Defendant District of Columbia maintained a persistent municipal custom, pattern, and practice of utilizing administrative segregation as a punitive mechanism to warehouse vulnerable detainees, silencing civil rights reporting, operating the Central Detention Facility under a chronic correctional staffing deficit of hundreds of unfilled officer positions, and failing to remediate known environmental hazards despite the mandatory statutory command of D.C. Code § 24-211.02(b)(2) requiring quarterly and monthly reporting to the Council of the District of Columbia on inmate grievances, Priority One environmental problems and repair times, Environmental Safety Office audits, and temperature control and ventilation at the Central Detention Facility,[48] which municipal custom and statutory notice operated as the direct and proximate moving force behind the deprivation of Plaintiff's constitutional liberties under ***Monell*** and *Baker v. District of Columbia*.[49]

---

[47] 28 C.F.R. § 115.43, at § 115.43 (2012).

[48] D.C. Code § 24-211.02(b)(2), at § 24-211.02(b)(2) (2023) -- *"(2) Provide the Council on a quarterly basis all internal reports relating to living conditions in the Central Detention..."*

[49] United States Court of Appeals for the District of Columbia Circuit, *Baker v. District of Columbia, 326 F.3d 1302,* at p. 1306 (D.C. Cir. 2003).

As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered debilitating physical and psychological injuries, including neurological trauma, permanent auditory ear damage and chronic 24/7 bilateral tinnitus (ICD-10 H93.13, constant ringing in both ears), chronic sleep deprivation, aggravated panic disorder, [redacted], optical and pulmonary injury from sewage and toxic fumes, muscular atrophy, and prolonged deprivation of liberty. Plaintiff is entitled to compensatory damages in an amount to be determined at trial exceeding, and in no event less than, **$12,481,030.79** (encompassing at least $11,310,500.00 for the unlawful deprivation of liberty and systemic municipal injuries and no less than $1,170,530.79 in custodial environmental and conditions damages), plus punitive damages against Defendants Faust, Mazzuchelli, Marr, Brown, Williams, Denton, and John and Jane Does 1-35 in their individual capacities in a sum to be determined by the jury of no less than $2,000,000.00, together with reasonable attorney's fees and costs under 42 U.S.C. § 1988(b).

## COUNT II: DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL, PSYCHIATRIC, NEUROLOGICAL, AND PHYSICAL HEALTH NEEDS, AND STATUTORY PSYCHOTROPIC SEVERANCE (42 U.S.C. § 1983; U.S. CONST. AMENDS. V, VIII; D.C. CODE § 7-1231.08)

*(Against Defendants District of Columbia, Unity Health Care, Inc., Thomas Faust, Sheila Marr, Anthony Brown, Anju Menon, M.D., Roderick I. Wellington, Ph.D., LCPC, NCC, CFC, and John and Jane Does 1-50)*

Plaintiff repeats, realleges, and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Verified Complaint as though set forth in full under this Count.

Operating under 42 U.S.C. § 1983 and the Fifth and Eighth Amendments to the United States Constitution, custodial administrators and contracted clinical personnel are under an affirmative, non-delegable constitutional obligation to furnish adequate, timely, and competent medical, psychiatric, neurological, and physical healthcare to individuals committed to municipal custody.[50] Pursuant to the seminal standards established in *Estelle v. Gamble* and *Farmer v. Brennan*,[51] deliberate indifference to the serious medical, psychiatric, neurological, and physical health needs of incarcerated persons constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment and violates the substantive due process guarantees of the Fifth Amendment. Pursuant to *West v. Atkins*,[52] private corporate entities and licensed clinicians contracted by a municipal sovereign to perform exclusive correctional healthcare functions act under color of state law within the meaning of Section 1983. Pursuant to ***Monell*** and *Lewis v. Government of the District of Columbia*,[53] a contracted institutional healthcare provider such as Unity Health Care, Inc. incurs direct corporate liability for systemic institutional customs, clinical understaffing protocols, fiscal cost-containment practices, and supervisory defaults that operate as the moving force behind the denial, delay, or constructive abandonment of essential clinical care. Furthermore, pursuant to the District of Columbia Mental Health Consumers' Rights Protection Act, D.C. Code § 7-1231.08, mental health consumers possess an enforceable statutory right to receive individualized, evidence-based behavioral healthcare, continuity of established psychotropic pharmacotherapy, and statutory protection against the unilateral, abrupt termination of maintenance medications absent informed consent and documented clinical justification.

---

[50] United States Supreme Court, *Estelle v. Gamble*, 429 U.S. 97, at pp. 103-05 (1976).
[51] United States Supreme Court, *Farmer v. Brennan*, 511 U.S. 825, at pp. 834-37 (1994).
[52] United States Supreme Court, *West v. Atkins*, 487 U.S. 42, at pp. 48-54 (1988).
[53] United States District Court for the District of Columbia, *Lewis v. Government of the District of Columbia, Civ. No. 1:15-cv-00352 (RBW)*, at p. 1 (D.D.C. 2018).

Plaintiff suffered from objectively serious medical, psychiatric, neurological, auditory, and physical health emergencies throughout his 201 days of municipal detention. Prior to his confinement at the Central Detention Facility, Plaintiff was a high-functioning, self-supporting competitive athlete operating at an exceptional physical and occupational baseline with stable, well-managed outpatient health. Defendants' unlawful carceral conditions and clinical abandonment operated as a direct, proximate, and substantial causal factor that shattered Plaintiff's high-functioning baseline and inflicted severe, permanent physical, musculoskeletal, auditory, cardiovascular, neurological, and psychiatric impairments resulting in total disability. Specifically: (1) Defendants subjected Plaintiff to over 160 consecutive days of continuous 23-to-24 hour solitary confinement inside an 8x10 uninsulated concrete cell in total deprivation of natural sunlight and fresh air and under the nonstop 24/7 full-volume acoustic blare of the upper-tier enclosed plastic-glass dayroom television reverberating down the hallway, destroying Plaintiff's circadian cycle, depleting baseline vitamin D, causing severe sensory starvation and cognitive disorientation, and inflicting permanent [redacted] (ICD-10 F43.10), Panic Disorder (ICD-10 F41.0), Major Depressive Disorder (ICD-10 F32.A), Generalized Anxiety Disorder (ICD-10 F41.1), and permanent auditory ear damage in the form of Chronic Bilateral Tinnitus (ICD-10-CM H93.13,causing Plaintiff's ears to ring nonstop 24/7); (2) Defendants subjected Plaintiff to prolonged physical stagnation and near-total cellular immobilization in cramped quarters-depriving him of meaningful out-of-cell movement, outdoor recreation, or exercise space-systematically destroying Plaintiff's elite musculoskeletal conditioning, causing profound muscular atrophy, severe physical deconditioning, lower-extremity vascular stasis and Raynaud's disease, and chronic pain that substantially limits the major life activities of walking, standing, running, and working; (3) Defendants subjected Plaintiff to chronic nutritional deprivation and

substandard caloric intake compounding metabolic decay and physical wasting; (4) Defendants subjected Plaintiff to ambient sub-freezing 32°F winter cold drafts without thermal wear or blankets, causing prolonged hypothermia and triggering painful Raynaud's neurovascular spasms; (5) Defendants exposed Plaintiff to biohazardous cell conditions including raw human sewage backups, unventilated black mold, and pervasive plumes of toxic synthetic cannabinoid (K2/Spice) chemical smoke; (6) between November 16, 2023 and May 15, 2024-a period of exactly 181 consecutive days-Defendants abruptly discontinued and withheld Plaintiff's prescribed maintenance medications (including [redacted], [redacted], [redacted]/[redacted], and [redacted]) in direct violation of D.C. Code § 7-1231.08, violating mandatory FDA Boxed and Prescribing Information warnings ([redacted] Sections 2.6, 5.5, and 17; [redacted] Boxed Warning & Sections 5.1-5.2; [redacted] Clinical Pharmacology & Drug Abuse and Dependence; [redacted] Sections 5.7, 7, and 12.1; [redacted]/[redacted] Warnings & Adverse Reactions) by triggering acute serotonergic/noradrenergic discontinuation syndrome (which FDA [redacted] Section 5.5 explicitly warns causes "tinnitus, and seizures" alongside electric-shock paresthesias, dizziness, tremor, anxiety, and confusion), precipitating an acute hypodopaminergic crash (striatal and prefrontal cortex dopamine transporter $\theta_{\mathrm{DAT}}$ occupancy plummeting from >60% to 0%), and exposing upregulated cardiac adrenoceptors to unbuffered catecholamine surges and Raynaud-type peripheral arterial insufficiency from abrupt [redacted] cessation, plunging Plaintiff into severe physiological and neurochemical withdrawal, tremors, cardiovascular palpitations, autonomic dysregulation, panic attacks, and severe decompensation; (7) despite having never had a seizure or convulsive episode in his entire life prior to his confinement at the Central Detention Facility, on January 31, 2024 at 10:58 AM in the lower-tier video call recreation room of Unit SW-1-following 76 consecutive days of abrupt psychotropic and beta-blocker withdrawal, freezing solitary

confinement, toxic smoke exposure, and nonstop 24/7 acoustic sleep deprivation-after sitting on a steel stool reading the *Doctrine and Covenants* on his tablet in front of a black video box fastened to the concrete wall, Plaintiff stood up to walk around the room and suffered an acute, untreated, first-in-lifetime convulsive seizure and blackout in which he fainted backward onto the steel stool and struck his head against the concrete wall while his body convulsed out of control (catching himself at the last moment by throwing his hand against the wall-mounted black video box to keep from falling head-first into it), which on-duty correctional officers (including CO "Candy Man", who called Plaintiff a liar and refused to let him see medical so he would not have an incident on his shift, a second officer who walked away, and CO "Alpha") and clinical staff left entirely unexamined, without medical evaluation, diagnostic triage, neuroimaging, or neurological follow-up despite Plaintiff's immediate verbal reports, tablet Hotline / Tips 2022 submission (Confirmation #417531541), and written Sick Call Request (received 2/01/2024); and (8) Defendants refused medical intervention for rapidly deteriorating vision with large obstructive black spots, and an excruciating, ulcerated gluteal abscess leaking blood and infectious purulent discharge that was denied surgical debridement or systemic antibiotics. Plaintiff submitted seventeen (17) separate written Inmate Sick Call Request Forms (Form PS 6001.1) pleading for urgent medical, neurological, and psychiatric intervention; yet, in every single instance, Defendants left the clinical assessment, triage, disposition, and provider signature fields 100% blank, completely ignoring Plaintiff's medical emergencies. Furthermore, Defendants systematically manipulated and falsified Plaintiff's Electronic Medication Administration Record (*"MAR"*) and Electronic Health Record (*"EHR"*) files (**Exhibit 978**), including: (a) logging fraudulent code Ø *"PT Refused/med not Administered"* entries on May 15, 2024 at 20:00 less than five hours after Plaintiff signed formal consent forms and pleaded with NP Linda

Fonju and PA DeBreaka Posey to renew his medications; (b) exploiting Accu-Flo eMAR Instruction A automated programming to falsely reclassify Defendants' own outright failure to deliver medications into fabricated patient *"refusals"* ("PT Refused/med not Administered,"), while Dr. Roderick Wellington simultaneously falsified Plaintiff's clinical chart ("He is now housed on South-2, when he left he was on South-1, because of his safety") by impossibly claiming Plaintiff was housed in an intake unit (South-2) *"because of his safety"* to cover up DCDOC locking Plaintiff in South-2 beyond the 24-to-72-hour legal intake ceiling in defiance of three clinical orders mandating Open Population; (c) suppressing documented weekend administrations from May 10-12, 2024 and creating an unmedicated 72-hour intake MAR void for [redacted] (d) blaming Plaintiff for custodial escort defaults by falsely logging clinical *"No Shows"* and canceling *"med issues"* sick calls; (e) manufacturing impossible future anachronisms (*"SEEN 5/15/25"*) and fictitious specialist appointments (*"Ophthalmology appt is next week,"* when Plaintiff literally never saw an eye doctor, not once, throughout his entire incarceration) to pretextually wipe sick-call queues; (f) fabricating physical clinical encounters, normotensive blood pressure readings (122/77 mmHg on May 10, 2024 and 127/85 mmHg on May 14, 2024), and *"bp cpntrolled"* entries out of whole cloth-directly contradicted by contemporaneous communications and the physical reality that zero vitals checks, arm cuffs, or physical examinations occurred, and by eight clinical records explicitly stamping Plaintiff's chart with *"HYPERTENSION (ICD-401.9)"*-to simulate active vital monitoring and justify total medical inaction while abandoning Plaintiff to severe physiological distress from continuous solitary confinement, an active pus-draining abscess, and the deafening nonstop 24/7 blare of the upper-tier enclosed plastic-glass dayroom television set at full volume and reverberating down the hallway (which inflicted permanent ear damage and chronic 24/7 bilateral tinnitus, ICD-10 H93.13); (g) mechanically cloning

phantom [redacted] orders across five progress notes while simultaneously entering automated, canned substance abuse counseling macros for a former elite athlete who is a lifetime non-smoker and has completely abstained from alcohol for over five continuous years; (h) transcribing non-existent phantom facilities (*"Grand Jury Medical Center - UTAH"* by NP Meena Kumar, pp. 28, 31) and fictitious treating physicians (*"Dr. Vivaci Fauci"* by LPC Darius Mills, p. 32) onto Plaintiff's permanent intake chart to construct an institutional dead end and excuse 181 days of total psychotropic abandonment, while HIMS Manager Lynda Boykin and HIMS Clerk Jean Washington **intentionally fabricated and falsified Plaintiff's Social Security Number as "[redacted]"** on Plaintiff's permanent Chart Summaries (**Exhibit 979** at p. 3; **Exhibit 978** at p. 37) to sabotage Utah disability records requests and falsely certify (XX) on December 19, 2025 that Plaintiff "was not at this facility for the dates/period that was request." (**Exhibit 979** at p. 2); (i) omitting active [redacted] from the federal USM-553 transit summary on May 31, 2024; and (j) logging fraudulent code Ø ("PT Refused/med not Administered,") entries on May 15 and May 22, 2024, substituting completely blank future-dated "MAR For: June 2026" pages (printed March 3, 2026) in place of Plaintiff's actual June 2024 Accu-Flo MAR, and entering post-transfer appointment cancellations on June 7, 2024 ("NOC") and July 26, 2024 ("Inmate not on census per JACCS") weeks after Plaintiff had departed DCDOC custody. As an additive and cumulative illustration of Defendants' across-the-board clinical neglect, Plaintiff also submitted an unanswered sick call request on April 3, 2024 for basic preventative dental care (**Exhibit 977** at p. 17) following an intake form on January 26, 2024 where staff dentist Dr. Shayla Calhoun left clinical notes 100% blank, which Defendants wholly ignored in deliberate indifference to serious medical and dental needs, violating established constitutional standards under

*Chance v. Armstrong*.[54]

Defendants acted with actual subjective awareness of the excessive risks to Plaintiff's health and safety and knowingly disregarded those risks. Defendants Menon and Wellington possessed personal knowledge of Plaintiff's psychiatric history, physical health needs, repeated sick call slips, and documented physiological distress, yet withheld treatment, generated unauthenticated preliminary records labeled *"ON HOLD DOCUMENT,"* and participated in the falsification of clinical administration records. Defendants Faust, Marr, and Brown possessed supervisory notice through grievances, sick call manifest logs, administrative alerts, and DCDOC's own Director-commissioned *"Report on Suicide Prevention Practices within the District of Columbia, Department of Corrections' Central Detention Facility"* documenting systemic psychiatric and suicide-prevention deficiencies at CDF as recognized in *Waldo v. District of Columbia*, Civ. No. 19-cv-136 (TSC), 2021 WL 8322693 (D.D.C. Oct. 1, 2021),[55] yet knowingly acquiesced in the clinical abandonment and failed to train or supervise personnel to conduct timely psychiatric assessments where constitutional violations were the obvious consequence under the established deliberate indifference standard of *Warren v. District of Columbia*.[56] Defendant Unity Health Care, Inc. maintained corporate policies and customs of rationing medical, physical, and mental health care, understaffing correctional clinics, tolerating unauthenticated records, and ignoring unanswered sick call requests to maximize corporate profits under municipal contract CW92833.

---

[54] United States Court of Appeals for the Second Circuit, *Chance v. Armstrong*, 143 F.3d 698, at p. 703 (2d Cir. 1998).

[55] United States District Court for the District of Columbia, *Waldo v. District of Columbia, Civ. No. 19-cv-136 (TSC)*, at pp. 4-8 (D.D.C. Oct. 1, 2021) -- *"Finally, a failure to train or supervise employees may be a policy..."*

[56] United States Court of Appeals for the District of Columbia Circuit, *Warren v. District of Columbia*, 353 F.3d 36, at p. 39 (D.C. Cir. 2004).

As a direct and proximate result of Defendants' deliberate indifference, Plaintiff suffered agonizing physical pain, severe physical and vascular deconditioning, irreversible musculoskeletal deconditioning, traumatic head and neurological injury, severe unmonitored convulsive seizures, acute psychiatric decompensation, chronic [redacted], autonomic collapse, and permanent physical and mental disabilities substantially limiting major life activities. Plaintiff is entitled to compensatory damages against Defendants District of Columbia and Unity Health Care, Inc., jointly and severally, in a sum to be proven at trial of no less than **$3,872,798.27** (encompassing at least $873,750.00 in statutory psychotropic severance damages alongside systemic medical, physical, and psychiatric abandonment), plus punitive damages against Defendants Unity Health Care, Inc., Faust, Marr, Brown, Menon, Wellington, and John and Jane Does 1-50 in their individual capacities in an amount exceeding, and in no event less than, $5,000,000.00, together with costs and reasonable attorney's fees under 42 U.S.C. § 1988(b).

## COUNT III: FIRST AMENDMENT RETALIATION, FAILURE TO PROTECT FROM INMATE VIOLENCE, AND RETALIATORY SOLITARY CONFINEMENT

**(42 U.S.C. § 1983; U.S. CONST. AMENDS. I, V, VIII; D.C. CODE § 24-211.02)**

*(Against Defendants District of Columbia, Andrew Paul Mazzuchelli, Christina Whitehead, Cortney Savage, Anthony Brown, Delonte Williams, and John and Jane Does 1-35)*

Plaintiff repeats, realleges, and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Verified Complaint as though set forth in full under this Count.

Pursuant to 42 U.S.C. § 1983 and the First Amendment to the United States Constitution, incarcerated persons retain an absolute, fundamental right to petition the government for redress of grievances, notify custodial staff of imminent life-safety perils, utilize administrative remedy programs, and report sexual harassment or threats under the Prison Rape Elimination Act without being subjected to retaliatory state action (*Doe v. District of Columbia*, 796 F.3d 96, 106 (D.C. Cir. 2015)).[57] Official retaliation against an incarcerated person for exercising protected First Amendment speech violates the Constitution whenever: (1) the individual engaged in constitutionally protected conduct; (2) custodial officials executed an adverse action of a nature that would deter an individual of ordinary firmness from continuing to exercise protected rights; and (3) a substantial causal nexus binds the protected expression to the adverse action under *Toolasprashad v. Bureau of Prisons*.[58] Concurrently, pursuant to the Eighth and Fifth Amendments and D.C. Code § 24-211.02, correctional custodians are bound by an affirmative, non-delegable constitutional and statutory mandate to safeguard incarcerated individuals from known, documented risks of physical violence and predatory sexual abuse by fellow detainees under *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).[59]

Plaintiff engaged in protected First Amendment activity by formally reporting an acute incident of sexual harassment and knife threats by inmates that occurred in the shower enclosure on December 21, 2023, submitting emergency grievances, and cooperating with DCDOC Office of Investigative Services (OIS) investigators in PREA Case #2024-0001 (IAPro #4144 & #4337). In direct retaliation for Plaintiff's exercise of

[57] United States Court of Appeals for the District of Columbia Circuit, *Doe v. District of Columbia*, 796 F.3d 96, at p. 106 (D.C. Cir. 2015).

[58] United States District Court for the District of Columbia, *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, at pp. 584-85 (D.C. Cir. 2002).

[59] United States Supreme Court, *Farmer v. Brennan*, 511 U.S. 825, at pp. 833-34 (1994) -- *"Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped..."*

these protected First Amendment rights, Defendants PREA Compliance Manager Cortney Savage, Deputy General Counsel Andrew Paul Mazzuchelli, Lieutenant Anthony Brown Sr., Sergeant Delonte Williams, Housing Manager Christina Whitehead, and John and Jane Does 1-35 initiated and enforced retaliatory housing measures commencing January 3, 2024. Specifically, Defendant Savage authored an ideological profiling email flagging Plaintiff as a prominent media figure and directed that Plaintiff be placed in punitive solitary confinement in Unit SW-1 Cell 54 rather than receiving standard protective housing, and Defendant Mazzuchelli personally ratified Plaintiff's indefinite retention in Unit South-1 solitary isolation on January 5, March 28, and April 2-3, 2024. Defendants maintained Plaintiff in punitive solitary isolation for over 160 consecutive days, systematically deprived Plaintiff of out-of-cell time, denied outdoor exercise, restricted rare out-of-cell movement to an isolated indoor cage, subjected Plaintiff's cell to destructive shakedowns, and suppressed Plaintiff's outgoing grievances. Furthermore, Defendants repeatedly breached their constitutional duty to protect Plaintiff from foreseeable inmate violence: on April 16, 2024, Officer O-Rock compromised Plaintiff's security by bringing J6 detainee Bos Dominic to Plaintiff's cell, prompting unit-wide death threats and false snitch labeling; and on May 3, 2024, as Plaintiff was held in three-point mechanical shackles during an escort by Officer Tchamo from the shower back to Cell 50, detainee Goon in Cell 5 sprayed a jet of urine through his door crack directly onto Plaintiff's face, eye, and shoulder (and hitting Officer Tchamo). Defendants failed to secure the corridor perimeter, Officer Tchamo initially attempted to march Plaintiff back into his cell without decontamination until Plaintiff asserted on Officer Tchamo's chest-mounted body-worn camera that he must be decontaminated and medically examined as both he and Officer Tchamo had been assaulted, and medical staff subsequently provided zero biological triage or infectious prophylaxis. On May 8-10,

2024, DCDOC executed an inter-facility transfer to Northern Neck Regional Jail where Plaintiff was evaluated as a 0-point minimum security risk, only to be hauled back on May 10, 2024 into CDF Unit South-2 Cell 34 under a sham Restrictive Housing Review hearing (Program Statement 5300.1, Attachment F), stripped of his property, and placed under a 72-hour continuous lockdown. On May 15, 2024, DCDOC staff attempted to send Plaintiff from Unit South-2 intake directly into Unit SW-2 (Southwest-2)-the most violent maximum-security general population unit in the entire jail, where detainees and correctional officers routinely get stabbed (including five guards fatally stabbed) and inmates carry butcher-sized knives, where sending a 0-point minimum-security detainee made zero logical or penological sense. When Plaintiff explained that sending him to the jail's most violent unit where people and guards get stabbed made no sense and stated that as a January 6th defendant he was supposed to go to CTF, the officer quickly backtracked, stated that he would go check on that, and scratched Plaintiff off the SW-2 transfer list. Thereafter, following Plaintiff's submission of property and safety grievances (IGP #20240520-365 and #20240522-470) and while transferring his white January 6 intake cellmate and peers to CTF, Defendants retaliated on May 24, 2024 at 4:00 PM EST (heading into Memorial Day weekend) by forcing Plaintiff back into solitary confinement in Unit South-1 Cell 35 under the false pretext of protective custody-even though Plaintiff vehemently and vocally told Sergeant Okori (on active body-worn camera), unit officer Candy Man, and custodial staff that he did not want to go back to South-1 and did not want to be held in protective custody-re-imposing 3-point shackles on every cell exit and threatening Plaintiff with disciplinary sanctions when he objected to involuntary segregated housing.

Defendants executed these adverse actions with specific retaliatory intent, malice, and bad faith. The timing of Plaintiff's punitive solitary transfer on January 3, 2024-occurring within five days of his PREA report-combined with Defendant Savage's written profiling communications and Defendant Mazzuchelli's written ratifications, establishes incontrovertible causal linkage under *Pinson v. U.S. Department of Justice*.[60] Defendants used the administrative machinery of the PREA program not to protect Plaintiff, but to punish, silence, and isolate him for reporting staff misconduct and custodial abuse, exhibiting deliberate indifference to Plaintiff's safety and well-being (*Daskalea v. District of Columbia*, 227 F.3d 433, 441-42 (D.C. Cir. 2000)).[61]

As a direct and proximate result of Defendants' retaliatory acts, failure to protect, and punitive solitary placement, Plaintiff suffered acute emotional trauma, terror, humiliation, severe psychological distress, loss of liberty, and physical degradation. Plaintiff is entitled to compensatory damages against Defendant District of Columbia upward from a minimum baseline of **$1,113,500.00**, and such greater sum as may be established at trial (comprising at least $506,000.00 in failure-to-protect damages alongside no less than $607,500.00 for retaliation, PREA sexual safety breaches, and punitive isolation), plus punitive damages against Defendants Mazzuchelli, Whitehead, Savage, Brown, Williams, and John and Jane Does 1-35 in their individual capacities in an amount to be determined by the jury of no less than $1,500,000.00, together with attorney's fees and costs under 42 U.S.C. § 1988(b).

---

[60] United States District Court for the District of Columbia, *Pinson v. U.S. Department of Justice, 246 F. Supp. 3d 211*, at p. 224 (D.D.C. 2017).

[61] United States Court of Appeals for the District of Columbia Circuit, *Daskalea v. District of Columbia*, 227 F.3d 433, at pp. 441-42 (D.C. Cir. 2000).

**COUNT IV: UNLAWFUL CUSTODIAL MAIL CENSORSHIP AND OUTGOING CORRESPONDENCE BLACKOUT (42 U.S.C. § 1983; U.S. CONST. AMENDS. I, V)**

*(Against Defendants District of Columbia, Thomas Faust, Sheila Marr, Anthony Brown, Delonte Williams, and John and Jane Does 1-35)*

Plaintiff repeats, realleges, and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Verified Complaint as though set forth in full under this Count.

Operating under 42 U.S.C. § 1983, *Thornburgh v. Abbott*,[62] and the First and Fifth Amendments to the United States Constitution, incarcerated citizens retain fundamental constitutional rights to communicate by mail with their family members and to transmit letters and correspondence free from arbitrary sovereign censorship. Pursuant to the categorical standards of *Procunier v. Martinez*,[63] the custodial censorship of outgoing prisoner correspondence is constitutionally impermissible unless the state affirmatively demonstrates that the restriction directly furthers an important or substantial governmental interest entirely unrelated to the suppression of expression, and that the limitation is strictly no greater than necessary to protect that asserted interest. Furthermore, procedural due process guaranteed by the Fifth Amendment commands that whenever correctional authorities intercept, confiscate, or withhold inmate correspondence, they must provide: (1) prompt written notice to the sender; (2) a reasonable, meaningful opportunity to protest the withholding; and (3) an impartial administrative review conducted by an official other than the intercepting officer.[64] DCDOC Policy Program 4070.1E expressly incorporates

[62] United States Supreme Court, *Thornburgh v. Abbott*, 490 U.S. 401, at pp. 407-09 (1989).
[63] United States Supreme Court, *Procunier v. Martinez*, 416 U.S. 396, at pp. 413-14 (1974).
[64] United States Supreme Court, *Procunier v. Martinez*, 416 U.S. 396, at pp. 417-19 (1974).

these mandatory constitutional minimums, proscribing the arbitrary confiscation, withholding, or destruction of outgoing correspondence.[65]

Defendants District of Columbia, Director Thomas Faust, Correctional Major Sheila Marr, Lieutenant Anthony Brown Sr., Sergeant Delonte Williams, and John and Jane Does 1-35 implemented an unlawful correspondence blackout and systematic mail censorship regime targeting Plaintiff throughout his 201 days of municipal detention. Specifically, Plaintiff prepared letters and outgoing correspondence addressed to his family detailing systemic medical abandonment, custodial corruption, and illicit drug overdoses inside CDF, and deposited those outgoing letters and correspondence in the designated outgoing mail receptacles. Defendants intercepted, confiscated, suppressed, and destroyed outgoing letters and correspondence addressed to his family at the CDF mailroom and housing unit collection points solely because the contents documented and exposed unlawful facility conditions, in violation of *Wolff v. McDonnell*.[66] Defendants executed this censorship in secret, failing to issue a single rejection notice, failing to provide Plaintiff with any explanation or administrative opportunity to contest the withholding, and failing to provide administrative review, thereby violating the procedural due process mandate of *Procunier v. Martinez*, *Demons v. Gregory*,[67] and DCDOC Program Statement 4070.1E.

[65] D.C. Code § 24-211.02 (Authorizing DCDOC Program Statement 4070.1E), at § 24-211.02 (2023).
[66] United States Supreme Court, *Wolff v. McDonnell*, 418 U.S. 539, at pp. 575-77 (1974).
[67] United States District Court for the Southern District of Florida, *Demons v. Gregory, Case No. 1:24-cv-21455*, at pp. 1-10 (S.D. Fla. 2024).

Defendants acted willfully, knowingly, and with deliberate indifference to Plaintiff's First and Fifth Amendment rights. Supervisory Defendants Faust, Marr, and Brown issued directives and established unwritten facility customs commanding line officers to scrutinize, seize, and discard outgoing writings authored by high-profile detainees, specifically targeting Plaintiff's letters and communications to his family to prevent exposure of systemic jail conditions and ongoing staff misconduct.

As a direct and proximate result of Defendants' unlawful mail censorship and correspondence blackout, Plaintiff was silenced and cut off from his family. Plaintiff is entitled to compensatory damages against Defendant District of Columbia in a sum exceeding, and in no event less than, **$1,632,945.97** for these unlawful mail censorship deprivations, plus punitive damages against Defendants Faust, Marr, Brown, Williams, and John and Jane Does 1-35 in their individual capacities in an amount to be proven at trial of at least $2,000,000.00, together with statutory costs and attorney's fees under 42 U.S.C. § 1988(b).

**COUNT V: SUBSTANTIAL BURDEN ON RELIGIOUS EXERCISE AND DENOMINATIONAL DISCRIMINATION (RFRA, 42 U.S.C. §§ 2000BB-1(A)-(C), 2000BB-2(1); RLUIPA, 42 U.S.C. § 2000CC-1(A); U.S. CONST. AMEND. I)**

*(Against Defendants District of Columbia, Thomas Faust, Sheila Marr, Anthony Brown, Delonte Williams, and John and Jane Does 1-35)*

Plaintiff repeats, realleges, and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Verified Complaint as though set forth in full under this Count.

Pursuant to the strict statutory commands of the Religious Freedom Restoration Act of 1993 (*"RFRA"*), 42 U.S.C. § 2000bb-1, and the Religious Land Use and Institutionalized Persons Act of 2000 (*"RLUIPA"*), 42 U.S.C. § 2000cc-1, the government shall not substantially burden an individual's religious exercise-even where such burden results from a rule of general applicability-unless the sovereign affirmatively demonstrates that the application of the burden to the claimant is in furtherance of a compelling governmental interest and constitutes the least restrictive means of furthering that compelling interest.[68] Pursuant to 42 U.S.C. § 2000bb-2(1), the District of Columbia constitutes an expressly covered government entity subject to RFRA, and under *Tanzin v. Tanvir*, 592 U.S. 43, 46 (2020),[69] RFRA explicitly authorizes actions for monetary damages against government officials in their individual capacities. Concurrently, pursuant to *Levitan v. Ashcroft*,[70] the First Amendment bars custodial administrators from arbitrarily curtailing religious observances, suppressing sacred scriptures, or discriminating against particular detainees absent legitimate, neutral penological justification.

Throughout his 160+ days in solitary confinement in Unit SW-1 (subsequently renamed Unit South-1 / S-1 on February 26, 2024) and his initial confinement in Unit NE-1, Plaintiff sought to practice his denomination of faith as a member of **The Church of Jesus Christ of Latter-day Saints (*"LDS"*)**, specifically requiring weekly Sunday worship services and the ordinance of partaking of the **Sacrament** blessed and administered by an authorized member of his denomination holding the priesthood.

---

[68] 42 U.S.C. §§ 2000bb-1, 2000cc-1, at p. 1 (1993, 2000).

[69] United States Supreme Court, *Tanzin v. Tanvir*, 592 U.S. 43, at pp. 46-54 (2020).

[70] United States Court of Appeals for the District of Columbia Circuit, *Levitan v. Ashcroft*, 281 F.3d 1313, at pp. 1317-20 (D.C. Cir. 2002).

Defendants District of Columbia, Faust, Marr, Brown, (within Unit SW-1 / South-1) Williams, and John and Jane Does 1-35 (including Unit SW-1 / South-1 Chaplain Eric Sims and DCDOC Religious Services personnel) imposed severe, substantial burdens on Plaintiff's religious exercise and engaged in overt denominational discrimination by: (1) categorically refusing to permit any authorized member or priesthood holder of The Church of Jesus Christ of Latter-day Saints (including Brother Pete Christensen, who sought clearance through the DCDOC Chaplain's Office in February 2024) to enter the facility or housing unit to visit Plaintiff and bless and administer the Sacrament; (2) denying Plaintiff the ability to attend or participate in weekly Sunday religious services of his denomination; (3) engaging in blatant denominational discrimination within Unit South-1 by granting detainees of the Muslim denomination the right to practice and attend religious services of their choosing inside the South-1 unit while completely denying Plaintiff equal religious opportunity as a member of The Church of Jesus Christ of Latter-Day Saints; and (4) completely ignoring Plaintiff's March 30, 2024 (03-30-2024) request for assistance submitted to Chaplain Eric Sims, his April 1, 2024 (04-01-2024) Step 1 Informal Resolution Complaint Form (PP 4030.1, Attachment C, requesting "the ability to attend religious services for my faith every Sunday and to partake of the Sacrament blessed by members of the Church of Jesus Christ who hold the powers and authorities of the priesthood to administer such ordinances as ordained by God"), and his April 4, 2024 (04-04-2024) Step 2 Inmate Formal Grievance Form (PP 4030.1, Attachment D), leaving the official "***FOR DOC COMPLETION***" response sections 100% blank. Defendants enforced this categorical denial of Plaintiff's denominational ordinances and Sunday worship services without any individualized assessment and without any compelling governmental interest. Defendants' refusal to permit a priesthood holder from Plaintiff's denomination to administer the Sacrament and conduct Sunday

services-while actively accommodating Muslim religious services within the exact same housing unit-was far from the least restrictive means and violated RFRA, RLUIPA, the First and Fifth Amendments, and DCDOC Policy Program 4310.3B.[71]

Defendants acted with conscious knowledge and deliberate indifference to Plaintiff's protected statutory and constitutional rights. Defendants received Plaintiff's March 30, 2024 request to Chaplain Eric Sims and his formal April 1, 2024 and April 4, 2024 religious services grievances (PP 4030.1, Attachments C and D) explicitly requesting a priesthood holder from his denomination to administer the Sacrament and conduct Sunday services, yet left the grievance response fields completely blank and summarily denied Plaintiff the ability to practice the core ordinances of his faith without penological rationale.

As a direct and proximate result of Defendants' unlawful conduct, Plaintiff was deprived of spiritual solace, suffered severe moral injury, despair, and psychological anguish while confined in solitary isolation. Plaintiff is entitled to compensatory damages against Defendant District of Columbia of no less than **$259,500.00**, and such greater amount as may be established at trial for these religious exercise burdens, plus individual-capacity money damages under *Tanzin v. Tanvir* against Defendants Faust, Marr, Brown, Williams, and John and Jane Does 1-35 in a sum exceeding, and not less than, $500,000.00, together with attorney's fees and costs under 42 U.S.C. § 1988(b).

[71] D.C. Code § 24-211.02 (Authorizing DCDOC Program Statement 4310.3B), at § 24-211.02 (2023).

**COUNT VI: RACE-BASED AND POLITICAL-AFFILIATION CUSTODIAL SEGREGATION, PRIVATE CONTRACTOR IMPAIRMENT, AND D.C. HUMAN RIGHTS ACT DISCRIMINATION (42 U.S.C. §§ 1981(A)-(C), 1983, 1985(3), 1986; U.S. CONST. AMEND. V; D.C. CODE §§ 2-1402.73, 2-1403.16)**

*(Against Defendants District of Columbia, Unity Health Care, Inc., Thomas Faust, Andrew Paul Mazzuchelli, Sheila Marr, Anthony Brown, Delonte Williams, Cortney Savage, Cuthbert Denton, and John and Jane Does 1-50)*

Plaintiff repeats, realleges, and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Verified Complaint as though set forth in full under this Count.

Under 42 U.S.C. § 1981(a), all persons within the jurisdiction of the United States possess the same right to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. Under Section 1981(c), these rights are protected against impairment by nongovernmental discrimination and impairment under color of state or municipal law. Under 42 U.S.C. § 1985(3), an actionable conspiracy exists where two or more persons conspire for the purpose of depriving any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, and commit an overt act in furtherance thereof resulting in injury.[72] Under 42 U.S.C. § 1986, every person who possesses knowledge of wrongs conspired to be done under Section 1985, has the power to prevent them, and neglects or refuses to do so, is liable for all damages caused by such

[72] 42 U.S.C. §§ 1981, 1985(3), 1986, at p. 1 (1991, 1994, 1976).

wrongful acts. Under the equal protection component of the Fifth Amendment, all racial classifications in correctional housing and assignments are subject to strict judicial scrutiny and are presumptively unconstitutional under *Johnson v. California*.[73] Furthermore, under the District of Columbia Human Rights Act (*"DCHRA"*), D.C. Code § 2-1402.73, it is an unlawful discriminatory practice for any District of Columbia government agency, official, or public facility to deny or restrict full and equal access to institutional services, housing accommodations, and protective programs based on race, color, or political affiliation. Pursuant to D.C. Code § 2-1403.16(a) and (f), any person claiming to be aggrieved by an unlawful discriminatory practice possesses an enforceable private right of action against the District of Columbia and participating actors in a court of competent jurisdiction for compensatory damages, attorney's fees, and such other remedies as may be appropriate.[74]

Plaintiff is an African American / Black independent video journalist who was committed to the Central Detention Facility under DCDC #387289 following his initial remand on November 16, 2023. Defendants District of Columbia, Unity Health Care, Inc., Faust, Mazzuchelli, Marr, Brown, Williams, Savage, and Denton entered into an unlawful concerted agreement, custom, and conspiratorial understanding to subject Plaintiff to discriminatory custodial segregation based on his race and perceived political affiliations under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*[75] This intentional racial and political disparity is demonstrated with mathematical precision by the sequential mid-November 2023 DCDOC booking registers: similarly situated white

---

[73] United States Supreme Court, *Johnson v. California*, 543 U.S. 499, at pp. 505-09 (2005).

[74] D.C. Code § 2-1403.16, at p. 904 (2023) -- *"(a) Any person claiming to be aggrieved by an unlawful discriminatory practice under this unit may file a private cause of action..."*

[75] United States Supreme Court, *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, at pp. 265-68 (1977).

detainees charged with offenses arising out of the January 6 Capitol demonstration who were booked sequentially immediately prior to Plaintiff-specifically Frank Giustino (DCDC #387252), Donald Chilcoat (DCDC #387253), and Dominic Box (DCDC #387287)-were expeditiously assigned to the dedicated, climate-controlled, and comparatively well-resourced January 6 protective custody pod at the Correctional Treatment Facility (CTF, the *"Patriot Wing"*), enjoying daily out-of-cell congregate socialization, personal electronic tablets, video visitation, educational seminars, and outside recreation. In stark contrast, Defendants categorically excluded Plaintiff (DCDC #387289), the sole Black independent journalist in the booking sequence, from the CTF pod. In an internal directive authored on January 2, 2024, Defendant PREA Compliance Manager Cortney Savage explicitly cited Plaintiff's race and media profile, directing that Plaintiff be isolated from all other detainees, and on January 5, 2024 and April 2-3, 2024, Defendant DCDOC Deputy General Counsel Andrew Paul Mazzuchelli (U.S.D.C. D.D.C. Bar No. 7647430; Deputy General Counsel July 2023 - October 2024 and General Counsel October 2024 - October 2025) formally ratified Plaintiff's exclusion from CTF and indefinite confinement in Unit South-1 solitary isolation explicitly on the basis of Plaintiff's "perceived affiliation" and supposed lack of "ideological alignment" despite acknowledging "0 disciplinary violations". Defendants exiled Plaintiff to the most decrepit, dangerous, and unsanitary solitary confinement units of CDF (Units SW-1, NE-1, and South-2, across Cells 54, 50, 63, 34, and 35) under continuous solitary lockdown with near-total deprivation of out-of-cell time, isolated indoor cage confinement, and total correspondence suppression, while denying Plaintiff the protective housing, congregate access, and medical oversight routinely afforded to white detainees. Defendants' proffered rationale for denying Plaintiff transfer to CTF-namely, the pretextual assertion that white January 6 detainees would pose an inherent danger of racial or physical violence to

Plaintiff-was a complete administrative fabrication and bad-faith pretext. In empirical reality, upon initial intake in Southwest 1, Plaintiff was physically co-housed in the exact same cell with two white January 6 detainees (including Frank Giustino, DCDC #387252), living in total peace with zero friction, zero threats, and zero violence, with Plaintiff voluntarily sharing his daily meal trays to assist them during acute illness. Moreover, during intake-both upon Plaintiff's initial booking in November 2023 and during his second intake in May 2024 following return from NNRJ-DCDOC maintained an intake policy where January 6 detainees were segregated from the general inmate population and released for one- to two-hour recreation, phone, and shower intervals strictly and exclusively with other January 6 detainees. During these segregated intake cohort releases, Plaintiff commingled directly, freely, and peacefully in congregate space with multiple white January 6 detainees without a single altercation, verbal dispute, or security incident. This total absence of conflict during direct in-cell co-housing with two white January 6 cellmates and congregate intake recreation conclusively obliterated Defendants' pretextual security rationale, proving that Defendants' refusal to house Plaintiff in CTF and their confinement of Plaintiff in torturous solitary isolation was driven strictly by invidious racial profiling, viewpoint discrimination, and bad-faith retaliation on the highest level under *Village of Arlington Heights*, 429 U.S. at 265-66. Defendants Unity Health Care and its supervisory clinical personnel actively participated in this discriminatory segregation by withholding psychiatric care, denying preventative dental care, and maintaining unauthenticated records for Plaintiff, while providing routine clinical services to white detainees.

Defendants acted with discriminatory intent, racial animus, and invidious purpose. Defendants Faust, Mazzuchelli, Marr, and Brown possessed supervisory command authority, knew of the racially disparate housing and denial of equal medical care, possessed the executive power to integrate or safely house Plaintiff, yet neglected and refused to intervene, in direct violation of 42 U.S.C. § 1986.[76]

As a direct and proximate result of Defendants' discriminatory segregation and conspiracy, Plaintiff suffered humiliation, equal protection deprivations, heightened danger of physical violence, severe mental anguish, and unconstitutional isolation. Plaintiff is entitled to compensatory damages against Defendants District of Columbia and Unity Health Care, Inc., jointly and severally, in a sum to be determined at trial exceeding, and in no event less than, **$709,831.50** (encompassing at least $662,331.50 for constitutional and statutory segregation deprivations and no less than $47,500.00 under the D.C. Human Rights Act, D.C. Code §§ 2-1402.73 and 2-1403.16), plus punitive damages against Defendants Faust, Mazzuchelli, Marr, Brown, Williams, Savage, Denton, and John and Jane Does 1-50 in their individual capacities upward from a minimum floor of $2,500,000.00, together with attorney's fees and costs under 42 U.S.C. § 1988(b) and D.C. Code § 2-1403.13(a)(1)(E).

[76] 42 U.S.C. § 1986, at p. 1 (1976).

**COUNT VII: UNCONSTITUTIONAL INVOLUNTARY SEGREGATED HOUSING BEYOND THE 30-DAY PREA CEILING, RETALIATORY PROTECTIVE CUSTODY, AND NEGLIGENCE PER SE (42 U.S.C. § 1983; U.S. CONST. AMENDS. I, V, VIII; D.C. CODE § 24-211.02; D.C. COMMON LAW; 34 U.S.C. §§ 30301, 30307 & 28 C.F.R. §§ 115.43, 115.68 AS PREDICATE CONSTITUTIONAL AND STATUTORY STANDARDS OF CARE)**

*(Against Defendants District of Columbia, Thomas Faust, Andrew Paul Mazzuchelli, Sheila Marr, Anthony Brown, Cortney Savage, Delonte Williams, and John and Jane Does 1-35)*

Plaintiff repeats, realleges, and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Verified Complaint as though set forth in full under this Count.

Plaintiff brings this cause of action directly under 42 U.S.C. § 1983 (for violations of the First, Fifth, and Eighth Amendments to the United States Constitution) and District of Columbia statutory and common-law negligence *per se* (D.C. Code § 24-211.02), expressly pleading the Prison Rape Elimination Act (*"PREA"*), 34 U.S.C. §§ 30301 and 30307, its implementing Department of Justice regulations, 28 C.F.R. §§ 115.43 and 115.68, and DCDOC Program Statement 3350.2I as: (1) actionable predicate constitutional standards and state-created liberty protections enforceable via 42 U.S.C. § 1983; and (2) mandatory statutory and regulatory standards of care establishing negligence *per se* under District of Columbia common law. Pursuant to 34 U.S.C. § 30307, the national custodial standards promulgated by the United States Department of Justice constitute mandatory, non-discretionary federal regulations binding

upon all state and municipal detention facilities.[77] Pursuant to 28 C.F.R. § 115.43(a), inmates assigned to segregated housing for their own protection shall be placed in segregated housing only until an alternative means of separation from likely abusers can be effectuated, and such involuntary protective assignment *"shall not ordinarily exceed a period of 30 days."* Pursuant to 28 C.F.R. § 115.43(a)-(d),[78] whenever a correctional facility restricts an inmate's access to institutional programs or privileges, the administration must document the specific limitations and justifications, exhaust all available alternative housing options, and execute a formal substantive classification review every thirty (30) days, preserving an individualized written record of each determination. Pursuant to 28 C.F.R. § 115.68, correctional authorities are strictly mandated to protect inmates who report sexual abuse or harassment from official or peer retaliation and maintain active monitoring for at least ninety (90) days following a report.[79] DCDOC Policy Program 3350.2I expressly incorporates these mandatory federal standards into binding municipal correctional directives, and D.C. Code § 24-211.02(a) and (b)(4) establish an affirmative, non-delegable municipal statutory mandate commanding proper classification, safekeeping, and humane treatment.[80] Under 42 U.S.C. § 1983, the mandatory substantive predicates of 28 C.F.R. §§ 115.43(a)-(d), 115.68, DCDOC Program Statement 3350.2I, and D.C. Code § 24-211.02 create a protected liberty expectation against indefinite, unreviewed involuntary protective isolation under the Fifth Amendment (*Wilkinson v. Austin*, 545 U.S. 209, 223-25 (2005); *Hewitt v. Helms*, 459 U.S. 460, 472-77 (1983)), define objective unreasonableness and deliberate indifference under the Fifth and Eighth Amendments, establish retaliatory

---

[77] 34 U.S.C. § 30307, at p. 1 (2003).
[78] 28 C.F.R. § 115.43(a)-(d), at § 115.43 (2012).
[79] 28 C.F.R. § 115.68, at § 115.68 (2012).
[80] D.C. Code § 24-211.02 (Authorizing DCDOC Program Statement 3350.2I), at § 24-211.02 (2023).

pretext under the First Amendment, and place individual custodial officials on unequivocal regulatory notice stripping them of qualified immunity. Concurrently, under District of Columbia tort law (*Webster v. District of Columbia*, Civ. No. 1:20-cv-00300 (JDB); *Johnson v. District of Columbia*, Civ. No. 18-3062 (RBW)), because 28 C.F.R. §§ 115.43, 115.68, DCDOC Program Statement 3350.2I, and D.C. Code § 24-211.02 were enacted for the specific purpose of protecting incarcerated reporters of sexual harassment from retaliatory or prolonged involuntary isolation-and Plaintiff is a member of the exact class of persons those provisions were designed to protect-Defendants' unexplained breach of those mandatory duties constitutes **negligence *per se*** under District of Columbia common law.

Following Plaintiff's reporting of custodial sexual harassment on December 28, 2023, Defendants District of Columbia, Faust, Mazzuchelli, Marr, Brown, Savage, Williams, and John and Jane Does 1-35 placed Plaintiff on January 3, 2024 into involuntary solitary confinement in Special Management Unit SW-1 Cell 54 under the pretext of protective custody (OIS Case #2024-0001, IAPro #4144, **Exhibit 976**). Defendants maintained Plaintiff in involuntary solitary confinement for over 160 consecutive days-exceeding the federal thirty-day ceiling by more than 530%, with Defendant Mazzuchelli declaring on March 28, 2024 that "there is no limit on how long he can be there". Throughout this entire 160+ day period, Defendants failed to explore alternative housing options, failed to transfer Plaintiff to an appropriate protective unit at CTF, failed to document program restrictions, and failed to conduct the mandatory thirty-day status reviews required by 28 C.F.R. § 115.43(d) and *Wilkinson v. Austin*.[81] Instead, Defendants used the label of protective custody as a punitive instrument under

[81] United States Supreme Court, *Wilkinson v. Austin*, 545 U.S. 209, at pp. 223-25 (2005).

*Hewitt v. Helms*,[82] stripping Plaintiff of all educational, religious, and contact-visitation privileges, while locking Plaintiff in an eight-by-ten-foot cell with near-zero out-of-cell time, denying outdoor recreation, and confining Plaintiff to an indoor cage to run in circles on rare out-of-cell intervals; and on May 24, 2024-after an aborted May 15, 2024 attempt to send Plaintiff to Unit SW-2 (the most violent maximum-security unit in the jail where inmates and guards get stabbed) was scratched off the transfer list when Plaintiff informed the officer he was a January 6th defendant supposed to go to CTF-Defendants forced Plaintiff back into Unit South-1 Cell 35 under the pretext of protection, even though Plaintiff vehemently stated on Sergeant Okori's body-worn camera that he did not want to go back to South-1 and did not want to be held in protective custody.

Defendants acted with bad-faith pretext, gross negligence, negligence *per se*, and deliberate indifference to Plaintiff's First, Fifth, and Eighth Amendment rights and governing federal and municipal standards of care. Defendants knew that federal and municipal regulations strictly prohibited indefinite protective segregation beyond thirty days, yet deliberately maintained Plaintiff in isolation to conceal their failure to protect him from sexual harassment and to punish him for invoking PREA reporting channels.

As a direct and proximate result of Defendants' unconstitutional, retaliatory, and negligent per se segregated detention, Plaintiff suffered severe sensory deprivation, claustrophobia, panic attacks, muscular deterioration, and intense mental anguish. Pursuant to 42 U.S.C. § 1983, D.C. Code § 24-211.02, and District of Columbia common-law negligence *per se*, Plaintiff is entitled to compensatory damages against Defendant District of Columbia in a sum of no less than **$1,461,370.40**, and such greater

[82] United States Supreme Court, *Hewitt v. Helms*, 459 U.S. 460, at pp. 472-77 (1983).

amount as may be proven at trial, plus punitive damages against Defendants Faust, Mazzuchelli, Marr, Brown, Savage, Williams, and John and Jane Does 1-35 in their individual capacities in an amount exceeding, and not less than, $2,000,000.00, together with attorney's fees and costs under 42 U.S.C. § 1988(b).

**COUNT VIII: DISABILITY DISCRIMINATION AND FAILURE TO ACCOMMODATE UNDER TITLE II OF THE ADA AND SECTION 504 OF THE REHABILITATION ACT**

**(42 U.S.C. § 12132; 29 U.S.C. § 794; D.C. CODE § 24-211.02(A), (B)(1)-(5), (B)(9))**

*(Against Defendant District of Columbia)*

Plaintiff repeats, realleges, and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Verified Complaint as though set forth in full under this Count.

Pursuant to Title II of the Americans with Disabilities Act of 1990 (*"ADA"*), 42 U.S.C. § 12132, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.[83] Municipal correctional departments and local detention facilities constitute covered public entities under Title II pursuant to *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998).[84] Pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), no otherwise qualified individual with a disability shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits

[83] 42 U.S.C. § 12132, at p. 1 (1990).

[84] United States Supreme Court, *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206, at pp. 209-13 (1998).

of, or be subjected to discrimination under any program or activity receiving federal financial assistance. Pursuant to *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 267 (D.D.C. 2015),[85] the District of Columbia is directly liable for compensatory damages under Title II and Section 504 upon an affirmative showing of deliberate indifference to the accommodation requirements of disabled detainees. In addition, D.C. Code § 24-211.02 commands an affirmative, non-delegable municipal statutory mandate binding DCDOC to furnish proper treatment, safekeeping, and clinical instruction to all persons committed to its institutions.

Plaintiff is a qualified individual with documented physical, musculoskeletal, auditory, psychiatric, cognitive, and neurological disabilities within the meaning of 42 U.S.C. § 12102 and 29 U.S.C. § 705(20)-including [redacted] (ICD-10 F43.10), Panic Disorder (ICD-10 F41.0), Major Depressive Disorder (ICD-10 F32.A / F32.9), Generalized Anxiety Disorder (ICD-10 F41.1), [redacted] (ICD-10 F90.9), Chronic Bilateral Tinnitus (ICD-10 H93.13, permanent acoustic-trauma ear damage causing nonstop 24/7 ringing in both ears), Raynaud's disease / lower-extremity vascular impairment, and chronic autonomic/neurological dysregulation-which substantially limit major life activities including hearing, walking, standing, running, working, thinking, concentrating, sleeping, interacting with others, and musculoskeletal and neurological functioning, as formally determined post-release by the Utah Department of Workforce Services (**Exhibit 979**, and Exhibit 17 attached to Plaintiff's concurrently filed *Motion for Leave to Proceed In Forma Pauperis*). Prior to his confinement at the Central Detention Facility, Plaintiff was a

[85] United States District Court for the District of Columbia, *Pierce v. District of Columbia, 128 F. Supp. 3d 250,* at pp. 267-70 (D.D.C. 2015).

high-functioning, self-supporting competitive athlete operating independently at an exceptional physical and occupational baseline, and Defendants' unlawful carceral conditions, prolonged solitary confinement, nonstop 24/7 acoustic trauma, forced physical stagnation, and clinical abandonment operated as a direct, proximate, and substantial causal factor that shattered his functional baseline and inflicted severe, permanent disabling impairments resulting in total occupational and functional disability. Defendant District of Columbia receives federal financial assistance for its correctional operations and programs. Defendant possessed complete actual and constructive knowledge of Plaintiff's clinical vulnerability, psychiatric history, emerging physical deterioration, and disabling collapse during custody, as recorded on his intake Electronic Health Records and detailed in seventeen unaddressed Inmate Sick Call Requests.

Notwithstanding this knowledge, Defendant District of Columbia intentionally discriminated against Plaintiff and failed to provide reasonable accommodations for his emerging and acute disabilities by: (1) abruptly terminating Plaintiff's established psychotropic medication regimen for 181 consecutive days without clinical justification, precipitating acute withdrawal and psychiatric collapse; (2) placing and maintaining Plaintiff in total sensory deprivation and solitary confinement for over 160 consecutive days, an environment known to trigger severe psychological decompensation and neurological breakdown; (3) refusing to provide adequate physical mobility, out-of-cell movement, outdoor recreation, or exercise accommodations, instead subjecting Plaintiff to continuous physical stagnation and near-total cellular immobilization inside an 8x10 concrete cell and isolating him alone inside a small indoor wire cage, destroying his athletic conditioning and causing severe physical and musculoskeletal deconditioning; (4) ignoring seventeen written sick call slips pleading for physical, neurological, and mental

health support; and (5) failing to modify facility housing policies to ensure Plaintiff received equal access to custodial programs, counseling, and recreation. In an official Medical Records Department Memorandum executed on December 19, 2025 in response to Utah disability authorities (**Exhibit 979** at p. 2), DCDOC HIMS Manager Lynda Boykin certified (XX) that "We are unable to locate all the records you requested, enclosed are portions of the record that are available. 2020-2022" and "Patient was not at this facility for the dates/period that was request."-attaching zero physical examination or diagnostic triage records for Plaintiff's entire November 16, 2023 to May 10, 2024 CDF detention beyond a single January 26, 2024 dental visit, confirming that Defendant completely excluded Plaintiff from its clinical and rehabilitative services.

Defendant District of Columbia acted with deliberate indifference to Plaintiff's federally protected disability rights. High-ranking municipal and correctional officials knew that solitary confinement, environmental biohazards, physical stagnation, and unmedicated withdrawal would cause catastrophic musculoskeletal, neurological, and psychiatric injury, yet deliberately chose not to provide accommodations, medical care, or transfers to appropriate treatment facilities, and instead intensified Plaintiff's punitive isolation as his physical and psychiatric health deteriorated.[86]

As a direct and proximate result of Defendant's intentional discrimination and failure to accommodate, Plaintiff suffered excruciating mental distress, severe physical deconditioning, panic attacks, physical seizures, deep psychological trauma, and permanent physical, neurological, and psychiatric disabilities. Plaintiff is entitled to

---

[86] United States District Court for the District of Columbia, *Johnson v. District of Columbia, Civ. No. 18-3062 (RBW)*, Mem. Op. at pp. 19-20 (D.D.C. Oct. 26, 2023).

compensatory damages against Defendant District of Columbia upward from a minimum baseline of **$1,379,750.00**, with the full measure to be determined at trial, together with reasonable attorney's fees and litigation expenses under 42 U.S.C. § 12205 and 29 U.S.C. § 794a.

**COUNT IX: BAD-FAITH GRIEVANCE THWARTING, ADMINISTRATIVE OBSTRUCTION, FIRST AND FIFTH AMENDMENT PETITION AND DUE PROCESS VIOLATIONS, AND NEGLIGENCE PER SE / EVIDENTIARY SPOLIATION (42 U.S.C. § 1983; U.S. CONST. AMENDS. I, V; D.C. CODE § 24-211.02; D.C. COMMON LAW; D.C. CODE § 22-723(A)-(B) & DCDOC PP 4030.1N AS PREDICATE CONSTITUTIONAL AND STATUTORY STANDARDS OF CARE)**

*(Against Defendants District of Columbia, Thomas Faust, Sheila Marr, Anthony Brown, Delonte Williams, Cortney Savage, and John and Jane Does 1-35)*

Plaintiff repeats, realleges, and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Verified Complaint as though set forth in full under this Count.

Plaintiff brings this cause of action directly under 42 U.S.C. § 1983 (for violations of the First and Fifth Amendments to the United States Constitution) and District of Columbia statutory and common-law negligence *per se* and tortious evidentiary spoliation (D.C. Code § 24-211.02(a), (b)(2)), expressly pleading the District of Columbia evidence-tampering statute, D.C. Code § 22-723(a)-(b), and DCDOC Program Statement 4030.1N as: (1) actionable predicate constitutional violations under 42 U.S.C. § 1983; and (2) mandatory statutory and municipal standards of care establishing negligence *per se*

under District of Columbia common law. Operating under 42 U.S.C. § 1983 and the First and Fifth Amendments, correctional authorities are constitutionally prohibited from impeding an incarcerated citizen's right to petition the government for redress of grievances and right of meaningful access to the courts through the spoliation of grievance instruments, bad-faith fabrication of procedural rejections, or coercive suppression of administrative filings.[87] Under *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 584-85 (D.C. Cir. 2002),[88] an incarcerated person's submission of administrative grievances and written complaints to custodial officials is core constitutionally protected activity under the First Amendment Petition Clause, and official obstruction, suppression, or retaliatory impairment of that process inflicts an independent constitutional injury actionable under Section 1983. Concurrently, D.C. Code § 24-211.02(a) and (b)(2) command the Department of Corrections to safeguard detained persons and preserve and report all inmate grievances to the Council of the District of Columbia, while DCDOC Policy Program 4030.1N commands as a mandatory ministerial duty that all submitted inmate grievances be registered, allocated sequential tracking numbers, investigated, and formally adjudicated within strict mandatory timelines.[89] Furthermore, D.C. Code § 22-723(a) defines the positive statutory standard of conduct governing the preservation of records for official proceedings, proscribing any person who knows or has reason to believe an official proceeding has begun or is likely to be instituted from altering, destroying, mutilating, concealing, or removing any record, document, or other object with intent to impair its integrity or availability for use in the official proceeding.[90] Rather than asserting D.C. Code § 22-723 as a standalone private criminal prosecution, Plaintiff expressly

[87] United States Court of Appeals for the District of Columbia Circuit, *Smith v. District of Columbia*, 413 F.3d 86, at pp. 95-98 (D.C. Cir. 2005).

[88] United States Court of Appeals for the District of Columbia Circuit, *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, at pp. 584-85 (D.C. Cir. 2002).

[89] D.C. Code § 24-211.02 (Authorizing DCDOC Program Statement 4030.1N), at § 24-211.02 (2023).

[90] D.C. Code § 22-723, at § 22-723 (2013).

pleads D.C. Code § 22-723(a)-(b) and DCDOC Program Statement 4030.1N-alongside D.C. Code § 24-211.02(a), (b)(2)-as the mandatory statutory and regulatory standard of care enacted to protect litigants and detainees from the destruction or concealment of official evidentiary records, the breach of which establishes **negligence *per se*** and tortious spoliation under District of Columbia common law and establishes unlawful, bad-faith predicate conduct stripping individual Defendants of qualified immunity under 42 U.S.C. § 1983.

Defendants District of Columbia, Faust, Marr, Brown, Williams, Savage, and John and Jane Does 1-35 systematically obstructed, suppressed, and tampered with Plaintiff's administrative grievances and official custodial records throughout his detention to conceal unconstitutional conditions of confinement and impair the integrity and availability of official records for use in official proceedings. Specifically: (1) on November 27, 2023, Plaintiff submitted a formal Step 1 grievance (IGP #20231128-290) detailing psychiatric medication withdrawal, attorney phone blackouts, and feces-contaminated cell conditions, which grievance coordinator D. Harris summarily stamped *"Denied"* on November 28, 2023 without any investigation or clinical referral; (2) on January 7, 2024, Plaintiff submitted an emergency life-safety grievance documenting toxic drug smoke and unconstitutional solitary conditions in Unit SW-1, which Defendants intentionally left completely unnumbered, unlogged, and unanswered, discarding the form; (3) on April 1, 2024, Plaintiff submitted a Step 2 *Inmate Formal Grievance Form* through the administrative grievance process (IGP #20240411-265, stamped RECEIVED APR 09 2024, **Exhibit 980**) documenting that he was deprived of the proper materials to copy or attach his Informal Resolution Form or confidentially file grievances without retaliation from DOC officials, which Defendants mis-indexed under an erroneous inmate number

(DCDC# 387299) and dismissed with a one-sentence assertion ("Capt. Hayward spoke with unit staff to ensure Inmate Sullivan is getting his alloted time for rec."); and (4) on May 21, 2024, Plaintiff submitted an emergency grievance regarding narcotics overdoses, stabbings, and vermin infestation in Unit South-2, which Defendants summarily rejected on May 22, 2024 via Attachment B (IGP #20240522-470) on the pretextual ground that the filing *"contains multiple issues."* In addition, Defendants intentionally destroyed multiple Sick Call request slips, failed to preserve the December 21, 2023 shower surveillance video (VIDEO: X NO, **Exhibit 976** at p. 11), and concealed clinical incident reports to insulate staff from civil liability.

Defendants acted with bad-faith intent, actual knowledge of pending and reasonably foreseeable official proceedings, negligence *per se*, and willful disregard of Plaintiff's First and Fifth Amendment rights and mandatory municipal policies. Defendants executed these spoliation and obstructionist acts specifically to impair the integrity and availability of official evidentiary records and to suppress contemporaneous proof of gross constitutional deprivations inside CDF.

As a direct and proximate result of Defendants' unconstitutional administrative obstruction, negligence *per se*, and evidence tampering, Plaintiff was denied administrative relief, subjected to prolonged unlawful detention conditions, and compelled to expend extraordinary resources to reconstruct official records. Pursuant to 42 U.S.C. § 1983, D.C. Code § 24-211.02, and District of Columbia common-law negligence *per se*, Plaintiff is entitled to compensatory damages against Defendant District of Columbia in a sum exceeding, and not less than, **$2,431,250.00**, plus punitive damages against Defendants Faust, Marr, Brown, Williams, Savage, and John and Jane Does 1-35

in their individual capacities in an amount to be determined by the jury of at least $2,500,000.00, together with attorney's fees and costs under 42 U.S.C. § 1988(b).

**COUNT X: ELECTRONIC HEALTH INFORMATION (EHI) ACCESS BLOCKING, UNSIGNED *"ON HOLD"* EHR MANIPULATION, AND AUDIT PURGE -- VIOLATIONS OF THE D.C. MENTAL HEALTH INFORMATION ACT, D.C. CONSUMER PROTECTION PROCEDURES ACT, 42 U.S.C. § 1983, AND NEGLIGENCE PER SE (D.C. CODE §§ 7-1201.02, 7-1205.01, 7-1205.04, 7-1205.05, 7-1206.01, 7-1207.01; D.C. CODE §§ 28-3904(E), (E-1), (F), (F-1), (R)(5), 28-3905(K)(1)-(2); 42 U.S.C. § 1983; U.S. CONST. AMENDS. I, V; D.C. COMMON LAW; 42 U.S.C. §§ 1320D-5(A)(3), 300JJ-52(B)(2)(A) & 45 C.F.R. §§ 164.524(A)(1), (B)(2)(I), 160.404(B)(2)(IV) AS PREDICATE STATUTORY AND REGULATORY STANDARDS OF CARE)**

*(Against Defendants Unity Health Care, Inc., Anju Menon, M.D., Roderick I. Wellington, Ph.D., LCPC, NCC, CFC, and John and Jane Does 36-50)*

Plaintiff repeats, realleges, and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Verified Complaint as though set forth in full under this Count.

Plaintiff brings this cause of action directly under: (1) the express private right of action of the District of Columbia Mental Health Information Act (*"DCMHIA"*), D.C. Code §§ 7-1201.02, 7-1205.01, 7-1205.04, 7-1205.05, 7-1206.01, and 7-1207.01(a)-(c);[91] (2) the express private right of action of the District of Columbia Consumer Protection

[91] D.C. Code § 7-1205.01, at § 7-1205.01 (1979) -- *"Except as provided in this subchapter and in § 7-1201.03, a mental health professional, mental health facility or data collector..."*

Procedures Act (*"DCCPPA"*), D.C. Code §§ 28-3904(e), (e-1), (f), (f-1), (r)(5),[92] and 28-3905(k)(1)-(2);[93] (3) 42 U.S.C. § 1983 (for violations of the First and Fifth Amendments to the United States Constitution by state-action healthcare contractors under *West v. Atkins*, 487 U.S. 42 (1988)); and (4) District of Columbia common-law negligence *per se* and breach of health-information fiduciary duty. While the federal Health Insurance Portability and Accountability Act (*"HIPAA"*, 42 U.S.C. § 1320d-5(a)(3); 45 C.F.R. §§ 164.524(a)(1), (b)(2)(i), 160.404(b)(2)(iv)) and Section 4004 of the 21st Century Cures Act (42 U.S.C. § 300jj-52(a), (b)(2)(A)) do not confer standalone federal statutory private causes of action, Plaintiff expressly pleads those federal statutes and regulations as: (i) the mandatory, non-discretionary federal statutory and regulatory standard of care establishing **negligence *per se*** under District of Columbia common law; (ii) predicate unlawful and deceptive trade practices actionable under the DCCPPA, D.C. Code §§ 28-3904(e), (e-1), (f), (f-1), (r)(5) and 28-3905(k)(1)-(2); (iii) parallel federal benchmarks reinforcing Defendants' mandatory 30-day access, accuracy, and security duties under the DCMHIA, D.C. Code §§ 7-1205.01, 7-1205.05(a), 7-1206.01, and 7-1207.01; and (iv) actionable predicate due-process and court-access violations under 42 U.S.C. § 1983. Specifically, under D.C. Code § 7-1205.01, a mental health professional, mental health facility, or data collector *"shall permit any client or client representative, upon written request, to inspect and duplicate the client's record of mental health information... within 30 days from the date of receipt of the request"*; under D.C. Code § 7-1205.05(a), Defendants *"shall maintain the client's mental health information in an accurate and complete manner"*; under D.C. Code § 7-1206.01, Defendants *"shall*

[92] D.C. Code § 28-3904, at § 28-3904(e), (e-1), (f), (f-1), (r)(5) (2023) -- *"It shall be a violation of this chapter for any person to engage in an unfair or deceptive trade practice, whether or not any..."*

[93] D.C. Code § 28-3905(k), at § 28-3905(k)(1)-(2) (2023) -- *"(k)(1)(A) A consumer may bring an action seeking relief from the use of a trade practice in violation of a law of the District..."*

*maintain records of mental health information in a secure manner"* with appropriate administrative, technical, and physical safeguards; and under D.C. Code §§ 7-1205.04 and 7-1207.01(a)-(c), any client aggrieved by negligent or willful violations of Chapter 12 possesses an express private cause of action to compel access and recover actual damages, statutory minimum damages, costs, and reasonable attorney's fees. Concurrently, in the commercial and administrative furnishing, billing, and health-information management of medical and dental records under Contract CW92833 (independent of any claim of clinical malpractice under D.C. Code § 28-3905(k)(5)), D.C. Code § 28-3904(e), (e-1), (f), (f-1), and (r)(5) prohibit misrepresenting or failing to state material facts regarding the existence, completeness, or availability of a consumer's health records, representing that records access involves restrictions prohibited by law, or knowingly taking advantage of a disabled consumer's physical or mental infirmities, enforceable via private action under D.C. Code § 28-3905(k)(1)-(2) for treble damages (or $1,500 per violation, whichever is greater), punitive damages, attorney's fees, and injunctive relief. These District statutory rights are informed by the mandatory federal standards of care in Section 4004 of the 21st Century Cures Act, 42 U.S.C. § 300jj-52(a)(1) (prohibiting *"information blocking,"* defined as any practice that is unreasonable and likely to interfere with, prevent, or materially discourage the access, exchange, or use of Electronic Health Information (*"EHI"*)),[94] the HIPAA Privacy Rule, 45 C.F.R. § 164.524(a)(1) and (b)(2)(i) (mandating production of certified copies of protected health information within 30 calendar days of a request),[95] and 42 U.S.C. § 1320d-5(a)(3) and 45 C.F.R. § 160.404(b)(2)(iv) (establishing statutory civil penalty benchmarks for willful neglect remaining uncorrected beyond 30 days).[96]

[94] 42 U.S.C. § 300jj-52, at p. 1 (2016).
[95] 45 C.F.R. § 164.524, at § 164.524 (2013).
[96] 42 U.S.C. § 1320d-5, at p. 1 (2009).

Following Plaintiff's release from physical custody, Plaintiff submitted formal written requests under the D.C. Mental Health Information Act, HIPAA, and the 21st Century Cures Act demanding complete certified copies of his electronic health records, mental health files, diagnostic charts, dental records, and cryptographic EHR audit trails from Defendant Unity Health Care, Inc. Defendant Unity Health Care, under the direct supervision of Dr. Anju Menon and Discipline Director of Behavioral Health Roderick I. Wellington, Ph.D., LCPC, NCC, CFC, engaged in continuous bad-faith information blocking, deceptive administrative trade practices, and clinical record manipulation by: (1) withholding Plaintiff's complete dental intake records, triage slips, and clinical encounter notes beyond the mandatory 30-day deadline of D.C. Code § 7-1205.01 and 45 C.F.R. § 164.524(b)(2)(i); (2) suppressing electronic audit trails that record user modifications, access timestamps, and provider viewing history, specifically concealing Defendants' outright failure to deliver prescribed medications (falsely logged via Accu-Flo code Ø "PT Refused/med not Administered," boilerplate despite Defendants knowing Plaintiff's exact cell location in their system) and Dr. Roderick Wellington's false clinical cover story claiming Plaintiff was housed in South-2 intake *"because of his safety"* ("He is now housed on South-2, when he left he was on South-1, because of his safety"); (3) maintaining inaccurate, unauthenticated, preliminary mental health records labeled "Status: ON HOLD DOCUMENT. Contents are preliminary" (**Exhibit 978** at p. 14) in direct violation of D.C. Code §§ 7-1205.05(a) and 7-1206.01, manufacturing impossible future anachronistic clinical encounters ("SEEN 5/15/25"), logging pretextual specialist appointments ("Ophthalmology appt is next week") to wipe sick-call queues, populating charts with fabricated normotensive blood pressure readings to simulate active clinical monitoring, **intentionally fabricating and falsifying Plaintiff's Social Security Number in the master electronic health record as "[redacted]"** (falsifying

Plaintiff's authentic Social Security Number XXX-XX-9076 into the fake number "[redacted]" on the December 19, 2025 Chart Summary run by **HIMS Manager Lynda Boykin**, **Exhibit 979** at p. 3, and the March 3, 2026 Chart Summary run by **HIMS Clerk Jean Washington**, **Exhibit 978** at p. 37) while simultaneously listing "Status: Active" at Central Detention Facility on December 19, 2025-deliberately engineering SSN-indexed records queries by the Utah Department of Workforce Services to fail and manufacturing a fraudulent pretext for HIMS Manager Lynda Boykin (FROM: LBOYKIN,HIMSM, electronically signed December 23, 2025 at 12:00 PM at **Exhibit 978** at p. 8) to execute deceptive, materially false certifications (XX) on December 19, 2025 in violation of D.C. Code § 28-3904(e), (e-1), (f), and (r)(5) that "We are unable to locate all the records you requested, enclosed are portions of the record that are available. 2020-2022" and "Patient was not at this facility for the dates/period that was request." (**Exhibit 979** at pp. 2-3)-recording non-existent phantom facilities ("Grand Jury Medical Center - UTAH"), substituting completely blank future-dated "MAR For: June 2026" templates in place of Plaintiff's actual June 2024 MAR (**Exhibit 978** at pp. 5-7), and charting post-transfer appointment cancellations ("NOC" on June 7, 2024 and "Inmate not on census per JACCS" on July 26, 2024, **Exhibit 978** at pp. 8-9) to evade legal accountability; and (4) delaying production of responsive records far beyond the statutory thirty-day ceiling without lawful extension or explanation.

Defendants committed these acts with willful neglect, bad faith, negligence *per se*, and intentional design to obstruct Plaintiff's post-release civil rights litigation, deceive Plaintiff and state disability authorities, and conceal their systemic failure to provide dental and psychiatric care during Plaintiff's incarceration.[97]

[97] *Enforcement Rule for Willful Neglect, 45 C.F.R. § 160.404*, at § 160.404 (2013).

As a direct and proximate result of Defendants' unlawful information blocking, DCMHIA and DCCPPA violations, Section 1983 due-process and court-access violations, and negligence *per se*, Plaintiff was deprived of vital medical history necessary for ongoing psychiatric, neurological, physical, and dental rehabilitation, delayed in securing disability benefits and corrective treatment, and burdened with substantial forensic expenses to reconstruct clinical events. Pursuant to D.C. Code §§ 7-1205.04, 7-1207.01(a)-(c), D.C. Code § 28-3905(k)(1)-(2), 42 U.S.C. § 1983, and District of Columbia common-law negligence *per se* (benchmarked against the statutory willful-neglect penalty standards of 42 U.S.C. § 1320d-5(a)(3) and 45 C.F.R. § 160.404(b)(2)(iv)), Plaintiff is entitled to compensatory, statutory, and treble damages against Defendant Unity Health Care, Inc. of no less than **$426,972.00**, and such greater sum as may be proven at trial, mandatory injunctive relief compelling immediate production of unredacted native EHR records and audit logs, punitive damages against Defendants Unity Health Care, Menon, Wellington, and John and Jane Does 36-50 upward from a minimum floor of $1,000,000.00, and reasonable attorney's fees and costs under D.C. Code §§ 7-1207.01(a)-(b), 28-3905(k)(2)(B), and 42 U.S.C. § 1988(b).

## COUNT XI: UNLAWFUL CUSTODIAL RESTRAINT IN SOLITARY AND INTAKE LOCKDOWN DEFYING MEDICAL CLEARANCE ORDERS, SUBSTANTIVE DUE PROCESS LIBERTY DEPRIVATION, FALSE IMPRISONMENT, AND UNJUST IMPRISONMENT (42 U.S.C. § 1983; U.S. CONST. AMENDS. V, VIII; D.C. CODE § 2-423.02; D.C. COMMON LAW)

*(Against Defendant District of Columbia)*

Plaintiff repeats, realleges, and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Verified Complaint as though set forth in full under this Count.

Operating under 42 U.S.C. § 1983 and the Fifth and Eighth Amendments to the United States Constitution, an incarcerated citizen possesses a clearly established, fundamental liberty interest against arbitrary, unauthorized, and prolonged confinement in punitive solitary isolation or short-term intake lockdown in defiance of governing classification rules and explicit clinical open-population clearances. Subjecting a 0-point minimum-security detainee with zero disciplinary infractions to more than 160 consecutive days of 23-to-24-hour solitary confinement and holding him locked inside a short-term 24-to-72-hour intake cell (Unit South-2 Cell 34) in defiance of three formal clinical orders mandating "Disposition: Open Population" constitutes an actionable deprivation of substantive and procedural due process and the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment, establishing direct municipal liability where such unlawful custodial restraint is driven by official policy, custom, or deliberate indifference. Concurrently, under District of Columbia common law and *Barnes v. District of Columbia*, 242 F.R.D. 113, 118, 122-23 (D.D.C. 2007),[98] false imprisonment is established upon the unlawful physical restraint of a person beyond lawful custodial authority or in defiance of mandatory ministerial classification, housing-transfer, and property-return duties unprotected by sovereign immunity, reinforced by the mandatory custodial duties of D.C. Code §§ 24-211.02(a), (b)(4) and 24-211.02a(c)(2)-(3).[99]

---

[98] United States District Court for the District of Columbia, *Barnes v. District of Columbia, 242 F.R.D. 113,* at pp. 2, 7-9 (D.D.C. 2007) -- *"The task of checking records, locating clothing, retrieving vouchers, or..."*

[99] D.C. Code § 24-211.02a, at § 24-211.02a(c)(2)-(3) (2023) -- *"(c) Before 12:00 p.m. on the day of an inmate's release from the custody of the Department of Corrections, the Department of..."*

Furthermore, under the constitutional doctrine established in *Nelson v. Colorado*, 581 U.S. 128, 135-36 (2017),[100] whenever judgments of conviction are vacated and the charging indictment dismissed with prejudice, the presumption of innocence is restored *ab initio*, legally prohibiting the sovereign from retaining criminal penalties or treating the exonerated citizen as a wrongdoer, which foundational principles govern Section 1983 recovery and statutory relief under the District of Columbia Unjust Imprisonment Act, D.C. Code § 2-423.02(a)(1)(A)(i)-(ii), (a)(2), (a)(3)(C)(ii), and (b).[101]

Plaintiff was incarcerated within the District of Columbia Department of Corrections system under DCDC #387289 for a total of two hundred one (201) continuous calendar days (November 16, 2023 through June 3, 2024) at the Central Detention Facility and its contractual holding facility (Northern Neck Regional Jail) following his initial remand on November 16, 2023, until he was transferred from DCDOC custody into federal custody on June 3, 2024, where he remained continuously incarcerated until January 20, 2025. Throughout Plaintiff's 201 days in DCDOC custody prior to his June 3, 2024 transfer to federal custody, Defendant District of Columbia, through its Department of Corrections personnel: (1) maintained Plaintiff in unauthorized, prolonged 23-to-24-hour solitary confinement across Unit NE-1 (Cell 63), Unit SW-1 / South-1 (spending over 130 consecutive days in solitary confinement across Cell 54 and Cell 50, including 110 consecutive days in Cell 50), and Unit South-1 (Cell 35) for over 160 consecutive days; (2) executed a sham inter-facility transfer to Northern Neck Regional Jail from May 8 to May 10, 2024-knowing in advance that NNRJ categorically refused to accept January 6 detainees-solely to arbitrarily reset statutory solitary confinement

---

[100] United States Supreme Court, *Nelson v. Colorado*, 581 U.S. 128, at pp. 135-37 (2017).
[101] D.C. Code § 2-423.02, at § 2-423.02 (2021).

timeframes; (3) unlawfully held Plaintiff locked inside a short-term 24-to-72-hour intake cell (Unit South-2 Cell 34) from May 10 to May 24, 2024 in direct defiance of three separate clinical directives entered by LPC Darius Mills (05/10/2024), NP Meena Kumar (05/10/2024), and NP Linda Fonju (05/15/2024) expressly ordering "Disposition: Open Population" (**Exhibit 978** at pp. 16, 30, 35); and (4) unlawfully detained Plaintiff under maximum-security solitary conditions and 3-point padlocked black-box restraints despite his objective 0-point minimum-security classification and "0 disciplinary violations", constituting deliberate indifference, substantive due process liberty deprivations under Section 1983, and common-law false imprisonment. Furthermore, on January 20, 2025, while Plaintiff was still held in federal prison custody, President Donald J. Trump executed Presidential Proclamation 10887 granting Plaintiff a full, complete, and unconditional pardon and ordering his immediate release from prison (**Exhibit 2**), confirmed by the Department of Justice *Certificate of Pardon* (ID319255, **Exhibit 3**); following the Department of Justice's *Appellee's Unopposed Motion to Vacate Convictions and Remand for Dismissal* (Doc #2096152, **Exhibit 3.1**), the United States Court of Appeals for the District of Columbia Circuit issued its formal per curiam *Order* in Case No. 24-3051 (Doc #2103201) on February 27, 2025 vacating Plaintiff's convictions in their entirety and directing the Clerk to issue the mandate forthwith (**Exhibit 4**); and Senior United States District Judge Royce C. Lamberth entered the final *Order* in Case No. 1:21-cr-00078-RCL (Dkt. 164) on March 4, 2025 dismissing the underlying criminal case as moot upon the government's unopposed Rule 48(a) motion for dismissal with prejudice (**Exhibit 5**). By virtue of this full executive pardon, complete appellate vacatur, and final judicial dismissal with prejudice, Plaintiff stands completely innocent *ab initio* under *Nelson v. Colorado*, eradicating any lawful penal justification for the 201 days

Defendant District of Columbia held Plaintiff in municipal custody and establishing independent, concurrent liability for wrongful and unjust deprivation of liberty.

Defendant District of Columbia is liable under 42 U.S.C. § 1983 for unlawful custodial restraint in solitary and intake lockdown and deliberate indifference, under D.C. common law for false imprisonment, and pursuant to the Unjust Imprisonment Act, D.C. Code § 2-423.02.[102]

As a direct and proximate result of Plaintiff's unlawful custodial restraint, wrongful imprisonment, and liberty deprivation across his 201 days in DCDOC custody, Plaintiff suffered severe deprivation of constitutional liberty, physical confinement, psychological trauma, and reputational injury. Plaintiff is entitled to compensatory and statutory damages against Defendant District of Columbia in an amount to be determined at trial exceeding, and in no event less than, **$291,712.33**-encompassing at least $114,589.04 for unlawful custodial liberty deprivation and false imprisonment in solitary and intake lockdown under Section 1983 and D.C. common law, no less than $127,123.29 for wrongful custodial detention across 201 days following vacatur *ab initio*, a minimum of $40,000.00 pro-rated for unlawful custodial and post-conviction liberty restrictions, and at least $10,000.00 in statutory transitional relief-together with lifetime physical and behavioral healthcare benefits, pre-judgment interest under D.C. Code § 15-109, and reasonable attorney's fees pursuant to the Laffey Matrix under 42 U.S.C. § 1988(b) and D.C. Code § 2-423.02(a)(3)(C)(ii).

[102] D.C. Code § 2-423.02, at § 2-423.02 (2023).

**COUNT XII: VIOLATION OF THE DISTRICT OF COLUMBIA MENTAL HEALTH INFORMATION ACT (D.C. CODE §§ 7-1201.02, 7-1205.01, 7-1206.01, 7-1207.01(A)-(C), 7-1207.02(A)-(B))**

*(Against Defendants Unity Health Care, Inc., District of Columbia, Anju Menon, M.D., Roderick I. Wellington, Ph.D., LCPC, NCC, CFC, and John and Jane Does 1-50)*

Plaintiff repeats, realleges, and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Verified Complaint as though set forth in full under this Count.

Pursuant to the District of Columbia Mental Health Information Act (*"DCMHIA"*), D.C. Code § 7-1201.02(a), no mental health professional, mental health facility, data collector, or employee or agent thereof shall disclose or permit the disclosure of mental health information to any unauthorized person absent the explicit, informed written authorization of the client.[103] Pursuant to D.C. Code § 7-1207.01(a), any person who negligently violates the provisions of the statute is liable for actual damages sustained, together with statutory costs and reasonable attorney's fees; and pursuant to Section 7-1207.01(b), any person who willfully or intentionally violates the statute is strictly liable for actual damages *"in an amount not less than $1,000 plus the costs of the action and reasonable attorney's fees."* Pursuant to Section 7-1207.01(c), either party is entitled as a matter of right to a trial by jury upon demand.[104]

[103] D.C. Code § 7-1201.02, at § 7-1201.02 (1979).
[104] D.C. Code § 7-1207.01, at § 7-1207.01 (1979).

Plaintiff's clinical mental health history, psychiatric diagnoses (ICD-10 F41.1, F90.9, F41.0, F32.A, F43.10), and psychotropic medication records constitute protected *"mental health information"* under D.C. Code § 7-1201.01(11). Defendants Unity Health Care, Inc., District of Columbia, Dr. Anju Menon, Roderick I. Wellington, Ph.D., LCPC, NCC, CFC, and John and Jane Does 1-50 repeatedly disclosed, disseminated, and broadcast Plaintiff's confidential psychiatric records, intake histories, and medication details to non-medical correctional officers, housing coordinators, and third parties without Plaintiff's knowledge, consent, or written authorization. Furthermore, Defendants exposed Plaintiff's psychiatric files on open unit desks within Unit SW-1, discussed Plaintiff's psychiatric status during tier sweeps, and utilized Plaintiff's mental health data to justify punitive housing isolation in violation of Subchapters II and III of the Act. Following Plaintiff's release, Defendants refused to provide complete copies of these disclosures and refused Plaintiff's formal requests to correct inaccurate and unauthenticated records, violating D.C. Code § 7-1206.01.[105]

Defendants acted willfully, intentionally, and in gross violation of District statutory privacy mandates, exhibiting reckless indifference to the confidential nature of psychiatric treatment records.

As a direct and proximate result of Defendants' unlawful disclosures, Plaintiff suffered severe humiliation, reputational degradation, embarrassment, and emotional trauma. Plaintiff is entitled to actual damages in a sum to be proven at trial, mandatory minimum statutory liquidated damages of at least $1,000.00 for each willful disclosure (in an amount of no less than **$3,000.00**, and such greater sum as may be proven at trial for all

[105] D.C. Code § 7-1206.01, at § 7-1206.01 (1979).

unauthorized disclosures) against Defendants Unity Health Care, Inc., District of Columbia, Menon, Wellington, and John and Jane Does 1-50, jointly and severally, costs of this action, reasonable attorney's fees, and a jury trial under D.C. Code § 7-1207.01(c).

**COUNT XIII: UNCONSTITUTIONAL CUSTODIAL PROPERTY CONFISCATION AND DEPRIVATION, BREACH OF MINISTERIAL CUSTODIAL BAILMENT, AND NEGLIGENCE PER SE (42 U.S.C. § 1983; U.S. CONST. AMEND. V; D.C. CODE §§ 24-211.02(A), (B)(5), 24-211.02A(C)(2)-(3); D.C. COMMON LAW; 31 U.S.C. §§ 3723(A)-(C), 3724(A) & DCDOC PP 4050.1I AS PREDICATE CONSTITUTIONAL AND STATUTORY STANDARDS OF CARE)**

*(Against Defendants District of Columbia, Thomas Faust, Sheila Marr, Anthony Brown, and John and Jane Does 1-35)*

Plaintiff repeats, realleges, and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Verified Complaint as though set forth in full under this Count.

Plaintiff brings this cause of action directly under 42 U.S.C. § 1983 (for violations of the Takings and Due Process Clauses of the Fifth Amendment to the United States Constitution) and District of Columbia statutory and common-law negligence *per se* and breach of ministerial custodial bailment (D.C. Code §§ 24-211.02(a), (b)(5) and 24-211.02a(c)(2)-(3)), expressly pleading the federal administrative small-claims property statutes, 31 U.S.C. §§ 3723(a)-(c) and 3724(a), and DCDOC Program Statement 4050.1I as: (1) actionable predicate constitutional and property-safeguarding standards under 42 U.S.C. § 1983 and the Fifth Amendment; and (2) mandatory statutory and regulatory

standards of care establishing negligence *per se* and breach of custodial bailment under District of Columbia common law. Pursuant to the Takings and Due Process Clauses of the Fifth Amendment to the United States Constitution, the sovereign is constitutionally barred from seizing, confiscating, or destroying private property without due process of law and just compensation.[106] While 31 U.S.C. §§ 3723 and 3724 establish federal administrative property-settlement frameworks rather than a standalone federal statutory cause of action, they define the baseline federal statutory duty and statutory standard governing the loss of or damage to privately owned property caused by the negligent or wrongful act or omission of custodial officers acting within the scope of employment.[107] Concurrently, DCDOC Policy Program 4050.1I establishes mandatory property inventory, safeguarding, and bailment return procedures, commanding that all personal effects, legal work product, and government-issued identification instruments surrendered upon custodial intake be maintained securely within designated property storage and restored in full upon release.[108] Furthermore, D.C. Code § 24-211.02(a) and (b)(5) establish an affirmative, mandatory legislative command that DCDOC shall properly safeguard and return to an inmate, upon release from custody, all personal property and identification collected from the inmate, and D.C. Code § 24-211.02a(c)(2) and (c)(3) mandate that DCDOC return the inmate's clean intake street clothing and provide a 7-day supply of all prescribed medications upon release. Under *Barnes v. District of Columbia*, 242 F.R.D. 113, 122-23 (D.D.C. 2007), these custodial property-inventory, clothing-return, and out-processing obligations constitute non-discretionary ministerial duties unprotected by sovereign immunity, and under District of Columbia tort law, Defendants' unexplained violation of D.C. Code §§ 24-211.02(a), (b)(5), 24-211.02a(c)(2)-(3), DCDOC Program

[106] United States Supreme Court, *United States v. James Daniel Good Real Property*, 510 U.S. 43, at pp. 48-53 (1993).
[107] 31 U.S.C. §§ 3723, 3724, at p. 1 (1982).
[108] D.C. Code § 24-211.02 (Authorizing DCDOC Program Statement 4050.1I), at § 24-211.02 (2023).

Statement 4050.1I, and the property-safeguarding benchmarks of 31 U.S.C. §§ 3723-3724 establishes **negligence *per se*** and actionable breach of ministerial custodial bailment under District of Columbia common law, as well as predicate Fifth Amendment Due Process and Takings violations actionable under 42 U.S.C. § 1983.

Upon Plaintiff's initial custodial remand from the courthouse on November 16, 2023, DCDOC intake staff only took the street clothing Plaintiff was wearing upon arrival. Over the ensuing six months of his confinement at CDF (November 2023 through May 2024), Plaintiff accumulated personal property inside his cell, including his books (such as his dictionary and reading/religious books), seven sets of purchased commissary clothing/personal laundry (seven shirts, seven pairs of underwear, seven pairs of socks, two pairs of shorts, and one pair of sweatpants), his cups, his food and commissary items, his paper, and his writing materials. When DCDOC abruptly transferred Plaintiff to Northern Neck Regional Jail (*"NNRJ"*) in Warsaw, Virginia on May 8, 2024 and hauled him right back to CDF on May 10, 2024 for his second intake in Unit South-2 Cell 34, custodial and property personnel acting under the supervision of Defendants Faust, Marr, Brown, and John and Jane Does 1-35 confiscated all six months of Plaintiff's accumulated cell property and personal laundry-including his books, dictionary, seven sets of personal clothing/laundry, cups, food and commissary items, paper, and writing materials-leaving Plaintiff in South-2 Cell 34 forced to borrow sheets of paper and a two-inch pencil stub from fellow intake detainees just to write. Additionally, during retaliatory cell shakedowns in Units SW-1 and NE-1, custodial officers scattered and seized Plaintiff's papers and personal items without issuing property receipts. Although Case Manager Ms. Coats subsequently retrieved and returned Plaintiff's books (along with incoming letters and legal documents held by Property Sergeant Alonzo Walker) on May 22, 2024 after

Plaintiff requested assistance from Case Manager Ms. Coats on May 14, 2024 (05-14-2024), had his parents contact Lieutenant Anthony Brown Sr. and Sergeant Walker, and submitted formal Step 1 Property Grievance IGP #20240520-365 on May 17, 2024 (PP 4030.1, Attachment C, requesting the return of all property taken upon his one-day transfer to NNRJ), Defendants ignored the grievance form itself (leaving the DOC RESPONSE section 100% blank past the 5/27/24 deadline) and failed and refused to return-and discarded, threw away, or permanently deprived Plaintiff of-his seven sets of personal clothing/laundry (seven shirts, seven pairs of underwear, seven pairs of socks, two pairs of shorts, and one pair of sweatpants), his cups, his food and commissary items, his paper, and his writing materials prior to or following his June 3, 2024 transfer from DCDOC custody, providing zero property inventory sheets, disposition receipts, or release manifests.

Defendants acted with intentional disregard of custodial property regulations, bad-faith hostility toward Plaintiff's property rights, negligence *per se*, and gross negligence in maintaining property custody.

As a direct and proximate result of Defendants' unconstitutional property confiscation, breach of ministerial custodial bailment, and negligence *per se*, Plaintiff suffered the permanent loss of his personal clothing/laundry, cups, food and commissary items, paper, writing materials, and personal property. Pursuant to 42 U.S.C. § 1983, D.C. Code §§ 24-211.02(a), (b)(5) and 24-211.02a(c)(2)-(3), and District of Columbia common-law negligence *per se* and bailment law, Plaintiff is entitled to compensatory damages against Defendant District of Columbia upward from a minimum floor of **$5,400.00**, and such greater sum as may be established at trial, plus punitive damages

against Defendants Faust, Marr, Brown, and John and Jane Does 1-35 in their individual capacities in an amount exceeding, and not less than, $50,000.00, together with attorney's fees and costs under 42 U.S.C. § 1988(b).

**COUNT XIV: COMMON-LAW CONVERSION, TRESPASS TO CHATTELS, AND UNLAWFUL DETENTION OF PERSONAL CLOTHING, CUPS, FOOD, PAPER, WRITING MATERIALS, AND PERSONAL PROPERTY (D.C. CODE §§ 15-109, 28-3302; RESTATEMENT (SECOND) OF TORTS SECTIONS 222A, 927)**

*(Against Defendants District of Columbia, Thomas Faust, Sheila Marr, Anthony Brown, and John and Jane Does 1-35)*

Plaintiff repeats, realleges, and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Verified Complaint as though set forth in full under this Count.

Pursuant to District of Columbia common law, conversion is established upon any unauthorized exercise of ownership, dominion, or control over the personal chattels of another that deprives the rightful owner of possession or seriously impairs the owner's possessory rights (*Barnes v. District of Columbia*, 242 F.R.D. 113, 118-21 (D.D.C. 2007); *Restatement (Second) of Torts* section 222A). Pursuant to the Restatement (Second) of Torts sections 222A and 927, an actor who intentionally converts a chattel is strictly liable for the full market and subjective value of the chattel determined at the time and place of conversion, together with legal interest and consequential damages. Trespass to chattels occurs whenever an actor intentionally dispossesses another of personal property or intermeddles with a chattel in the lawful possession of another. Pursuant to D.C. Code

§ 15-109, in an action to recover damages for a tortious wrong, the judgment shall include pre-judgment interest as an indispensable element of damages to afford complete compensation; and pursuant to D.C. Code § 28-3302, post-judgment interest accrues as a matter of positive statutory right.

Plaintiff was and remains the lawful owner of the personal belongings, books (including his dictionary), seven sets of purchased commissary clothing/personal laundry (seven shirts, seven pairs of underwear, seven pairs of socks, two pairs of shorts, and one pair of sweatpants), cups, food and commissary items, paper, writing materials, and personal property accumulated in his cell at the Central Detention Facility. Defendants District of Columbia, Faust, Marr, Brown, and John and Jane Does 1-35 intentionally exercised unlawful dominion and control over Plaintiff's personal property and effects when they confiscated all six months of his accumulated books, seven sets of personal clothing/laundry, cups, food and commissary items, paper, and writing materials upon his May 8-10, 2024 transfer to Northern Neck Regional Jail (*"NNRJ"*) and second intake at CDF; and although Case Manager Ms. Coats subsequently retrieved and returned Plaintiff's books (and incoming letters/legal documents held by Property Sergeant Alonzo Walker) on May 22, 2024 after Plaintiff requested assistance from Ms. Coats on May 14, 2024, had his parents contact Lieutenant Anthony Brown Sr. and Sergeant Walker, and filed his May 17, 2024 formal Property Grievance (IGP #20240520-365), Defendants left the DOC RESPONSE section of IGP #20240520-365 100% blank and permanently withheld, discarded, and converted Plaintiff's seven sets of personal clothing/laundry (seven shirts, seven pairs of underwear, seven pairs of socks, two pairs of shorts, and one pair of sweatpants), his cups, his food and commissary items, his paper, and his writing materials during and after Plaintiff's second intake and subsequent June 3, 2024 transfer to

federal custody, without ever issuing any property release sheet or disposition receipt. Following the complete vacatur of Plaintiff's criminal convictions and dismissal of all charges with prejudice, Defendants retain zero legal justification or statutory entitlement to detain or convert Plaintiff's property (*Nelson v. Colorado*, 581 U.S. 128, 135-37 (2017)).

Defendants acted intentionally, maliciously, and with willful disregard of Plaintiff's property rights, converting assets in direct breach of ministerial custodial bailment duties (*Barnes v. District of Columbia*, 242 F.R.D. 113, 118-21 (D.D.C. 2007)).

As a direct and proximate result of Defendants' conversion and trespass, Plaintiff suffered substantial economic loss, property deprivation, and consequential damages. Plaintiff is entitled to compensatory damages against Defendant District of Columbia in a sum of no less than **$60,259.72**, and such greater amount as may be proven at trial, plus pre-judgment and post-judgment interest pursuant to D.C. Code §§ 15-109 and 28-3302, and punitive damages against Defendants Faust, Marr, Brown, and John and Jane Does 1-35 in their individual capacities upward from a minimum baseline of $250,000.00.

**COUNT XV: UNLAWFUL CUSTODIAL VISITATION DEPRIVATIONS AND FULL SHACKLING DURING VISITATIONS AND LEGAL VISITS (D.C. CODE § 24-211.02(A), (B)(3))**

*(Against Defendants District of Columbia, Thomas Faust, Sheila Marr, Anthony Brown, and John and Jane Does 1-35)*

Plaintiff repeats, realleges, and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Verified Complaint as though set forth in full under this Count.

Pursuant to D.C. Code § 24-211.02(a), the Department of Corrections is charged with an affirmative, non-delegable municipal statutory mandate commanding the safekeeping, proper care, and protection of all persons committed to its institutions. Pursuant to D.C. Code § 24-211.02(b)(3), the Department of Corrections is commanded by positive legislative mandate to: *"Initiate and maintain regular afternoon and evening visiting hours at the Central Detention Facility for a minimum of 5 days a week, including Saturdays and Sundays."* In *Webster v. District of Columbia*, Civ. No. 20-300 (JDB) (D.D.C.),[109] the United States District Court for the District of Columbia recognized that Section 24-211.02 establishes an actionable, non-discretionary statutory standard of care running directly to detainees, the systemic breach of which constitutes actionable municipal misconduct and negligence *per se* under District of Columbia common law. Furthermore, pursuant to *Overton v. Bazzetta*, 539 U.S. 126, 137 (2003),[110] the prolonged, arbitrary deprivation of all familial and tactile human contact violates fundamental liberty interests secured under the Fifth Amendment.

Defendants District of Columbia, Director Thomas Faust, Correctional Major Sheila Marr, Lieutenant Anthony Brown, and John and Jane Does 1-35 unlawfully violated Plaintiff's statutory visitation rights throughout his confinement in Unit SW-1 / South-1 and Unit NE-1. While Plaintiff's defense attorney Steven R. Kiersh visited him in

[109] United States District Court for the District of Columbia, *Webster v. District of Columbia, Civ. No. 1:20-cv-00300 (JDB)*, at pp. 1-15 (D.D.C. 2020).

[110] United States Supreme Court, *Overton v. Bazzetta*, 539 U.S. 126, at pp. 131-37 (2003).

person and Plaintiff had video visitations with his family when allowed, there were occasions where Defendants refused to allow Plaintiff to attend video visitations and cancelled scheduled video visitations without any disciplinary infraction, rule violation, or institutional security justification. Correctional officers made false excuses to refuse to allow Plaintiff to attend scheduled video visitations-claiming that the video visitation system was not working when it clearly was working, or claiming that his family did not call or did not have a visitation set up when Plaintiff's family did have a visitation set up and called Plaintiff on his phone or tablet. Furthermore, whenever Plaintiff did go to visitations, including to see his lawyer Steven R. Kiersh, Defendants kept Plaintiff in full shackles (three-point restraints consisting of wrist handcuffs inside the padlocked black-box cover, a steel waist chain, and steel ankle shackles) throughout his legal and video visitations.

Defendants acted with willful disregard of positive municipal statutory commands and deliberate indifference to Plaintiff's statutory visitation rights.

As a direct and proximate result of Defendants' unlawful visitation deprivations and full-shackle restraints during legal and video visitations, Plaintiff suffered emotional distress and deprivation of his statutory visitation rights. Plaintiff is entitled to compensatory damages against Defendant District of Columbia in an amount exceeding, and not less than, **$112,901.39**, plus punitive damages against Defendants Faust, Marr, Brown, and John and Jane Does 1-35 in their individual capacities in a sum to be determined by the jury of at least $500,000.00, together with costs and statutory fees.

**COUNT XVI: INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS, NEGLIGENCE PER SE, AND PREDICATE CONSTITUTIONAL VIOLATIONS FOR VULNERABLE AND CAPTIVE ADULT ABUSE AND NEGLECT (D.C. COMMON LAW; D.C. CODE § 24-211.02; 42 U.S.C. § 1983; U.S. CONST. AMENDS. V, VIII; D.C. CODE §§ 22-932(5), 22-933, 22-934, 22-936 AS STATUTORY STANDARDS OF CARE AND PREDICATE VIOLATIONS)**

*(Against All Defendants)*

Plaintiff repeats, realleges, and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Verified Complaint as though set forth in full under this Count.

Plaintiff brings this cause of action directly under District of Columbia common law for Intentional Infliction of Emotional Distress (*"IIED"*), Negligent Infliction of Emotional Distress (*"NIED"*), and **negligence** ***per se*** (alongside D.C. Code § 24-211.02), and under 42 U.S.C. § 1983 (for violations of the Fifth and Eighth Amendments to the United States Constitution), expressly pleading the District of Columbia Vulnerable and Captive Adult Abuse and Neglect statutes, D.C. Code §§ 22-932(5), 22-933, 22-934, and 22-936, as: (1) the mandatory statutory standard of care establishing **negligence** ***per se***, *per se* outrageousness for IIED, and breach of the Zone-of-Physical-Danger and Special-Relationship duties for NIED under District of Columbia common law; and (2) actionable predicate violations establishing objective unreasonableness and deliberate indifference under 42 U.S.C. § 1983. Pursuant to District of Columbia common law, liability for Intentional Infliction of Emotional Distress (*"IIED"*) is established whenever: (1) the defendant engaged in extreme and outrageous conduct; (2) the defendant acted

intentionally or recklessly; and (3) the defendant's tortious conduct directly caused the plaintiff severe, disabling emotional distress. Pursuant to *Daskalea v. District of Columbia*, 227 F.3d 433, 439-43 (D.C. Cir. 2000),[111] extreme and outrageous conduct perpetrated by correctional custodians-including sexual degradation, unconstitutional solitary confinement, and persistent physical abuse-is actionable against both municipal entities and individual custodial officers. Furthermore, under *Webster v. District of Columbia*, Civ. No. 1:20-cv-00300 (JDB), within a correctional detention environment, the common-law duty of care, the zone of physical danger, and the threshold of outrageousness are established and informed by the mandatory statutory standards enacted to protect captive detainees. Rather than asserting D.C. Code §§ 22-932(5), 22-933, 22-934, and 22-936 as a standalone private criminal prosecution, Plaintiff expressly invokes those positive statutory enactments-together with the non-delegable safekeeping mandate of D.C. Code § 24-211.02-as the governing District of Columbia statutory standard of care enacted specifically to protect incapacitated, disabled, and custodially captive adults in Plaintiff's exact position. Under D.C. Code § 22-932(5), a *"vulnerable adult"* is defined as any person 18 years of age or older who has one or more physical or mental limitations that substantially impair the ability to independently provide for daily needs or safeguard person, property, or legal interests; under § 22-933(2) and (4), criminal abuse encompasses intentionally or knowingly imposing *"unreasonable confinement or involuntary seclusion, including but not limited to, the forced separation from other persons against his or her will"* and causing *"mental anguish by intimidating, humiliating, threatening, or terrorizing the vulnerable adult"*; and under § 22-934, actionable criminal negligence occurs when an institutional custodian or healthcare provider *"knowingly,*

[111] United States Court of Appeals for the District of Columbia Circuit, *Daskalea v. District of Columbia*, 227 F.3d 433, at pp. 441-43 (D.C. Cir. 2000) -- *"To establish intentional infliction of emotional distress, a..."*

*willfully or through a wanton, reckless or willful indifference fails to discharge a duty to provide care and services necessary to maintain the physical and mental health of a vulnerable adult... including but not limited to food, clothing, medicine, shelter, supervision and medical services."* Concurrently, D.C. Code § 24-211.02 imposes an affirmative, non-delegable statutory duty of safekeeping, protection, and humane care. Because D.C. Code §§ 22-933, 22-934, 22-936, and 24-211.02 impose specific, mandatory protective duties to prevent the exact physical, neurological, and psychological injuries inflicted upon Plaintiff, Defendants' violation of these statutes establishes **negligence *per se*** under District of Columbia common law (*Webster v. District of Columbia*, Civ. No. 1:20-cv-00300 (JDB)), establishes that Defendants' conduct violated positive criminal prohibitions of the District of Columbia so as to satisfy the *"extreme and outrageous"* element of IIED, and strips individual Defendants of any claim of objective reasonableness or qualified immunity under 42 U.S.C. § 1983.

Defendants engaged in extreme, outrageous, and utterly intolerable conduct toward Plaintiff throughout his 201 days of municipal detention, satisfying all elements of IIED, NIED, negligence *per se*, and Section 1983 liability. Specifically, Defendants: (1) forced Plaintiff into over 160 consecutive days of torturous solitary confinement with near-total deprivation of out-of-cell time; (2) enforced Plaintiff's punitive solitary confinement with total denial of outdoor recreation, locking him inside a small indoor cage to run in circles on rare out-of-cell intervals in retaliation for reporting custodial threats; (3) subjected Plaintiff to continuous, nonstop 24/7 unremitting acoustic blare from the unit's single television located on the upper tier inside the enclosed plastic-glass dayroom operating at full, maximum volume and reverberating down the hallway, eliminating sleep, inducing chronic cephalalgia, and inflicting permanent auditory ear damage and chronic 24/7

bilateral tinnitus (ICD-10-CM H93.13,causing Plaintiff's ears to ring nonstop 24/7); (4) completely ignored seventeen written sick call slips, denying preventative dental care and teeth cleaning, and leaving Plaintiff with an untreated ruptured gluteal abscess and unaddressed convulsive seizures; (5) abruptly discontinued Plaintiff's psychotropic medications for 181 consecutive days, inducing severe physical withdrawal and panic; (6) confined Plaintiff in cells filled with raw sewage, black mold, and toxic synthetic marijuana fumes; (7) failed to secure corridor perimeters or provide biological decontamination and infectious triage following a targeted urine assault; (8) suppressed Plaintiff's outgoing letters and family correspondence; and (9) falsified official clinical records, fabricating blood pressure vitals and anachronistic encounters to cover up their neglect. This systematic course of dehumanization went beyond all possible bounds of decency and was atrocious and utterly intolerable in a civilized community.

For purposes of NIED and common-law negligence *per se*, Plaintiff asserts liability under the dual-track framework benchmarked in *Daskalea* and *Webster*, informed by the statutory standards of care of D.C. Code §§ 22-933, 22-934, and 24-211.02:

1. **Against the Correctional Defendants and District of Columbia (Zone of Physical Danger & Negligence *Per Se*)**: Defendants District of Columbia, Faust, Mazzuchelli, Marr, Brown, Williams, Denton, Whitehead, Savage, and John and Jane Does 1-35 negligently, recklessly, and in violation of the statutory standards of care in D.C. Code §§ 22-933(2), (4), 22-934, and 24-211.02 subjected Plaintiff to continuous physical peril within the Zone of Physical Danger at CDF. By locking Plaintiff inside cells contaminated with raw human waste, airborne mold spores, and dense synthetic drug smoke, subjecting Plaintiff to continuous, nonstop 24/7 unremitting acoustic blare from the unit's single television located on the upper tier inside the enclosed

plastic-glass dayroom set at full, maximum volume and reverberating down the hallway, which eliminated sleep, induced chronic cephalalgia, and inflicted permanent ear damage and chronic 24/7 bilateral tinnitus (ICD-10-CM H93.13,constant ringing in both ears), failing to provide medical triage for an agonizing ruptured gluteal abscess leaking blood and pus, failing to provide biological decontamination or infectious disease triage following a targeted urine assault to the face and eye, denying treatment for an acute, first-in-lifetime convulsive seizure (Plaintiff having never had a seizure in his life prior to his confinement at CDF) in which Plaintiff fainted backward onto a steel stool and struck his head against the concrete wall, and exposing Plaintiff to progressive oral decay through the total denial of dental hygiene, Defendants directly placed Plaintiff in reasonable fear for his life and physical safety, which fear directly caused catastrophic, severe emotional distress.

2. **Against Healthcare Defendants Unity Health Care, Dr. Menon, Dr. Wellington, and John and Jane Does 36-50 (Special Relationship & Negligence *Per Se*)**: Defendants Unity Health Care, Inc., Dr. Anju Menon, Roderick I. Wellington, Ph.D., LCPC, NCC, CFC, and John and Jane Does 36-50 stood in a direct, established physician-patient, psychological, and clinical healthcare relationship with Plaintiff. As licensed medical and behavioral health providers contracted by the District to provide all clinical and mental health services to detainees, these Defendants undertook an affirmative fiduciary, clinical, and statutory obligation (under D.C. Code §§ 22-934 and 7-1231.08) of a nature that necessarily and directly implicated Plaintiff's emotional, neurological, and psychiatric well-being. Defendants knew-and FDA Prescribing Information for [redacted] (Sections 2.6 and 5.5, explicitly identifying "tinnitus, and seizures" as direct adverse reactions of abrupt serotonergic discontinuation), [redacted] (Boxed Warning & Section 5.1), [redacted], [redacted], and

[redacted]/[redacted] (WARNINGS, mandating gradual tapering over weeks) expressly warned-that abruptly severing maintenance medications and abandoning patients in punitive solitary confinement would inflict severe physiological and neurological shock, convulsive seizures, tinnitus, cardiovascular instability, and psychological collapse, yet negligently, recklessly, and in breach of mandatory statutory standards of care withheld all psychotropic medications for 181 consecutive days, left seventeen emergency sick call slips unanswered, fabricated MAR records, and refused basic dental and wound care, shattering Plaintiff's high-functioning baseline and directly and proximately causing and inflicting severe emotional distress, terror, lasting psychological decompensation, and permanent disabling psychiatric and neurological trauma.

Defendants acted with intentional malice, gross negligence, negligence *per se*, subjective recklessness, and total disregard for Plaintiff's mental and physical integrity, violating constitutional, statutory, and common-law duties.

As a direct and proximate result of Defendants' extreme, outrageous, and negligent per se conduct, Plaintiff suffered catastrophic emotional distress, recurrent panic attacks, terrifying nightmares, persistent insomnia, severe [redacted], [redacted], physical deterioration, and lasting loss of enjoyment of life. Pursuant to District of Columbia common law (IIED, NIED, and negligence *per se*), D.C. Code § 24-211.02, and 42 U.S.C. § 1983, Plaintiff is entitled to compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial exceeding, and in no event less than, **$16,203,736.49**, and punitive damages against all individual and corporate

Defendants in their individual capacities upward from a minimum floor of $10,000,000.00, together with costs and statutory fees under 42 U.S.C. § 1988(b).

## ARTICLE VI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff **JOHN EARLE SULLIVAN** (*"Plaintiff"*) respectfully prays that this United States District Court for the District of Columbia enter final judgment *in personam* and *in rem* in Plaintiff's favor and against Defendants **DISTRICT OF COLUMBIA**, a municipal corporation; **UNITY HEALTH CARE, INC.**, a District of Columbia corporation; **THOMAS FAUST**, in his individual and official capacities as Director of the District of Columbia Department of Corrections; **ANDREW PAUL MAZZUCHELLI**, in his individual and official capacities as Deputy General Counsel and General Counsel of the District of Columbia Department of Corrections (U.S.D.C. D.D.C. Bar No. 7647430); **SHEILA MARR**, in her individual and official capacities as Correctional Major and Inmate Grievance Coordinator at the Central Detention Facility; **ANTHONY BROWN SR.**, in his individual and official capacities as Lieutenant and Restrictive Housing Supervisor at the Central Detention Facility; **DELONTE WILLIAMS**, in his individual and official capacities as Lieutenant (former Sergeant) at the Central Detention Facility; **CUTHBERT DENTON**, in his individual and official capacities as former Housing Unit Manager and Correctional Officer at the Central Detention Facility; **CHRISTINA WHITEHEAD**, in her individual and official capacities as Correctional Officer and Housing Unit Manager at the Central Detention Facility; **CORTNEY SAVAGE**, in her individual and official capacities as Correctional Program Specialist and PREA Compliance Manager at the Central Detention Facility; **ANJU MENON, M.D.**, in her individual and official capacities as Psychiatrist and Behavioral

Health Medical Provider (NPI 1346775498); **RODERICK I. WELLINGTON, Ph.D., LCPC, NCC, CFC**, in his individual and official capacities as Discipline Director of Behavioral Health, Psychologist, and Licensed Clinical Professional Counselor (NPI 1336535319); and **JOHN AND JANE DOES 1-50**, in their individual and official capacities as unidentified correctional officers, supervisors, case managers, grievance coordinators, mailroom and property staff, and contracted medical, psychiatric, dental, and health-information personnel (collectively, *"Defendants"*), jointly and severally to the fullest extent authorized by governing federal and District of Columbia positive law, and grant the following declaratory, coercive equitable, restitutional, *in rem*, compensatory, statutory, and exemplary relief:

## I. DECLARATORY DECREES AND RIGHTS ADJUDICATIONS (28 U.S.C. §§ 2201-2202 & FED. R. CIV. P. 57)

Enter a final declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202, and Federal Rule of Civil Procedure 57 adjudging, declaring, and decreeing as follows:

I.i. **Adjudication of Unlawful Custodial, Clinical, Retaliatory, Discriminatory, and Information-Blocking Conduct**:

I.i.i. **Unconstitutional Solitary Confinement, Environmental Deprivation, and Municipal *Monell* Custom**: Defendants District of Columbia, Faust, Mazzuchelli, Marr, Brown, Williams, Denton, and John and Jane Does 1-35's policy, custom, practice, and usage of confining Plaintiff in twenty-three- to twenty-four-hour-per-day punitive solitary confinement for more than one hundred sixty (160) consecutive days ($6,408.0 custodial hours) across Central

Detention Facility (*"CDF"*) Housing Units NE-1 (Cell 63), SW-1 / South-1 (*"the hole,"* on the top tier, right-hand side, Cell 54 and Cell 50 for over 130 consecutive days), South-2 (Cell 34), and South-1 (Cell 35)-characterized by raw human sewage backups through in-cell plumbing, pervasive black mold colonies, ambient sub-freezing 32°F winter temperatures inducing persistent hypothermia and Raynaud's neurovascular spasms, repeated central-command-bubble overrides of overhead fluorescent cell lighting during thirty-minute security rounds, unventilated synthetic cannabinoid (*"K2/Spice"*) chemical smoke inundation, continuous, nonstop 24/7 unremitting acoustic blare from the unit's single television located on the upper tier inside the enclosed plastic-glass dayroom operating at full, maximum, deafening volume and reverberating down the concrete and steel hallway (inflicting permanent cochlear and central auditory cortical injury and chronic 24/7 bilateral tinnitus, ICD-10-CM H93.13), multi-day shower denials, mandatory pre-exit full strip and visual body-cavity searches and through-slot clothing/footwear inspections, padlocked *"black box"* wrist-cuff, waist-chain, and ankle-shackle three-point mechanical restraints enforced during all out-of-cell movement and medical/dental appointments, complete denial of outdoor recreation, and restriction of rare out-of-cell movement to an isolated indoor wire cage or sewage-flooded video visitation room-violated Plaintiff's substantive and procedural due process and cruel-and-unusual-punishment protections under the Fifth and Eighth Amendments to the United States Constitution, 42 U.S.C. § 1983, and the mandatory statutory safekeeping and environmental reporting commands of D.C. Code § 24-211.02(a) and (b)(2)-(4);

I.i.ii. **Deliberate Indifference to Serious Medical, Psychiatric, Neurological, and Physical Health Needs and Statutory Psychotropic Severance**: Defendants District of Columbia, Unity Health Care, Inc., Faust, Marr, Brown, Menon, Wellington, and John and Jane Does 1-50's unilateral, 181-day cold-turkey severance and withholding of Plaintiff's prescribed maintenance psychiatric and cardiovascular medications ([redacted] 60-65 mg/day, [redacted]/day, [redacted]/[redacted] 60 mg/day, and [redacted] 80-160 mg/day) from November 16, 2023 through May 15, 2024; total clinical abandonment of seventeen (17) pages of written Inmate Sick Call Request Forms (DCDOC Form PS 6001.1, **Exhibit 977**) left with one hundred percent (100%) blank provider triage, priority rating, and disposition fields; systemic abandonment of Plaintiff's serious physical health, vascular, and mobility needs during $160+$ days of solitary confinement, forced physical stagnation, and denial of natural sunlight, fresh air, and exercise, shattering Plaintiff's high-functioning competitive-athlete baseline and causing severe physical and musculoskeletal deconditioning; refusal to triage, examine, or treat Plaintiff's acute, first-in-lifetime convulsive seizure at 10:58 AM on January 31, 2024 in the lower-tier video call recreation room of Unit SW-1 in which he fainted backward onto a steel stool and struck his head against the concrete wall while his body convulsed uncontrollably (stamped received February 1, 2024, **Exhibit 977** at p. 11), progressive optical scotoma and dense vitreous floaters (accompanied by Physician Assistant Kamilah Ray-Boyd's May 17, 2024 simultaneous electronic note "Ophthalmology appt is next week" and immediate appointment cancellation at 12:59 PM when Plaintiff never saw an eye doctor once during his entire custody), May 2-5, 2024 ruptured, purulent gluteal abscess draining blood and infectious fluid, and additive requests

for preventative dental care (Dr. Shayla T. Calhoun's blank January 26, 2024 dental clinical notes and unanswered April 3, 2024 dental sick call slip); maintenance of unauthenticated clinical encounter notes marked "Status: ON HOLD DOCUMENT. Contents are preliminary" (Dr. Roderick I. Wellington, May 15, 2024, **Exhibit 978** at p. 14); bad-faith fabrication of normotensive blood pressure readings ("122 / 77" on May 10, 2024 and "127/85 mm Hg" / "bp cpntrolled" on May 14, 2024) without ever placing a sphygmomanometer cuff on Plaintiff's arm while simultaneously stamping eight clinical records with active "HYPERTENSION (ICD-401.9) (ICD10-I10)" and mechanically cloning phantom * *DC/[redacted] orders and canned substance-counseling macros; transcription of fictitious community facilities ("Gand jury medical center Southlake city Utah", "Grand jury medical center - UTAH") and phantom physicians ("Dr. Vivaci Fauci at Salt Lake City Utah"); omission of active [redacted] 75 mg QHS (RX: 2471754) from the May 31, 2024 federal USM-553 transit summary; logging of fraudulent Accu-Flo Electronic Medication Administration Record (*"MAR"*) code Ø ("PT Refused/med not Administered,") entries on May 15, 2024 at 20:00 (by LPN Abigail Bentil, AB1, less than five hours after Plaintiff signed medication consent forms) and on May 22, 2024 at 09:00 (by Emmerencia Ngwenyi, EN1); substitution of completely blank, future-dated "MAR For: June 2026" pages (printed March 3, 2026) in place of Plaintiff's actual June 2024 Accu-Flo MAR; and entry of post-transfer clinical appointment cancellations on June 7, 2024 ("NOC") and July 26, 2024 ("Inmate not on census per JACCS", **Exhibit 978** at pp. 4-9)-violated the Fifth and Eighth Amendments to the United States Constitution, 42 U.S.C. § 1983, the

District of Columbia Mental Health Consumers' Rights Protection Act (D.C. Code § 7-1231.08), and D.C. Code § 24-211.02;

I.i.iii. **First Amendment Retaliation and Failure to Protect from Foreseeable Inmate Violence**: Defendants District of Columbia, Mazzuchelli, Whitehead, Savage, Brown, Williams, and John and Jane Does 1-35's retaliatory placement and retention of Plaintiff in punitive solitary confinement commencing January 3, 2024 following Plaintiff's December 21, 2023 emergency PREA grievance stamped received December 28, 2023 (OIS PREA Case #2024-0001, IAPro #4144 & #4337, **Exhibit 976**); deliberate compromise of Plaintiff's cell security on April 16, 2024 inciting unit-wide "rat" and "snitch" death threats; failure to protect Plaintiff from the May 3, 2024 pressurized urine biological assault sprayed through the cell door crack of Cell 5 into Plaintiff's left eye, cheek, and shoulder while Plaintiff was locked in mechanical shackles and subsequent denial of baseline infectious-disease prophylaxis; execution of a sham inter-facility contractual transfer to Northern Neck Regional Jail (*"NNRJ"*, Warsaw, VA) from May 8 to May 10, 2024 (where Plaintiff was objectively evaluated as a 0-Point Minimum Security classification risk) knowing in advance that NNRJ categorically refused to accept January 6 detainees; aborted May 15, 2024 attempt to transfer Plaintiff from Unit South-2 intake directly into violent maximum-security Unit SW-2; and retaliatory May 24, 2024 forced re-confinement of Plaintiff in Unit South-1 Cell 35 over his explicit, body-worn-camera-recorded objections-violated the First, Fifth, and Eighth Amendments to the United States Constitution, 42 U.S.C. § 1983, 28 C.F.R. § 115.68, and D.C. Code § 24-211.02;

I.i.iv. **Unconstitutional Outgoing Mail Censorship and Correspondence Blackout**: Defendants District of Columbia, Faust, Marr, Brown, Williams, and John and Jane Does 1-35's systematic interception, confiscation, suppression, and destruction of Plaintiff's outgoing letters and correspondence addressed to his family without written rejection notices, penological justification, opportunity to protest, or impartial administrative review-violated the First and Fifth Amendments to the United States Constitution under *Procunier v. Martinez*, 416 U.S. 396, 417-19 (1974), 42 U.S.C. § 1983, and DCDOC Program Statement 4070.1E;

I.i.v. **Substantial Burden on Religious Exercise and Denominational Discrimination**: Defendants District of Columbia, Faust, Marr, Brown, Williams, and John and Jane Does 1-35's (including Unit Chaplain Eric Sims) categorical refusal to allow an authorized priesthood holder or member from Plaintiff's denomination of faith (The Church of Jesus Christ of Latter-day Saints, including Brother Pete Christensen) to enter the facility or housing unit to visit Plaintiff, bless and administer the sacred ordinance of the Sacrament, and conduct weekly Sunday denominational worship services-while simultaneously granting detainees of the Muslim denomination inside Unit South-1 the right to practice and attend religious services of their choosing, and leaving the official "***FOR DOC COMPLETION***" response sections of Plaintiff's April 1, 2024 Step 1 Informal Resolution Complaint (PP 4030.1, Attachment C) and April 4, 2024 Step 2 Inmate Formal Grievance (PP 4030.1, Attachment D) one hundred percent (100%) blank-without a compelling governmental interest or least-restrictive-means tailoring, violated the Religious Freedom Restoration Act (*"RFRA"*, 42 U.S.C. §§ 2000bb-1(a)-(c), 2000bb-2(1)), the Religious Land Use

and Institutionalized Persons Act (*"RLUIPA"*, 42 U.S.C. § 2000cc-1(a)), the First and Fifth Amendments to the United States Constitution, and DCDOC Program Statement 4310.3B;

I.i.vi. **Race-Based and Political-Affiliation Custodial Segregation and Conspiracy**: Defendants District of Columbia, Unity Health Care, Inc., Faust, Mazzuchelli, Marr, Brown, Williams, Savage, Denton, and John and Jane Does 1-50's intentional racial and viewpoint-based custodial segregation of Plaintiff (DCDC #387289), the sole African American / Black independent video journalist in the mid-November 2023 booking sequence, into hazardous CDF solitary confinement while assigning sequentially booked white January 6 detainees (Frank Giustino, DCDC #387252; Donald Chilcoat, DCDC #387253; and Dominic Box, DCDC #387287)-with whom Plaintiff had peacefully co-housed in-cell and commingled without incident during segregated intake recreation-to the communal Correctional Treatment Facility (*"CTF"*) pod, as expressly ratified in writing by Defendant Deputy General Counsel Andrew Paul Mazzuchelli on January 5, 2024 and April 2-3, 2024 based on Plaintiff's "perceived affiliation" and supposed lack of "ideological alignment" despite acknowledging "0 disciplinary violations"-violated the Equal Protection component of the Fifth Amendment under *Johnson v. California*, 543 U.S. 499 (2005), 42 U.S.C. §§ 1981(a)-(c), 1983, 1985(3), and 1986, and the District of Columbia Human Rights Act (D.C. Code §§ 2-1402.73 and 2-1403.16);

I.i.vii. **Unconstitutional Involuntary Segregated Housing Beyond the 30-Day PREA Ceiling, Retaliatory Protective Custody, and Negligence *Per Se***: Defendants District of Columbia, Faust, Mazzuchelli, Marr, Brown, Savage, Williams, and John and Jane Does 1-35's confinement of Plaintiff in involuntary

segregated housing under the pretext of PREA "protective custody" for over 160 consecutive days-exceeding the mandatory 30-day federal ceiling by more than five hundred thirty percent (530%), with Defendant Mazzuchelli declaring on March 28, 2024 that "there is no limit on how long he can be there", without exploring less restrictive alternatives, without individualized written justification findings, and without conducting mandatory 30-day substantive classification reviews-violated the First, Fifth, and Eighth Amendments to the United States Constitution actionable under 42 U.S.C. § 1983, D.C. Code § 24-211.02, and District of Columbia common-law negligence *per se* incorporating the mandatory statutory and regulatory standards of care established by 34 U.S.C. §§ 30301 and 30307, 28 C.F.R. §§ 115.43(a)-(d) and 115.68, and DCDOC Program Statement 3350.2I;

I.i.viii. **Disability Discrimination and Failure to Accommodate Under Title II of the ADA and Section 504 of the Rehabilitation Act**: Defendant District of Columbia's intentional exclusion of and deliberate-indifference failure to accommodate Plaintiff's acute, emerging, and permanent physical, musculoskeletal, auditory, vascular, psychiatric, cognitive, and neurological disabilities-including [redacted] (ICD-10 F43.10), Panic Disorder (ICD-10 F41.0), Major Depressive Disorder (ICD-10 F32.A), Generalized Anxiety Disorder (ICD-10 F41.1), [redacted] (ICD-10 F90.9), Chronic Bilateral Tinnitus (ICD-10-CM H93.13), Raynaud's disease / lower-extremity neurovascular impairment, and chronic autonomic dysregulation (**Exhibit 979**)-directly inflicted by Defendants' prolonged solitary confinement, nonstop 24/7 acoustic trauma, forced physical stagnation, and 181-day medication severance, violated Title II of the Americans

with Disabilities Act (42 U.S.C. § 12132), Section 504 of the Rehabilitation Act (29 U.S.C. § 794(a)), and D.C. Code § 24-211.02(a), (b)(1)-(5), and (b)(9);

I.i.ix. **Bad-Faith Grievance Thwarting, First and Fifth Amendment Obstruction, and Negligence *Per Se* / Evidentiary Spoliation**: Defendants District of Columbia, Faust, Marr, Brown, Williams, Savage, and John and Jane Does 1-35's spoliation, unnumbered suppression, mis-indexing under an erroneous inmate number (DCDC# 387299), and bad-faith summary rejection of Plaintiff's administrative grievances (IGP #20231128-290, unnumbered January 7, 2024 emergency life-safety grievance, IGP #20240411-265 at **Exhibit 980**, IGP #20240520-365, and IGP #20240522-470), written Form PS 6001.1 sick call slips, and December 21, 2023 shower surveillance video (VIDEO: X NO at **Exhibit 976**, p. 11)-violated the First and Fifth Amendments to the United States Constitution actionable under 42 U.S.C. § 1983, D.C. Code § 24-211.02(a) and (b)(2), and District of Columbia common-law negligence *per se* and tortious evidentiary spoliation incorporating the mandatory statutory and regulatory standards of care of D.C. Code § 22-723(a)-(b) and DCDOC Program Statement 4030.1N;

I.i.x. **Post-Release Electronic Health Information (EHI) Access Blocking, Fake Social Security Number Fabrication ("[redacted]"), Unsigned "ON HOLD" EHR Manipulation, and Unauthorized Mental Health Disclosures**: Defendants Unity Health Care, Inc., District of Columbia, Menon, Wellington, and John and Jane Does 1-50's post-release blocking of Plaintiff's Electronic Health Information (*"EHI"*), native EHR audit logs, and dental/clinical records beyond the 30-day statutory deadline; intentional fabrication and falsification of Plaintiff's Social Security Number in the master EHR database as "Soc Sec No:

[redacted]" (generated and certified by HIMS Manager Lynda Boykin on December 19, 2025, **Exhibit 979** at p. 3, and HIMS Clerk Jean Washington on March 3, 2026, **Exhibit 978** at p. 37) while listing Plaintiff's custody status as "Status: Active" at CDF on December 19, 2025, and fraudulent certification (XX) to the State of Utah Department of Workforce Services on December 19, 2025 that Plaintiff's 2023-2024 records could not be located and that "Patient was not at this facility for the dates/period that was request." (**Exhibit 979** at p. 2); maintenance of preliminary, unauthenticated mental health records marked "Status: ON HOLD DOCUMENT. Contents are preliminary"; and unauthorized disclosures of Plaintiff's protected mental health information (ICD-10 F41.1, F90.9, F41.0, F32.A, F43.10) to non-medical custodial personnel without written authorization or mandatory disclosure logging-violated the District of Columbia Mental Health Information Act (D.C. Code §§ 7-1201.02(a), 7-1201.04, 7-1205.01, 7-1205.04, 7-1205.05(a), 7-1206.01, 7-1207.01(a)-(c), and 7-1207.02), the District of Columbia Consumer Protection Procedures Act (D.C. Code §§ 28-3904(e), (e-1), (f), (f-1), (r)(5) and 28-3905(k)(1)-(2)), the First and Fifth Amendments actionable under 42 U.S.C. § 1983, and District of Columbia common-law negligence *per se* incorporating the mandatory federal statutory and regulatory standards of care of Section 4004 of the 21st Century Cures Act (42 U.S.C. § 300jj-52(a), (b)(2)(A)) and the HIPAA Privacy, Security, and Enforcement Rules (42 U.S.C. § 1320d-5(a)(3); 45 C.F.R. §§ 164.312(b), 164.524(a)(1), (b)(2)(i), 160.404(b)(2)(iv), 170.315(d)(2)-(3) and ASTM E2147-18); and

I.i.xi. **Unlawful Custodial Restraint Defying Medical Open-Population Clearance, False Imprisonment, Unjust Imprisonment, Property Confiscation and Conversion, Visitation and Shackling Deprivations, and Vulnerable Adult [redacted]d Neglect**: Defendants' unlawful custodial restraint of Plaintiff in solitary confinement and short-term intake lockdown (Unit South-2 Cell 34) beyond the 24-to-72-hour legal intake ceiling in defiance of three explicit clinical directives entered by LPC Darius Mills (05/10/2024), NP Meena Kumar (05/10/2024), and NP Linda Fonju (05/15/2024) ordering "Disposition: Open Population" (**Exhibit 978** at pp. 16, 30, 35), bolstered by Dr. Roderick Wellington's fabricated clinical cover story claiming Plaintiff was housed in South-2 intake "because of his safety"; arbitrary confiscation, conversion, and permanent deprivation of Plaintiff's seven sets of personal clothing/laundry (seven shirts, seven pairs of underwear, seven pairs of socks, two pairs of shorts, and one pair of sweatpants), cups, food and commissary items, paper, and writing materials during and following his May 8-10, 2024 inter-facility transfer to NNRJ and re-intake (IGP #20240520-365) without issuing any property inventory sheet, release receipt, or disposition accounting; arbitrary cancellations of scheduled family video visitations under false excuses and forcing Plaintiff to remain locked in full three-point padlocked black-box shackles during legal visitations with his attorney Steven R. Kiersh and video visitations; and intentional and negligent infliction of severe emotional distress and captive vulnerable-adult abuse and neglect-violated the Fifth and Eighth Amendments to the United States Constitution actionable under 42 U.S.C. § 1983, D.C. Code §§ 2-423.02, 24-211.02(a), (b)(3)-(5), and 24-211.02a(c)(2)-(3), and District of Columbia common law (encompassing false imprisonment, breach of ministerial

custodial bailment, conversion, trespass to chattels, intentional infliction of emotional distress, negligent infliction of emotional distress under the Zone-of-Physical-Danger and Special-Relationship doctrines, and negligence *per se* incorporating the statutory and regulatory standards of care of 31 U.S.C. §§ 3723-3724, DCDOC Program Statement 4050.1I, and D.C. Code §§ 22-932(5), 22-933, 22-934, and 22-936);

I.ii. **Adjudication of Restoration of Innocence *Ab Initio* and Elimination of Sovereign Penal Justification**:

I.ii.i. By operation of Presidential Proclamation 10887 executed on January 20, 2025 (**Exhibit 2**), the Department of Justice *Certificate of Pardon* (ID319255) authenticated on February 7, 2025 (**Exhibit 3**), the Department of Justice's *Appellee's Unopposed Motion to Vacate Convictions and Remand for Dismissal* (Doc #2096152) filed on January 24, 2025 (**Exhibit 3.1**), the unanimous per curiam *Order* of the United States Court of Appeals for the District of Columbia Circuit in Case No. 24-3051 (Doc #2103201) entered on February 27, 2025 vacating the judgment of conviction and directing the Clerk to issue the mandate forthwith (**Exhibit 4**), and the final *Order* entered by Senior United States District Judge Royce C. Lamberth in Criminal Case No. 1:21-cr-00078-RCL (Dkt. 164) on March 4, 2025 dismissing the case as moot upon the government's unopposed Rule 48(a) motion for dismissal with prejudice (**Exhibit 5**), Plaintiff John Earle Sullivan stands completely exonerated and restored to his constitutional presumption of innocence *ab initio* under *Nelson v. Colorado,* 581 U.S. 128, 135-37 (2017); and

I.ii.ii. Such complete vacatur and dismissal with prejudice strips Defendants of any legitimate penal interest, affirmative defense, preclusive bar under *Heck v. Humphrey*, 512 U.S. 477 (1994), or sovereign entitlement to retain Plaintiff's confiscated personal property or maintain adverse custodial, disciplinary, or classification records;

I.iii. **Adjudication of Satisfaction of Conditions Precedent and Unlawful Evidentiary Spoliation**:

I.iii.i. All conditions precedent to the initiation and maintenance of this civil action have occurred or been performed pursuant to Federal Rule of Civil Procedure 9(c); and

I.iii.ii. Defendants' bad-faith interception, unnumbered suppression, mis-indexing (DCDC# 387299), and spoliation of Plaintiff's administrative grievances, Form PS 6001.1 sick call requests, and December 21, 2023 surveillance video rendered administrative remedies unavailable as a matter of law and violated the First and Fifth Amendments actionable under 42 U.S.C. § 1983, D.C. Code § 24-211.02(a), (b)(2), and District of Columbia common-law negligence *per se* incorporating D.C. Code § 22-723(a)-(b) and DCDOC Program Statement 4030.1N; and

I.iv. **Adjudication of Municipal, Corporate, and *Respondeat Superior* Liability**:

I.iv.i. Defendant District of Columbia (under its non-delegable statutory safekeeping mandate in D.C. Code § 24-211.02, *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and *respondeat superior* on all District of Columbia statutory and common-law claims) is directly, vicariously, and jointly and severally liable for the unconstitutional policies, customs, and wrongful acts and

omissions of its supervisory officials, contracted clinicians, administrative personnel, and custodial staff; and

I.iv.ii. Defendant Unity Health Care, Inc. (under Municipal Contract CW92833, *West v. Atkins*, 487 U.S. 42 (1988), corporate *Monell* liability, and *respondeat superior* on all District of Columbia statutory and common-law claims) acted under color of District of Columbia law and is directly, vicariously, and jointly and severally liable with its subordinate clinicians, nurses, and health-information personnel.

## II. PROVISIONAL, COERCIVE, POSSESSORY, AND PERMANENT INJU[redacted] DECREES (FED. R. CIV. P. 65(D))

Issue a temporary restraining order, a preliminary injunction *pendente lite*, and a permanent injunction *in perpetuum* pursuant to Federal Rule of Civil Procedure 65(d)(1)-(2), 28 U.S.C. § 2202, D.C. Code §§ 7-1205.04 and 28-3905(k)(2)(D), and the inherent equitable jurisdiction of this Court ordering as follows:

II.i. **Prohibitory Injunction Against EHI Blocking, Evidentiary Spoliation, and Unauthorized Mental Health Disclosures**: Enjoining and restraining Defendants District of Columbia, Unity Health Care, Inc., Faust, Mazzuchelli, Marr, Brown, Williams, Denton, Whitehead, Savage, Menon, Wellington, and John and Jane Does 1-50, together with their officers, directors, principals, agents, servants, employees, attorneys, successors, assigns, health information technology vendors, and all other persons or entities in active concert or participation with any of them (specifically including DCDOC Privacy Officer Oluwasegun "Segun" Obebe, FOIA Officer Elton Jones, HIMS Manager Lynda Boykin, HIMS Clerk Jean Washington, Property Sergeant Alonzo Walker, and third-party eClinicalWorks, Accu-Flo eMAR, JACCS,

IAPro, VIAPATH, and CRISP DC system administrators) who receive actual notice of the Order pursuant to Federal Rule of Civil Procedure 65(d)(2), on pain of contempt, from directly or indirectly:

II.i.i. **Prohibition of Record Spoliation and Metadata Alteration**: Destroying, deleting, purging, overwriting, altering, modifying, backdating, finalizing without native pointer and audit-trail preservation, encrypting, or spoliating any physical or electronic records, relational database tables, Accu-Flo Electronic Medication Administration Record (*"MAR"*) entries, eClinicalWorks / EHR clinical notes (including Discipline Director of Behavioral Health Roderick I. Wellington, Ph.D., LCPC, NCC, CFC's May 15, 2024 "Status: ON HOLD DOCUMENT. Contents are preliminary" encounter record), dental intake charts, Form PS 6001.1 sick call slips, IAPro investigative files (OIS Case #2024-0001, IAPro #4144 and #4337), VIAPATH tablet message logs, Keefe commissary and property ledgers, housing unit logbooks, body-worn camera (*"BWC"*) footage, or CCTV surveillance recordings relating to Plaintiff (DCDC #387289 and mis-indexed DCDC #387299);

II.i.ii. **Prohibition of Electronic Health Information Blocking**: Interfering with, preventing, delaying, or materially discouraging Plaintiff's access to, inspection of, or electronic export of his complete Electronic Health Information (*"EHI"*) and native audit trails in violation of D.C. Code §§ 7-1205.01 and 28-3904(e), (e-1), (f), (r)(5), 42 U.S.C. § 300jj-52, and 45 C.F.R. § 164.524;

II.i.iii. **Prohibition of Unauthorized Mental Health Information Disclosures**: Disclosing, transmitting, or disseminating Plaintiff's protected mental health information (ICD-10 F41.1, F90.9, F41.0, F32.A, F43.10) or psychiatric

treatment records to any unauthorized person or entity in violation of the District of Columbia Mental Health Information Act, D.C. Code § 7-1201.02(a); and

II.i.iv. **Prohibition of Propagation of Fabricated Identifiers**: Transmitting, reporting, or maintaining the fabricated Social Security Number "[redacted]" or false active-custody status notations ("Status: Active" at Central Detention Facility) in any internal, municipal, state, or federal health or disability repository;

II.ii. **Mandatory Forensic EHR, Native Audit-Trail, and Investigative Disclosure Injunction**: Commanding Defendants District of Columbia and Unity Health Care, Inc., within **fourteen (14) calendar days** of entry of the Order, to produce and deliver to Plaintiff in native, machine-readable electronic format (accompanied by formal written certifications of authenticity and cryptographic data integrity executed pursuant to Federal Rule of Evidence 902(14)):

II.ii.i. **Complete Unredacted EHR, Dental, and Accu-Flo eMAR Production**: A complete, unredacted, certified copy of Plaintiff's entire Electronic Health Record (*"EHR"*) and dental file maintained under Contract CW92833 and DCDOC Health Information Management Services (*"HIMS"*), including all intake assessments, Dr. Shayla T. Calhoun's January 26, 2024 dental intake file, Psychiatric Nurse Practitioner Linda Fonju's May 15, 2024 psychiatric orders, Roderick I. Wellington, Ph.D., LCPC, NCC, CFC's May 15, 2024 "Status: ON HOLD DOCUMENT. Contents are preliminary" metadata, and unedited Accu-Flo Electronic Medication Administration Records (*"MAR"*) spanning November 16, 2023 through July 15, 2024 (specifically including Plaintiff's actual June 2024 MAR withheld in Defendants' March 3, 2026 production);

II.ii.ii. **Native ASTM E2147-18 and 45 C.F.R. § 170.315(d)(2)-(3) Audit Trails**: Complete, unaltered native electronic audit trails and access/disclosure logs conforming to the HIPAA Security Rule (45 C.F.R. § 164.312(b)), ONC Health IT Certification standards (45 C.F.R. §§ 170.210(e), (h), 170.299(c)(1), 170.315(b)(10), (d)(2)-(3), (d)(10)), Network Time Protocol Version 4 (RFC 5905), and ASTM E2147-18 (*Standard Specification for Audit and Disclosure Logs for Use in Health Information Systems*, sections 7.1.1, 7.1.2, 7.1.6-7.1.9, and 7.2-7.7), capturing every user ID (LBOYKIN, HIMSM, Jean Washington, AB1, EN1), clinician NPI (NPI 1346775498, NPI 1336535319), workstation IP/terminal identifier, timestamp, action type (create, view, modify, place on hold, delete, export, or print), and pointer-preserved pre-change and post-change field values for every entry in Plaintiff's EHR and Accu-Flo MAR (specifically including the insertion of "[redacted]", the May 15 and May 22, 2024 code Ø "PT Refused/med not Administered," MAR entries, the generation of blank "MAR For: June 2026" templates, and the May 17, 2024, May 27, 2024, June 7, 2024 "NOC", and July 26, 2024 "Inmate not on census per JACCS" appointment cancellations);

II.ii.iii. **Statutory Mental Health Disclosure Accounting**: A complete written accounting of all disclosures of Plaintiff's mental health information mandated by D.C. Code § 7-1201.04(a)(1)-(3), specifying the exact date of each disclosure, the full name, title, and agency of each recipient, and a granular description of the contents disclosed;

II.ii.iv. **Complete OIS / IAPro and Housing Board Investigative Files**: Complete, unredacted copies of all investigative files, electronic mail (including Defendant Cortney Savage's January 2, 2024 profiling directive and Defendant Andrew Paul

Mazzuchelli's January 5, March 27-28, and April 2-3, 2024 written communications), internal memoranda, witness statements, body-worn camera (*"BWC"*) videos (including Officer Tchamo's May 3, 2024 BWC footage and Sergeant Okori's May 24, 2024 BWC footage), photographs (including the May 3, 2024 biological assault photographs), and housing directives contained in DCDOC Office of Investigative Services (OIS) PREA Case #2024-0001 (IAPro #4144 and #4337), the April 24, 2024 Housing Board hearing file, and the May 10, 2024 Restrictive Housing Review Initial Hearing file (PP 5300.1, Attachment F); and

II.ii.v. **Verified Schedule Identifying John and Jane Does 1-50**: A verified, complete identification schedule disclosing the true full legal names, ranks/titles, badge or employee identification numbers, National Provider Identifiers (*"NPI"*), and current residential or official service addresses of all currently unidentified or partially identified custodial, supervisory, administrative, mailroom, property, clinical, nursing, and health-information personnel designated herein as **John and Jane Does 1-50** who participated in the acts and omissions alleged in the Verified Complaint, to facilitate prompt substitution and service of process pursuant to Federal Rules of Civil Procedure 4(c)(3), 15(a), 15(c), and 21; and

II.iii. **Mandatory Custodial Expungement, Exoneration Annotation, and Specific Property Return Injunction**: Commanding Defendant District of Columbia and Defendant Director Thomas Faust (in his official capacity), within **twenty-one (21) calendar days** of entry of the Order, to perform the following affirmative acts:

II.iii.i. **Expungement and Rectification of False Custodial and Clinical Records**: Immediately expunge, seal, and purge from all DCDOC and Unity Health Care

institutional databases (JACCS / Offender Management System, IAPro, HIMS, eClinicalWorks, and Accu-Flo MAR) all disciplinary reports, adverse behavioral notations, pretextual recreation "refusal" or "forfeiture" log entries, fabricated May 15 and May 22, 2024 MAR code Ø ("PT Refused/med not Administered,") notations, unauthenticated "Status: ON HOLD DOCUMENT. Contents are preliminary" psychiatric notes (or formally amend and correct said mental health records and purge the fabricated Social Security Number "[redacted]" field to reflect Plaintiff's authentic identifier pursuant to D.C. Code § 7-1206.01), and retaliatory restrictive housing classifications entered under DCDC #387289 and mis-indexed DCDC #387299;

II.iii.ii. **Annotation of Full Exoneration and Innocence *Ab Initio***: Formally append to and annotate all institutional records relating to Plaintiff with certified copies of Presidential Proclamation 10887 (**Exhibit 2**), the Department of Justice *Certificate of Pardon* (ID319255, **Exhibit 3**), the Department of Justice's *Appellee's Unopposed Motion to Vacate Convictions and Remand for Dismissal* (Doc #2096152, **Exhibit 3.1**), the D.C. Circuit's per curiam *Order* in Case No. 24-3051 vacating the judgment and directing issuance of the mandate forthwith (Doc #2103201, **Exhibit 4**), and the District Court's final *Order* in Case No. 1:21-cr-00078-RCL (Dkt. 164) dismissing the case as moot upon the government's unopposed Rule 48(a) motion for dismissal with prejudice (**Exhibit 5**), and transmit certified notices of such vacatur, dismissal with prejudice, and expungement to the Federal Bureau of Prisons, the United States Marshals Service, the Federal Bureau of Investigation (NCIC / III), Northern Neck Regional Jail, the State of Utah Department of Workforce Services, and all federal, state, and interstate criminal justice or healthcare data repositories

(CRISP DC) that received DCDOC or Unity Health Care data concerning Plaintiff;

II.iii.iii. **Specific Return of Unreturned Confiscated Clothing, Cups, Food, Paper, and Writing Materials (D.C. Code §§ 24-211.02(a), (b)(5), 24-211.02a(c)(2))**: Conduct an immediate physical search of the CDF Inmate Reception Center (IRC) Property Vault, Mailroom storage, and OIS evidence lockers and deliver up to Plaintiff all surviving unreturned confiscated personal property-specifically including Plaintiff's seven sets of purchased commissary clothing/personal laundry (seven shirts, seven pairs of underwear, seven pairs of socks, two pairs of shorts, and one pair of sweatpants), cups, food and commissary items, paper, and writing materials grieved under IGP #20240520-365 that were never returned when Case Manager Ms. Coats returned Plaintiff's books on May 22, 2024 (together with a certified property inventory accounting or full restitutional compensation for all items discarded without a property release receipt); and

II.iii.iv. **Sworn Executive Compliance Certification**: File with the Clerk of this Court and serve upon Plaintiff, within **twenty-one (21) calendar days** of entry of the Order, a sworn declaration executed under penalty of perjury pursuant to 28 U.S.C. § 1746 by an executive officer of DCDOC and an executive officer of Unity Health Care, Inc. attesting to complete, unreserved compliance with every directive set forth in this Article.

**III. EQUITABLE RESTITUTION, CONSTRUCTIVE TRUSTS, SPECIFIC PERFORMANCE, AND STRUCTURAL REMEDIES (FED. R. CIV. P. 53, 64, & 66)**

Enter equitable, restitutional, *in rem*, and structural decrees against Defendants ordering as follows:

III.i. **Imposition of Constructive Trust *Ex Maleficio* and Equitable Lien Over Confiscated Property and Funds**: Adjudging and decreeing that Defendants hold all unreturned personal property (specifically including Plaintiff's seven sets of personal clothing/laundry, cups, food and commissary items, paper, and writing materials), cash funds, and inmate trust account balances confiscated or withheld from Plaintiff during his custodial commitment from November 16, 2023 through June 3, 2024, together with any traceable proceeds thereof, as constructive trustees *ex maleficio* for the sole and exclusive benefit of Plaintiff, and imposing an immediate constructive trust and paramount equitable lien thereon pursuant to *Restatement (Third) of Restitution and Unjust Enrichment* §§ 55, 59;

III.ii. **Plenary Forensic Accounting and Equitable Disgorgement of Unjust Enrichment Under Municipal Contract CW92833**: Ordering a court-supervised forensic accounting of all municipal capitation payments, per-diem healthcare fees, pharmacy reimbursements, and avoided-care cost savings received or retained by Defendant Unity Health Care, Inc. under Municipal Contract CW92833 attributable to Plaintiff (DCDC #387289) during the 201-day custodial period in which Unity Health Care withheld Plaintiff's prescribed psychotropic and cardiovascular maintenance medications for 181 consecutive days, left all seventeen (17) pages of written Form PS 6001.1 sick call requests one hundred percent (100%) untriaged, and provided zero dental cleanings, zero ophthalmology examinations, and zero neurological seizure

workups, and compelling Defendant Unity Health Care, Inc. to disgorge and make full restitution to Plaintiff of one hundred percent (100%) of such unearned clinical revenues and avoided-care cost savings (pleaded as supplemental to, or where required to prevent double recovery *in the alternative* to, compensatory damages at law);

III.iii. **Specific Statutory Performance and Portable Out-of-State Healthcare and Educational Trust (D.C. Code § 2-423.02(a)(3)(A)-(B))**: Compelling Defendant District of Columbia to specifically perform its mandatory statutory obligations under the District of Columbia Unjust Imprisonment Act, D.C. Code § 2-423.02(a)(3)(A)-(B)-or, in the alternative, to fund an irrevocable, portable out-of-state Medical, Dental, Audiological, Neurological, Optical, and Behavioral Healthcare Trust administered for Plaintiff's benefit in his state of domicile (Utah)-providing Plaintiff with:

III.iii.i. **Lifetime Comprehensive Healthcare Coverage**: Comprehensive, lifetime physical, neurological, audiological/tinnitus, dental, optical, and behavioral health care coverage (D.C. Code § 2-423.02(a)(3)(A)) at zero out-of-pocket cost to Plaintiff; and

III.iii.ii. **Statutory Educational Reimbursement**: Full statutory reimbursement of up to **$10,000.00** for college, university, or vocational/continuing education tuition and fees (D.C. Code § 2-423.02(a)(3)(B));

III.iv. **Appointment of Special Master and Independent Forensic EHR / Custodial Auditor (FRCP 53)**: Appointing an independent Special Master and Forensic Health IT / Custodial Auditor pursuant to Federal Rule of Civil Procedure 53, compensated solely by Defendants District of Columbia and Unity Health Care, Inc., vested with unrestricted administrative read-access to inspect and audit Defendants'

eClinicalWorks EHR databases, Accu-Flo MAR tables, ASTM E2147-18 audit logs, JACCS census logs, IAPro files, and IGP grievance registries to verify the completeness of Defendants' electronic productions and investigate the fabrication, purging, or alteration of clinical and grievance records; and

III.v. **Pre-Judgment Writs of Replevin, Attachment, and Sequestration (FRCP 64)**: Issuing writs of pre-judgment replevin, attachment, and sequestration pursuant to Federal Rule of Civil Procedure 64 and District of Columbia pre-judgment attachment, replevin, and sequestration statutes (*D.C. Code* tit. 16, chs. 5 & 37) directing the United States Marshals Service to seize and recover Plaintiff's unreturned personal clothing/laundry, cups, food and commissary items, paper, writing materials, and personal belongings from DCDOC custody, and to attach sufficient non-exempt corporate assets of Defendant Unity Health Care, Inc. to secure satisfaction of the anticipated judgment.

## IV. COMPENSATORY, ECONOMIC, NON-ECONOMIC, CONSEQUENTIAL, AND SPECIAL DAMAGES AT LAW (FED. R. CIV. P. 9(G))

Award Plaintiff full direct, general, economic, non-economic, consequential, and itemized special damages at law against Defendants District of Columbia, Unity Health Care, Inc., Faust, Mazzuchelli, Marr, Brown, Williams, Denton, Whitehead, Savage, Menon, Wellington, and John and Jane Does 1-50, jointly and severally, in an amount to be proven at trial, but in no event less than **$22,793,594.63** in net non-duplicative compensatory, economic, and statutory liquidated damages (or, at Plaintiff's election at trial, the cumulative compensatory and statutory sum of no less than **$29,184,850.11**

across all pleaded theories of liability, within an aggregate judgment of no less than **$41,939,958.86** inclusive of punitive damages), specifically encompassing:

IV.i. **Direct, General, Economic, and Non-Economic Compensatory Damages by Unified Remedial Category**:

IV.i.i. **Unconstitutional Solitary Confinement, Liberty Deprivation, Environmental Biohazards, and Municipal *Monell* Liability (42 U.S.C. § 1983; U.S. Const. amends. V, VIII; D.C. Code § 24-211.02)**: Compensatory damages in a sum exceeding, and in no event less than, **$12,481,030.79**, comprising at least **$11,310,500.00** for the unlawful deprivation of liberty across $6,408.0 custodial hours and systemic *Monell* structural policy liabilities and no less than **$1,170,530.79** for raw sewage inundation, black mold exposure, 32°F winter hypothermia, central-command-bubble overhead fluorescent lighting overrides, nonstop 24/7 full-volume upper-tier dayroom television acoustic trauma, mandatory pre-exit full strip and visual body-cavity searches, padlocked black-box three-point mechanical restraints, K2/Spice chemical smoke inhalation, and indoor wire cage confinement;

IV.i.ii. **Deliberate Indifference to Serious Medical, Psychiatric, Neurological, and Physical Health Needs and Statutory Psychotropic Severance (42 U.S.C. § 1983; U.S. Const. amends. V, VIII; D.C. Code §§ 7-1231.08, 24-211.02)**: Compensatory damages in a sum of no less than **$3,872,798.27**, and such greater amount as may be proven at trial, comprising at least **$873,750.00** in statutory psychotropic severance damages for the 181-day cold-turkey withholding of prescribed [redacted], [redacted], [redacted]/[redacted], and [redacted], and no less than **$2,999,048.27** for systemic medical, neurological, physical health, optical, and dental abandonment across seventeen (17) pages of

unanswered Form PS 6001.1 sick call requests, severe physical and musculoskeletal deconditioning from forced physical stagnation and deprivation of sunlight and fresh air, the untreated January 31, 2024 first-in-lifetime convulsive seizure and head impact against the concrete wall, the untreated May 2-5, 2024 ruptured gluteal abscess, progressive optical injury, and manipulated Accu-Flo MAR and EHR entries;

IV.i.iii. **First Amendment Retaliation, Failure to Protect from Inmate Violence, and Unconstitutional PREA Involuntary Segregated Housing Beyond the 30-Day Ceiling (42 U.S.C. § 1983; U.S. Const. amends. I, V, VIII; D.C. Code § 24-211.02; D.C. Common-Law Negligence *Per Se* Incorporating 34 U.S.C. §§ 30301, 30307 & 28 C.F.R. §§ 115.43, 115.68)**: Compensatory damages upward from a minimum floor of **$1,113,500.00** for First Amendment retaliation and failure to protect (comprising at least **$506,000.00** for failure to protect from the December 21, 2023 armed shower threat, the April 16, 2024 cell-window security compromise and "snitch" incitement, and the May 3, 2024 pressurized urine biological assault, alongside no less than **$607,500.00** for retaliatory solitary transfers, PREA sexual safety breaches, and sham NNRJ re-intake lockdowns), together with compensatory damages of no less than **$1,461,370.40** for unconstitutional and negligent *per se* involuntary segregated housing exceeding the mandatory 30-day federal ceiling of 28 C.F.R. § 115.43 by more than 530%;

IV.i.iv. **Unlawful Outgoing Mail Censorship and Correspondence Blackout (42 U.S.C. § 1983; U.S. Const. amends. I, V; *Procunier v. Martinez*; DCDOC PP 4070.1E)**: Compensatory damages in an amount exceeding, and not less than, **$1,632,945.97**;

IV.i.v. **Substantial Burden on Religious Exercise and Denominational Discrimination (RFRA, 42 U.S.C. §§ 2000bb-1, 2000bb-2(1); RLUIPA, 42 U.S.C. § 2000cc-1; U.S. Const. amends. I, V; *Tanzin v. Tanvir*)**: Compensatory damages of at least **$259,500.00**, with the full measure to be determined at trial;

IV.i.vi. **Race-Based and Political-Affiliation Custodial Segregation and Conspiracy (42 U.S.C. §§ 1981(a)-(c), 1983, 1985(3), 1986; U.S. Const. amend. V; DCHRA, D.C. Code §§ 2-1402.73, 2-1403.16)**: Compensatory damages in a sum exceeding, and in no event less than, **$709,831.50**, comprising at least **$662,331.50** for constitutional and statutory segregation deprivations under 42 U.S.C. §§ 1981, 1983, 1985(3), and 1986 and no less than **$47,500.00** under the District of Columbia Human Rights Act;

IV.i.vii. **Disability Discrimination and Failure to Accommodate (Title II of the ADA, 42 U.S.C. § 12132; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a); D.C. Code § 24-211.02(a), (b)(1)-(5), (b)(9))**: Compensatory damages against Defendant District of Columbia upward from a minimum baseline of **$1,379,750.00**;

IV.i.viii. **Bad-Faith Grievance Thwarting, First and Fifth Amendment Petition and Due Process Obstruction, and Negligence *Per Se* / Evidentiary Spoliation (42 U.S.C. § 1983; U.S. Const. amends. I, V; D.C. Code § 24-211.02(a), (b)(2); D.C. Common Law Incorporating D.C. Code § 22-723(a)-(b) & DCDOC PP 4030.1N)**: Compensatory damages in an amount exceeding, and not less than, **$2,431,250.00**;

IV.i.ix. **Unlawful Custodial Restraint Defying Medical Open-Population Clearance, False Imprisonment, Property Confiscation, Ministerial Bailment Breach, Conversion, and Visitation / Shackling Deprivations (42 U.S.C. § 1983; U.S. Const. amends. V, VIII; D.C. Code §§ 2-423.02, 15-109, 24-211.02(a), (b)(3)-(5), 24-211.02a(c)(2)-(3), 28-3302; D.C. Common Law)**: Compensatory and statutory damages against Defendant District of Columbia of no less than **$291,712.33** for unlawful custodial restraint in solitary and intake lockdown, false imprisonment, and unjust imprisonment *ab initio* (comprising at least **$114,589.04** for unlawful custodial liberty deprivation and false imprisonment in solitary and intake lockdown defying three medical open-population clearance orders, no less than **$127,123.29** for wrongful custodial detention across 201 days following vacatur *ab initio*, a minimum of **$40,000.00** pro-rated for unlawful custodial and post-conviction liberty restrictions, and at least **$10,000.00** in immediate statutory transitional relief); upward from a minimum floor of **$5,400.00** for unconstitutional custodial property confiscation, breach of ministerial custodial bailment, and negligence *per se*; no less than **$60,259.72** for common-law conversion and trespass to chattels (*Restatement (Second) of Torts* sections 222A and 927); and at least **$112,901.39** for unlawful custodial visitation deprivations and full three-point shackling during legal and video visitations under D.C. Code § 24-211.02(a), (b)(3); and

IV.i.x. **Intentional and Negligent Infliction of Emotional Distress, Negligence *Per Se*, and Predicate Constitutional Violations for Vulnerable and Captive Adult Abuse and Neglect (D.C. Common Law; D.C. Code § 24-211.02; 42 U.S.C. § 1983; D.C. Code §§ 22-932(5), 22-933, 22-934, 22-936)**: Direct

compensatory emotional distress damages of no less than **$2,942,627.74** (within a total recovery under this theory exceeding, and in no event less than, **$16,203,736.49**);

IV.ii. **Itemized Special, Consequential, and Incidental Damages (FRCP 9(g))**: Pursuant to Federal Rule of Civil Procedure 9(g), specifically awarding Plaintiff all special, consequential, and incidental damages proximately caused by Defendants' wrongful acts (to the extent not already subsumed within Section IV.i. above, in amounts to be quantified and proven at trial), explicitly itemizing:

IV.ii.i. **Past and Future Restorative Dental and Oral Maxillofacial Expenses**: All out-of-pocket and projected clinical expenditures for periodontal scaling, restorative dentistry, endodontic therapy, and prosthetic tooth restoration required to remediate the oral health deterioration caused by Defendants' 201-day denial of dental hygiene and failure to act upon Plaintiff's January 26, 2024 dental intake and April 3, 2024 written dental sick call request (in amounts to be proven at trial);

IV.ii.ii. **Past and Future Neurological, Audiological / Otolaryngological, Ophthalmological, Vascular, and Dermatological Medical Expenses**: All diagnostic neuroimaging (MRI / EEG) and post-concussive neurological rehabilitation resulting from Plaintiff's unattended January 31, 2024 first-in-lifetime convulsive seizure and head impact against the concrete wall; specialized audiological, otolaryngological, and tinnitus-retraining / acoustic-trauma rehabilitation expenses for Plaintiff's permanent bilateral tinnitus (ICD-10-CM H93.13, constant 24/7 ringing in both ears); neuro-ophthalmological treatment and corrective lenses for bilateral scotoma and dense vitreous floaters; infectious-disease serology resulting from the May 3,

2024 ocular urine assault; vascular and physical therapy for Raynaud's disease and lower-extremity musculoskeletal deconditioning; and dermatological/surgical remediation for the ruptured May 2-5, 2024 gluteal abscess (in amounts to be proven at trial);

IV.ii.iii. **Past and Future Psychiatric and Psychopharmacological Rehabilitation Expenses**: All specialized trauma-informed psychiatric therapy, inpatient/outpatient stabilization, and ongoing pharmacotherapy required to treat the permanent exacerbation and infliction of Plaintiff's diagnosed [redacted] (ICD-10 F43.10), Panic Disorder (ICD-10 F41.0), Major Depressive Disorder (ICD-10 F32.A), Generalized Anxiety Disorder (ICD-10 F41.1), and [redacted] (ICD-10 F90.9) caused by 181 days of abrupt medication severance and >160 days of solitary sensory deprivation (in amounts to be proven at trial);

IV.ii.iv. **Lost Independent Journalistic and Documentary Earning Capacity**: The full economic and occupational value of lost independent journalism, video production, and documentary filmmaking contracts, licensing revenues, and lifetime earning capacity destroyed by the total occupational and functional disability inflicted during and following Plaintiff's unlawful confinement (in amounts to be proven at trial); and

IV.ii.v. **Personal Property Replacement, Forensic EHR Reconstruction, and Collateral Mitigation Expenditures**: All out-of-pocket expenditures incurred to replace Plaintiff's unreturned confiscated seven sets of personal clothing/laundry (seven shirts, seven pairs of underwear, seven pairs of socks, two pairs of shorts, and one pair of sweatpants), cups, food and commissary items, paper, writing materials, and personal belongings taken upon his May 8-10, 2024 NNRJ transfer

and re-intake (IGP #20240520-365) and never returned or accounted for when his books were returned on May 22, 2024, together with forensic technical auditing expenses incurred to reconstruct suppressed medical and custodial records (in amounts to be proven at trial); and

IV.iii. **Joint-and-Several Municipal, Corporate, Supervisory, and Individual Liability Allocation**: Adjudging and decreeing that the monetary judgment entered herein is assessed against, and jointly and severally borne by, Defendants in amounts to be determined at trial exceeding, and in no event less than, the following minimum liability thresholds:

IV.iii.i. **Primary Municipal and Corporate Entities (District of Columbia & Unity Health Care, Inc.)**: Joint and several institutional liability in a combined direct entity sum exceeding, and in no event less than, **$27,515,971.52**, comprising direct municipal entity liability of at least **$26,557,668.16** against Defendant District of Columbia (with joint and several liability for all subordinate supervisory, clinical, administrative, and custodial staff liabilities in an aggregate judgment sum exceeding, and not less than, **$41,939,958.86**) and direct corporate entity liability of no less than **$958,303.36** against Defendant Unity Health Care, Inc. (with joint and several corporate liability alongside its subordinate clinicians and records personnel in an aggregate clinical liability sum upward from a minimum floor of **$1,445,912.20**);

IV.iii.ii. **Contracted Healthcare, Legal, and Records Administration Personnel**: Liability in a sum exceeding, and not less than, **$1,808,480.25** across contracted healthcare, legal, and records administrators-including, without limitation, at least **$1,057,445.88** attributable to Records and Privacy Officer Oluwasegun "Segun" Obebe, no less than **$264,773.74** attributable to Defendant Anju Menon,

M.D., at least **$186,781.71** attributable to Defendant DCDOC Deputy General Counsel / General Counsel Andrew Paul Mazzuchelli (U.S.D.C. D.D.C. Bar No. 7647430), no less than **$144,547.49** attributable to Clinical Physician Dr. O'Donovan, at least **$78,287.61** attributable to Defendant Roderick I. Wellington, Ph.D., LCPC, NCC, CFC, and no less than **$76,643.82** attributable to FOIA Records Officer Elton Jones, together with Defendants **John and Jane Does 36-50** (including HIMS Manager Lynda Boykin, HIMS Clerk Jean Washington, LPC Darius Mills, NP Meena Kumar, LPN Theresa Anderson, PA DeBreaka Posey, PA Priscilla Momoh, PA Kamilah Ray-Boyd, LPN Abigail Bentil, Emmerencia Ngwenyi, and Dr. Kathy Alston)-jointly and severally borne by Defendants Unity Health Care, Inc. and District of Columbia;

IV.iii.iii. **Supervisory Command and Leadership Officials**: Liability upward from a minimum baseline of **$1,573,072.62** across facility command and supervisory officials for affirmative direction, knowledge, acquiescence, and deliberate-indifference failure to intervene-including, without limitation, at least **$552,630.16** attributable to Defendant Major Sheila Marr, no less than **$430,164.21** attributable to Defendant Lieutenant Anthony Brown Sr., at least **$156,438.76** attributable to Defendant Director Thomas Faust, no less than **$151,602.24** attributable to Defendant Lieutenant (former Sergeant) Delonte Williams, at least **$132,452.00** attributable to Sergeant Ugochukwu Okorie, no less than **$71,709.95** attributable to Supervisory Clinician Darius Mills, at least **$44,383.36** attributable to Lieutenant King, no less than **$22,650.75** attributable to Sergeant Darlene Bryant, at least **$5,917.86** attributable to Warden Lennard Johnson, no less than **$3,287.70** attributable to Captain D. Hayward, and at least **$1,835.63** attributable to Unit NE-1 Sergeant Theophilus Ojo, together with the

supervisory **John and Jane Does**-jointly and severally borne by Defendant District of Columbia; and

IV.iii.iv. **Individual Line Custodial Staff and Operational Personnel**: Liability of no less than **$746,598.61**, and such greater amount as proven at trial across subordinate correctional officers, case managers, and operational staff-including, without limitation, at least **$138,191.82** attributable to Case Manager Tiara Coates, no less than **$132,273.89** attributable to Correctional Officer "Candy Man", at least **$112,897.30** attributable to Correctional Officer Chancelin Tchakossi (Tchamo), no less than **$108,219.38** attributable to Defendant Housing Unit Manager Cuthbert Denton, at least **$86,657.23** attributable to Correctional Officer Ishaccar Kamara, no less than **$60,000.00** attributable to Facility Chaplain Eric Sims and DCDOC Religious Services personnel, at least **$36,250.00** attributable to Defendant PREA Compliance Manager Cortney Savage, no less than **$18,190.08** attributable to Movement Coordinator Mohamed Bangura, at least **$16,875.00** attributable to Case Manager Hawkins, no less than **$10,547.95** attributable to Correctional Officer Tosin Kayode, at least **$7,591.80** attributable to Property Sergeant Alonzo Walker, no less than **$4,602.66** attributable to Correctional Officer Georges Orock (O-Rock), at least **$2,958.93** attributable to Correctional Officer Dangustard Palle, no less than **$2,630.16** attributable to Correctional Officer Churda, at least **$2,383.58** attributable to Case Manager Zanders, no less than **$1,753.44** attributable to Correctional Officer Maurice Jones, at least **$1,479.47** attributable to Defendant Housing Unit Manager Christina Whitehead, no less than **$876.72** attributable to Case Manager Amaechi, and at least **$739.73** attributable to Case Manager Freezell, together

with Defendants **John and Jane Does 1-35**-jointly and severally borne by Defendant District of Columbia.

## V. ENHANCED STATUTORY MULTIPLIERS, LIQUIDATED DAMAGES, AND PER-VIOLATION AWARDS

Award Plaintiff enhanced statutory, treble, liquidated, and per-violation damages to the maximum extent authorized by the pleaded federal and District of Columbia statutes, specifically including:

V.i. **Mandatory and Discretionary Statutory Treble, Liquidated, and Per-Violation Awards**:

V.i.i. **D.C. Consumer Protection Procedures Act Treble Damages or Per-Violation Minimums (D.C. Code §§ 28-3904(e), (e-1), (f), (f-1), (r)(5), 28-3905(k)(1)-(2))**: Awarding Plaintiff against Defendants Unity Health Care, Inc., Menon, Wellington, and John and Jane Does 36-50 **treble damages, or $1,500.00 per violation, whichever is greater**, pursuant to D.C. Code § 28-3905(k)(2)(A)(i) for each deceptive misrepresentation, material omission, fabricated Social Security Number ("[redacted]"), false active-custody certification (XX), unsigned "Status: ON HOLD DOCUMENT" manipulation, blank "MAR For: June 2026" substitution, and unlawful EHI access restriction, in a statutory and treble sum of no less than **$426,972.00**;

V.i.ii. **D.C. Mental Health Information Act Statutory Liquidated and Actual Damages (D.C. Code §§ 7-1201.02, 7-1205.01, 7-1206.01, 7-1207.01(a)-(b))**: Awarding Plaintiff against Defendants Unity Health Care, Inc., District of Columbia, Menon, Wellington, and John and Jane Does 1-50, jointly and

severally, mandatory minimum statutory liquidated damages of **not less than $1,000.00 for each willful or intentional violation and unauthorized disclosure** pursuant to D.C. Code § 7-1207.01(b) (in a minimum statutory liquidated sum of no less than **$3,000.00**, together with $1,000.00 for each additional willful disclosure or access denial established through the D.C. Code § 7-1201.04 disclosure accounting and native audit logs), in addition to full actual damages sustained under D.C. Code § 7-1207.01(a)-(b);

V.i.iii. **D.C. Mental Health Consumers' Rights Protection Act Statutory Psychotropic Severance Damages (D.C. Code § 7-1231.08)**: Awarding Plaintiff statutory and compensatory psychotropic severance damages of no less than **$873,750.00** for the unilateral, unconsented 181-day severance of Plaintiff's established maintenance pharmacotherapy; and

V.i.iv. **D.C. Unjust Imprisonment Act Statutory Compensation and Tax-Exempt Status (D.C. Code § 2-423.02(a)(1)-(3), (b))**: Awarding Plaintiff statutory unjust imprisonment compensation against Defendant District of Columbia pursuant to D.C. Code § 2-423.02(a)(1)(A)(i)-(ii) and (a)(2) (pro-rated at the statutory rate of $200,000.00 per year of incarceration plus $40,000.00 per year of post-conviction restriction and $10,000.00 in immediate transitional assistance), and expressly decreeing pursuant to D.C. Code § 2-423.02(b) that all compensation awarded under said subchapter shall be completely exempt from any taxes or treatment as gross income under District of Columbia law; and

V.ii. **Negligence *Per Se* Statutory and Regulatory Willful-Neglect Benchmarks**:

V.ii.i. Benchmarking the negligence *per se* and punitive damages assessed against Defendants Unity Health Care, Inc., Menon, Wellington, and John and Jane Does 36-50 for uncorrected willful neglect in blocking Plaintiff's EHI beyond the

30-day statutory window against the inflation-adjusted federal civil monetary penalty schedule codified at 42 U.S.C. § 1320d-5(a)(3), 45 C.F.R. § 160.404(b)(2)(iv), and 45 C.F.R. § 102.3 (91 FR 3665, effective January 28, 2026, establishing Tier 4 willful-neglect penalties of **$73,011.00 to $2,190,294.00 per violation** with an annual cap of **$2,190,294.00** for identical provisions); and

V.ii.ii. Preserving Plaintiff's unilateral right prior to entry of final judgment to elect between overlapping statutory multipliers, per-violation minimums, and common-law punitive awards so as to maximize lawful recovery in accordance with the One-Satisfaction Rule.

## VI. COMMON-LAW AND STATUTORY EXEMPLARY AND PUNITIVE DAMAGES (42 U.S.C. §§ 1981, 1983; D.C. COMMON LAW)

Award Plaintiff punitive and exemplary damages pursuant to 42 U.S.C. §§ 1981, 1983, 1985(3), D.C. Code §§ 2-1403.16(f) and 28-3905(k)(2)(C), and District of Columbia common law (*Daskalea v. District of Columbia*, 227 F.3d 433, 441-43 (D.C. Cir. 2000)) as follows:

VI.i. **Assessment Against Corporate Defendant Unity Health Care, Inc. and Individual-Capacity Defendants**:

VI.i.i. Awarding Plaintiff punitive and exemplary damages against private corporate Defendant **Unity Health Care, Inc.**, and against individual Defendants **Thomas Faust**, **Andrew Paul Mazzuchelli**, **Sheila Marr**, **Anthony Brown Sr.**, **Delonte Williams**, **Cuthbert Denton**, **Christina Whitehead**, **Cortney Savage**, **Anju Menon, M.D.**, **Roderick I. Wellington, Ph.D., LCPC, NCC, CFC**, and **John**

**and Jane Does 1-50**, in their individual capacities, in an aggregate amount to be determined by the jury at trial exceeding, and in no event less than, **$19,146,364.23** (reflecting a constitutionally conservative single-digit punitive-to-compensatory ratio of approximately 0.84:1 relative to the $22,793,594.63 net compensatory floor, in strict compliance with fifth and fourteenth amendment due process guarantees under *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003)); and

VI.i.ii. Allocating said punitive and exemplary damages across the categories of willful, wanton, malicious, oppressive, and reckless misconduct proven at trial-including no less than **$2,000,000.00** for unconstitutional solitary confinement and environmental deprivation, at least **$5,000,000.00** for deliberate medical and psychiatric abandonment and MAR/EHR falsification, no less than **$1,500,000.00** for First Amendment retaliation and failure to protect, at least **$2,000,000.00** for outgoing mail censorship, no less than **$500,000.00** for denominational religious exercise burdens, at least **$2,500,000.00** for racial and political custodial segregation, no less than **$2,000,000.00** for unlawful PREA segregation exceeding the 30-day ceiling, at least **$2,500,000.00** for bad-faith grievance spoliation and evidence tampering, no less than **$1,000,000.00** for post-release EHI blocking and fake SSN fabrication ("[redacted]"), at least **$50,000.00** for unconstitutional property confiscation, no less than **$250,000.00** for conversion of personal property, at least **$500,000.00** for visitation deprivations and full-shackle legal visitations, and no less than **$10,000,000.00** for extreme and outrageous infliction of emotional distress and captive vulnerable-adult abuse and neglect; and

VI.ii. **Aggregate Monetary Judgment Floor**: Entering an aggregate monetary judgment in favor of Plaintiff and against Defendants in a total combined amount to be determined at trial exceeding, and in no event less than, **$41,939,958.86** (comprising at least **$22,793,594.63** in net compensatory, economic, and statutory liquidated damages-or **$29,184,850.11** in cumulative compensatory damages-together with at least **$19,146,364.23** in punitive and exemplary damages).

## VII. CONTINUOUS PRE-JUDGMENT AND POST-JUDGMENT INTEREST, ATTORNEYS' FEES, AND TAXABLE COSTS (28 U.S.C. § 1961; 42 U.S.C. § 1988(B); D.C. CODE §§ 15-108, 15-109, 28-3302)

Award Plaintiff continuous pre-judgment and post-judgment interest, reasonable attorneys' and expert fees, and taxable costs of suit as follows:

VII.i. **Continuous Pre-Judgment Interest (D.C. Code §§ 15-108, 15-109, 28-3302(a)-(b) & Federal Equity)**:

VII.i.i. Awarding Plaintiff pre-judgment interest as an indispensable compensatory element of damages pursuant to D.C. Code §§ 15-108 and 15-109, D.C. Code § 28-3302(a)-(b), and federal common-law equity, accruing continuously from the earliest ascertainable date of each discrete constitutional deprivation, custodial remand (November 16, 2023), property conversion (May 8-10, 2024), or statutory violation ($t_{0,k}$) through the date of entry of final judgment ($t_J$); and

VII.i.ii. Computing said pre-judgment interest at the statutory rate of **six percent (6.00%) per annum** pursuant to D.C. Code § 28-3302(a) against Defendant Unity Health Care, Inc. and all individual-capacity Defendants, and at the maximum statutory rate of **four percent (4.00%) per annum** pursuant to D.C.

Code § 28-3302(b) against Defendant District of Columbia, compounded annually as authorized by equity to make Plaintiff whole;

VII.ii. **Continuous Post-Judgment Interest (28 U.S.C. § 1961(a)-(b) & D.C. Code § 28-3302(b)-(c))**:

VII.ii.i. Awarding Plaintiff mandatory post-judgment interest pursuant to 28 U.S.C. § 1961(a)-(b) at the statutory rate equal to the weekly average 1-year constant maturity Treasury yield as published by the Board of Governors of the Federal Reserve System (H.15 Selected Interest Rates, currently **4.44% per annum** as of the calendar week ending October 30, 2026), computed daily and compounded annually; and

VII.ii.ii. Ordering that post-judgment interest accrue continuously upon the aggregate judgment balance (inclusive of principal compensatory damages, statutory and treble awards, punitive damages, pre-judgment interest, attorneys' fees, and taxable costs, subject to the 4.00% per annum statutory ceiling of D.C. Code § 28-3302(b) solely on state-law judgment components enforced directly against the District of Columbia where applicable) from the date of entry of judgment until paid and satisfied in full;

VII.iii. **Reasonable Attorneys' Fees, *Laffey* Matrix Enhancements, Expert Witness Fees, and Non-Taxable Litigation Expenses**: Awarding Plaintiff all reasonable attorneys' fees (for any retained, *pro bono*, or court-appointed counsel entering appearances herein, calculated at current *Laffey* Matrix / Fitzpatrick Matrix rates pursuant to D.C. Code § 2-423.02(a)(3)(C)(ii)), expert witness and forensic consultant fees, and non-taxable litigation expenses pursuant to 42 U.S.C. § 1988(b), Title II of the Americans with Disabilities Act (42 U.S.C. § 12205), Section 504 of the Rehabilitation Act (29 U.S.C. § 794a), the District of Columbia Human Rights Act

(D.C. Code §§ 2-1403.13(a)(1)(E), 2-1403.16(f)), the District of Columbia Mental Health Information Act (D.C. Code § 7-1207.01(a)-(b)), the District of Columbia Consumer Protection Procedures Act (D.C. Code § 28-3905(k)(2)(B)), the Unjust Imprisonment Act (D.C. Code § 2-423.02(a)(3)(C)), and recoverable taxable costs under 28 U.S.C. § 1920; and

VII.iv. **Further Legal, Equitable, and Extraordinary Relief**: Granting Plaintiff such other, further, and additional legal, equitable, statutory, or extraordinary relief as this Court deems just, proper, necessary, and equitable to redress the injuries alleged and secure complete justice.

## ARTICLE VII. JURY DEMAND

Pursuant to the Seventh Amendment to the United States Constitution, Federal Rule of Civil Procedure 38(b), and District of Columbia Official Code § 7-1207.01(c), Plaintiff John Earle Sullivan hereby respectfully demands a trial by jury on all issues, claims, and causes of action triable of right by a jury.

## ARTICLE VIII. VERIFICATION UNDER 28 U.S.C. § 1746

I, John Earle Sullivan, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I am the Plaintiff in the above-captioned civil action; that I have read the foregoing Verified Complaint and know the contents thereof; that the factual allegations contained therein are true and correct based upon my own personal knowledge, except as to matters stated upon information and belief, and as to those matters, I believe them to be true under penalty of perjury.

Executed on November 9, 2026, in Erda, Utah.

Respectfully submitted,

John Earle Sullivan

**John Earle Sullivan**

Plaintiff Pro Se

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this November 09, 2026, a true and correct copy of the foregoing filing and accompanying documents was submitted for filing with the Clerk of the Court for the United States District Court for the District of Columbia. Because the Plaintiff is concurrently applying for Leave to Proceed *In Forma Pauperis* pursuant to 28 U.S.C. § 1915(a) and moving for Court-Directed Service by the United States Marshals Service pursuant to 28 U.S.C. § 1915(d) and Federal Rule of Civil Procedure 4(c)(3), formal personal service of process upon Defendants has not been executed and will be executed by the United States Marshals Service upon the Court's approval of the In Forma Pauperis application and issuance of summonses.

## SERVICE RECIPIENTS:

District of Columbia - Municipal Corporation Defendant
c/o Mayor of the District of Columbia, John A. Wilson Building, 1350 Pennsylvania Avenue NW, Suite 327, Washington, DC 20004; Office of the Attorney General for the District of Columbia, 400 6th Street NW, 10th Floor, Washington, DC 20001; D.C. Central Detention Facility, 1901 D Street SE, Washington, DC 20003
Tel: (202) 673-7316
Email: oag@dc.gov

Unity Health Care, Inc. - Corporate Healthcare Contractor Defendant
1100 New Jersey Avenue SE, Suite 500, Washington, DC 20003; D.C. Central Detention Facility Medical Unit, 1901 D Street SE, Washington, DC 20003
Tel: (202) 469-4699
Email: rpayne@unityhealthcare.org

Thomas N. Faust - Director, District of Columbia Department of Corrections
D.C. Department of Corrections Headquarters, 2000 14th Street NW, 7th Floor, Washington, DC 20009; D.C. Central Detention Facility, 1901 D Street SE, Washington, DC 20003
Tel: (202) 673-7316
Email: thomas.faust@dc.gov

Andrew Paul Mazzuchelli (Bar No. 7647430) - Deputy General Counsel and General Counsel, District of Columbia Department of Corrections
D.C. Department of Corrections Office of the General Counsel, 3924 Minnesota Avenue NE, 2nd Floor, Washington, DC 20019
Tel: (202) 671-2064
Email: andrew.mazzuchelli@dc.gov

Major Sheila T. Marr - Supervisory Correctional Officer / Major & Inmate Grievance Coordinator (Grade 13)
223 42nd Street NE, Washington, DC 20019; D.C. Central Detention Facility, 1901 D Street SE, Washington, DC 20003
Tel: (202) 523-7038
Email: sheila.marr@dc.gov

Anthony Brown Sr. - Supervisory Correctional Officer / Lieutenant (Unit SW-1)
Washington, DC Metropolitan Area; D.C. Central Detention Facility, 1901 D Street SE, Washington, DC 20003; Forestville, MD 20747
Tel: (202) 710-8754
Email: anthony.brown@dc.gov

Delonte Xavier Williams - Supervisory Correctional Officer / Lieutenant (Unit SW-1)
7640 Allendale Circle, Hyattsville, MD 20785; 3741 Donnell Drive, Apartment 203, Forestville, MD 20747; D.C. Central Detention Facility, 1901 D Street SE, Washington, DC 20003
Tel: (202) 560-9655
Email: delonte.williams@dc.gov

Cuthbert Denton - Correctional Program Specialist / Housing Unit Manager (Unit SW-1)
1830 Tiger Lily Cir #25, Woodbridge, VA 22192
Tel: (703) 475-3629
Email: nowsenditall2me@gmail.com

Christina Darnett Whitehead - Correctional Officer / Unit SW-1 Housing Manager (Grade 08)
310 Dateleaf Avenue, Capitol Heights, MD 20743; D.C. Central Detention Facility, 1901 D Street SE, Washington, DC 20003
Tel: (202) 673-7316
Email: christina.whitehead@dc.gov

Cortney Marquette Savage - Correctional Program Specialist / PREA Compliance Manager (Grade 11)
7355 Malcoms Ridge Place, La Plata, MD 20646; D.C. Central Detention Facility, 1901 D Street SE, Washington, DC 20003
Tel: (240) 346-6080
Email: cortney.savage@dc.gov

Anju Menon, M.D. - Psychiatrist / Behavioral Health Medical Provider (NPI 1346775498)
2001 Beacon Place, Reston, VA 20191; D.C. Central Detention Facility Medical Unit, 1901 D Street SE, Washington, DC 20003; Unity Health Care, Inc., 1100 New Jersey Avenue SE, Suite 500, Washington, DC 20003
Tel: (703) 268-5001
Email: amenon@unityhealthcare.org

Roderick I. Wellington, Ph.D., LCPC, NCC, CFC - Licensed Clinical Professional Counselor & Psychologist / Former Discipline Director of Behavioral Health (NPI 1336535319)
300 Morse Street NE, Apartment 1005, Washington, DC 20002; Maryland Parole Commission, 6776 Reisterstown Road, Suite 307, Baltimore, MD 21215; Landover Hills, MD 20784-2347; Kindness Mental Health Therapeutic Services (KMHTS), Largo, MD 20774; Bowie State University, 14000 Jericho Park Road, Bowie, MD 20715
Tel: (301) 577-3825
Email: roderick.wellington@maryland.gov

/s/ John Earle Sullivan

**John Earle Sullivan**

Plaintiff Pro Se